**STANDARD OIL COMPANY (INDIANA), Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

**PHILLIPS PETROLEUM COMPANY, Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

**E. I. du PONT de NEMOURS & COMPANY, Plaintiff,**

v.

**MONTEDISON, S.p.A., et al., Defendants.**

Civ. A. No. 4319.

United States District Court, D. Delaware.

Jan. 11, 1980.

Supplemental Opinion Feb. 28, 1980.

---

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, Del., for plaintiff, Standard Oil Co. (Indiana); John T. Kelton, Thomas V. Heyman, Maxim H. Waldbaum, William G. Todd of Watson, Leavenworth, Kelton & Taggart, Thomas F. Reddy, Jr., Gerald J. Flintoft, Stanton T. Lawrence, III, of Pennie & Edmonds, New York City, Arthur G. Gilkes, Ralph C. Medhurst, Chicago, Ill., of counsel.

C. Waggaman Berl, Jr., Wilmington, Del., for plaintiff, Phillips Petroleum Co.; Sidney Neuman, Harry J. Roper, Kenneth R. Adamo, George S. Bosy of Neuman, Williams, Anderson & Olson, Chicago, Ill., Donald J. Quigg, Bartlesville, Okl., of counsel.

Roger A. Hines, Wilmington, Del., for plaintiff, E. I. du Pont de Nemours & Co.;

Earl L. Handley, Francis A. Paintin, Wilmington, Del., of counsel.

Edmund D. Lyons of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant, Montedison, S.p.A., et al.; George B. Finnegan, Jr., Jerome G. Lee, Alfred P. Ewert, David H. Pfeffer, Stephen R. Smith, Richard C. Komson of Morgan, Finnegan, Pine, Foley & Lee, New York City, of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This case is an appeal under 35 U.S.C.A. § 146[1] from a Board of Patent Interferences ("Board") Opinion issued pursuant to 35 U.S.C.A. § 135.[2] That Opinion awarded Montedison, S.p.A. ("Montedison")[3] priority for the invention of solid crystalline polypropylene. Each plaintiff in this litigation, E. I. du Pont de Nemours & Co. ("Du Pont"), Standard Oil Company ("Standard"), and Phillips Petroleum Company ("Phillips"), seeks to invalidate Montedison's claim of priority by establishing that it produced the product prior to Montedison. Each also argues that it is entitled to the patent in its own right. In addition, Du Pont argues that Montedison's senior party

---

1. 35 U.S.C. § 146 provides:
 Civil action in case of interference.
 Any party to an interference dissatisfied with the decision of the board of patent interferences on the question of priority, may have remedy by civil action, if commenced within such time after such decision, not less than sixty days, as the Commissioner appoints or as provided in section 141 of this title, unless he has appealed to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided. In such suits the record in the Patent Office shall be admitted on motion of either party under the terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court imposes, without prejudice to the right of the parties to take further testimony. The testimony and exhibits of the record in the Patent Office when admitted shall have the same effect as if originally taken and produced in the suit.
 Such suit may be instituted against the party in interest as shown by the records of

the Patent Office at the time of the decision complained of, but any party in interest may become a party to the action.

2. In relevant part, 35 U.S.C.A. § 135 provides:
 Interferences.
 (a) Whenever an application is made for a patent which, in the opinion of the Commissioner, would interfere with any pending application, . . . he shall give notice thereof to the applicants . . . . The question of priority of invention shall be determined by a board of patent interferences (consisting of three examiners of interferences) whose decision, if adverse to the claim of an applicant, shall constitute the final refusal by the Patent Office of the claims involved, and the Commissioner may issue a patent to the applicant who is adjudged the prior inventor.

3. When Montedison first sought a patent for solid crystalline polypropylene it was known as Montecatini, S.p.A. Its name was changed when it merged with Societa Edison.

status should be vacated on the grounds of a possible discrepancy in inventorship in Montedison's applications, and Phillips premises a similar demand upon Montedison's alleged failure to teach the best mode of producing its invention. Montedison defends the Board's decision awarding it priority, claiming that none of the other parties ever completed the steps required for an actual or a constructive reduction to practice.

This case traces its history to the early 1950s. Prior to that time, polymer chemists did not know whether the manufacture of solid crystalline polypropylene was possible, much less how to make it. By 1957, however, at least five companies,[4] including the litigants herein, claimed to have polymerized solid crystalline polypropylene and were seeking patent coverage for their alleged discoveries.[5] On September 9, 1958, the Patent Office initiated this Interference to determine which applicant, if any, was entitled to receive the American patent rights to solid crystalline polypropylene.[6]

The Primary Examiner initially defined the Interference Count[7] as:

Normally solid polypropylene having a crystalline polypropylene component.

The parties immediately filed Patent Office Rule 231 Motions[8] in order to change the wording of this Count. The Primary Examiner finally decided these motions on June 14, 1962,[9] amending the Count to its present form:

Normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content.

Du Pont, Phillips, and Standard subsequently took extensive testimony which was completed by March 25, 1966.[10] Montedison was given until July 29, 1966 to complete its testimony.[11] Montedison proceeded to file ancillary proceedings seeking broad discovery under 35 U.S.C. § 24,[12] and the Patent Office suspended any further action pending resolution of these ancillary proceedings.[13] The Interference was resumed on May 12, 1969,[14] and Natta's testimony period was extended to December 8, 1969.[15] In April, 1970, the parties terminated their rebuttal testimony, having generated more than 800 pleading papers, deposed more

4. The fifth company was Hercules Powder Company, which claimed the benefit of U. S. Application 500,051, filed by Arthur J. Vanderberg on April 7, 1955. Hercules was initially invited to join this Interference. Interference Record, Paper No. 1. The Patent Office dismissed Hercules on January 31, 1964 for failing to claim a date prior to those claimed by the other parties. Interference Record, Paper No. 195.

5. Montedison claimed the benefit of American Application No. 514,099 filed by Guilio Natta, et al., on June 8, 1955. Du Pont, claimed the benefit of U. S. Application No. 556,548 filed by Warren Baxter, et al., on December 30, 1955. Standard claimed the benefit of U. S. Application No. 462,480 filed by Alex Zletz on October 15, 1954. Phillips claimed the benefit of U. S. Application No. 558,530 filed by John Paul Hogan, et al., on January 11, 1956. See Interference Record, Paper No. 1.

6. Interference Record, Paper No. 1.

7. Interference Record, Paper No. 132.

8. Patent Office Rule 231 now provides, in relevant part:
"Within the period set in the notice of interference for filing motions any party to an interference may file a motion seeking . . . .. To amend the issue by addition or substitution of new counts. Each such motion must contain an explanation as to why a count proposed to be added is necessary or why a count proposed to be substituted is preferable to the original count, must demonstrate patentability of the count to all parties and must apply the proposed count to all involved applications except an application in which the proposed count originated." 37 C.F.R. § 1.231 (July 1, 1979).

9. Interference Record, Paper Nos. 132 and 138.

10. Interference Record, Paper No. 263.

11. Interference Record, Paper No. 266.

12. The principal cases involving these discovery motions are reported in In re Natta, 388 F.2d 215 (3d Cir. 1968); Natta v. Zletz, 379 F.2d 615 (7th Cir. 1967); and Natta v. Hogan, 392 F.2d 686 (10th Cir. 1968).

13. Interference Record, Paper No. 314.

14. Interference Record, Paper No. 404.

15. Interference Record, Paper No. 460.

than 100 witnesses, and amassed more than 18,000 pages of testimony and over 1000 exhibits.[16]

The parties argued their cases for priority before the Board on October 28 and 29, 1970,[17] and on November 29, 1971 the Board released its 113 page Opinion awarding priority to Montedison.[18] The Board's Opinion was appealed in early 1972 by Du Pont,[19] Standard,[20] and Phillips.[21] These cases were consolidated in this Court on May 15, 1975.[22] On July 1, 1977, this Court approved and signed a 181 page Pre-Trial Order.[23] Trial followed, consuming eighty-five days between September 19, 1977 and May 17, 1978. The parties generated a transcript in excess of 14,000 pages and prepared about 4,600 exhibits, more than 500 pages of legal memoranda, and nearly 2,000 proposed Findings of Facts and Conclusions of Law, about which they have argued extensively during two rounds of briefing totalling more than 1,800 pages.

In considering the evidence, this Court has generally adhered to the well established rule that clear and convincing evidence must be adduced in order to justify overruling a determination of priority made by the Board. This rule was established by the Supreme Court in *Morgan v. Daniels* : [24]

> [W]here the question decided in the Patent Office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction.[25]

The *Morgan v. Daniels* rule, however, is not always applicable. If, for instance, it is established that "fraud and perjury have intervened to impeach the very foundation upon which the ruling of the Patent Office [was] based",[26] the Board's Opinion must be given less weight and may be overturned upon a showing that a mere preponderance of evidence supports an alternative finding.[27]

In this case, all three plaintiffs claim that Montedison acted fraudulently in misrepresenting or failing to supply relevant information to the Examiners. As explained below, this Court finds that Montedison committed fraud against Phillips but that the other fraud claims against Montedison are either inadmissible or without merit.[28]

16. Montedison's testimony is hereinafter cited as "Natta Record"; Du Pont's testimony is hereinafter cited as "Baxter Record"; Standard's testimony is hereinafter cited as "Zletz Record"; Phillips's testimony is hereinafter cited as "Hogan Record".

17. Interference Record, Paper No. 716.

18. Interference Record, Paper No. 738 [hereinafter cited as "Board's Opinion"]. After the Board awarded priority to Montedison, prosecution upon its application was reinitiated on March 21, 1972. Phillips's Trial Exhibit No. 945. Phillips's Trial Exhibits will hereinafter be cited by number with the prefix "P". Ten months later, U. S. Patent 3,715,344, P–945A, issued to Montedison.

19. Civil Action No. 4323. This case was initially filed here on January 27, 1971.

20. Civil Action No. 4647. This case was initially filed in the District of Columbia on January 26, 1971.

21. Civil Action No. 4321. This case was initially filed here on January 24, 1971.

22. Civil Action No. 4319, Pleading Paper No. 76.

23. Civil Action No. 4319, Pleading Paper No. 204.

24. 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1893).

25. *Id.*, p. 125, 14 S.Ct. p. 773.

26. *Laas v. Scott*, 161 F. 122, 124 (Cir.Ct. E.D. Wis.1908).

27. *See also Etten v. Lovell Mfg. Co.*, 225 F.2d 844 (3d Cir. 1955).

28. *See* Fraud Sections, *infra*.

Phillips therefore need only adduce a preponderance of evidence that it is entitled to a priority date different from that awarded by the Board, but since fraud did not impeach the very foundation of the Board's findings with regard to the other plaintiffs, this ruling does not apply to them. The remaining plaintiffs must still adduce clear and convincing evidence to overcome the Board's findings regarding their priority dates.

Applying these standards, this Court finds that Montedison is entitled to a June 8, 1954 priority date as determined by the Board. This Court also finds that Du Pont failed to adduce even a preponderance of the evidence that it is entitled to a priority date prior to the August 17, 1954 date awarded by the Board, and that Standard similarly failed to adduce even a preponderance of evidence showing that it is entitled to a priority date prior to the October 15, 1954 date awarded by the Board. These findings are therefore affirmed. This Court, however, reverses the Board's findings as to Phillips, since Phillips did adduce at least a preponderance of evidence demonstrating its entitlement to a priority date no later than January 27, 1953 instead of the January 11, 1956 priority date found by the Board. Since Phillips's date is senior to those of the other three parties, priority is awarded to Phillips.

## THE PRODUCT

The distinguishing characteristics of solid crystalline polypropylene are described by the single Count in Interference: (1) normally solid; (2) polypropylene, consisting essentially of recurring propylene units; (3) having a substantial crystalline polypropylene content.[29]

The first limitation requires that the product be *normally solid*. The term "solid" implies a substance of definite shape,[30] while "normally" is implied when scientists usually characterize a material as solid.[31]

The second limitation requires that the product be a *polypropylene consisting essentially of recurring propylene units*. "Polypropylene" is a substance made by polymerizing molecules of propylene.[32] Propylene molecules contain three carbon atoms (C) and six hydrogen atoms (H) arranged as a methylene group ($=CH_2$) connected by a double bond to a $=CH-$ group that is in turn connected by a single bond to a methyl group ($-CH_3$). This arrangement may be depicted as follows:

Figure 1[33]

In a polymerization reaction, one of the bonds constituting the double bond breaks and provides the propylene molecule with an extra bond with which it can attach itself to other molecules. Sometimes the polymerization is very orderly, resulting in the production of a polypropylene consisting of recurring propylene units:[34]

Figure 2[35]

This type of regular polymerization is known as head-to-tail polymerization or 1–2

---

29. Interference Record, Paper No. 132, p. 1.

30. Hackh's Chemical Dictionary 786 (3d Ed. 1944) [hereinafter cited as "Hackh's"].

31. *See* Interference Record, Paper No. 132, p. 5.

32. Hackh's Chemical Dictionary 535–36 (4th Ed. 1969).

33. P–1146. The carbon atoms were numbered 1, 2 and 3 following standard procedures of chemical nomenclature. *See* Weininger, Contemporary Organic Chemistry, 167–78 (1972).

34. Transcript (hereinafter cited as "Tr."), pp. 886–87, 7291, 7361–65, 7783.

35. P–1196.

addition.[36] Its essential feature is that the first (head) carbon atoms in every propylene molecule joins with another propylene molecule by binding to its second (tail) carbon atom. One noticeable result of this 1–2 addition is that none of the methylene groups are adjacent, but are isolated from each other; another is that the pendant methyl group are also isolated in that none of them "dangle" from adjacent carbon atoms.[37]

The Count's second limitation does not require that the polypropylene be composed *solely* of recurring propylene units. As set forth by the Examiners, "The presence of very small irregularities in the polymer chain, in an amount insufficient to effect the basic character of the composition, would not disqualify a polymer from falling within the scope of the substituted count . . . ."[38]

A useful approach to describe the regularity of this structure is comparison of the number of methylene and methyl groups. When propylene polymerizes in a perfectly recurring head-to-tail fashion, the ratio of these numbers is 1.0 because each recurring propylene unit contains one methylene group and one methyl group. A ratio significantly larger than 1.0 indicates that the polypropylene is not composed essentially of recurring propylene units but rather contains an impurity that causes an impermissibly large increase in the number of methylene groups relative to the number of dangling methyl groups.[39]

The third limitation requires that the polymer be *substantially crystalline.* The term "crystalline" describes a structure in which molecules of a substance are arranged in a well ordered array [40] known as a lattice.[41] "Crystalline" may be contrasted with the term "amorphous", which describes materials such as glass, liquid water, or air, whose molecules are not arranged in any particular order.[42] The term "substantial" is used in order to exclude solid polypropylenes containing no more than an "inconsequential amount of crystalline polypropylene".[43]

Whether a product complies with the limitations of the Count may be ascertained by comparing certain of its properties with those of solid crystalline polypropylene. The product of the Count is generally a non-tacky, i. e. non-sticky,[44] solid. It is insoluble in pentane and weaker organic solvents.[45] When a sample of polypropylene is only slightly crystalline, it melts at about 230°F. (110°C.), and its density is 0.88 grams per cubic centimeter (g./cm.$^3$); when a sample is very crystalline, it melts at about 347°F. (175°C.), and its density is 0.95 g./cm.$^3$.[46] In contrast, amorphous polypropylene is soluble in pentane and weaker organic solvents, its density is 0.85 g./cm.$^3$, and it softens at 167°F. (75°C.).[47]

The most reliable techniques for determining that a product is solid crystalline polypropylene are infrared and x-ray analysis. Molecular units vibrate when exposed to characteristic wavelengths of infrared

**36.** *Weininger, supra* note 33 at p. 219.

**37.** Pendant methyls can dangle below or stick up from the polymer's main chain. When they all take the same position in polypropylene, the polymer is said to be "isotactic". *Id.*

**38.** Interference Record, Paper No. 132, pp. 3–4.

**39.** Montedison's Trial Exhibit No. 1261. Montedison's Trial Exhibits will hereinafter be cited by number with the prefix "M".

**40.** Hackh's *supra* note 30 at pp. 235–38. A general discussion of crystalline materials may be found in Verhoek, Chemistry 291–311 (1968).

**41.** Hackh's, *supra* note 30 at p. 790.

**42.** Hackh's, *supra* note 30 at p. 50.

**43.** Interference Record, Paper No. 132, p. 4.

**44.** Hackh's, *supra* note 30, at p. 828.

**45.** *See* M–957, p. 216.

**46.** *Id.*, p. 221.

**47.** *See* M–957, p. 9.

radiation, and in so doing, they absorb the infrared radiation. In infrared analysis, the amount of radiation absorbed by a sample at various wavelengths is measured, and a scan, or chart, plotting absorbances against wavelength is prepared. The molecular structure of the product may then be determined by examining the location and quantity of the absorption.[48]

Crystalline polypropylene typically absorbs infrared radiation in the bands or ranges near 7.25, 8.6, 10.03, 10.27, and 11.85 microns, and does not absorb infrared radiation at 13.7 and 13.9 microns.[49] Absorbance at 7.25, 8.6 and 10.27 microns and the lack of absorbance at 8.9 and 13.7 and 13.9 microns indicates the presence of recurring propylene units; absorbance at 7.25 microns specifically indicates the presence of dangling methyl groups.[50] It is evident that these methyl groups are isolated when there is absorbance at 8.6 and 10.27 microns.[51] Methylene group isolation is shown by a lack of absorbance at 13.7 and 13.9 microns.[52] Crystallinity is indicated by absorbance at 10.03 and 11.85 microns.[53]

The other significant technique for identifying crystalline polypropylene is x-ray diffraction. Molecules bend or diffract x-rays. When an amorphous material is exposed to x-rays, the random molecular arrangement produces a random diffraction pattern. In contrast, the well-ordered molecules of a crystalline material produce a distinct and identifiable x-ray diffraction pattern that may be recorded as a picture or as a scan in which the x-ray intensity is plotted at various angles of incidence.[54] It is thus possible to determine whether a material is amorphous or crystalline. The material's chemical constituency is also indicated if the diffraction pattern is similar to one previously prepared for a known sample.[55]

The parties to this litigation generally practiced remarkably similar techniques in producing their respective products. Each party mounted compounds of metals, the working part of the catalyst, upon catalytic supports containing silica and alumina. The catalyst was "activated" by heating it to 800°F. (425°C.) to 1000°F. (540°C.) for at least several hours under an atmosphere of dried gas, usually air. The catalyst was cooled and stored for the actual polymerization experiment.

Each party placed the catalyst in one of three principle types of reactor: stirred autoclave, shaker autoclave, or fixed bed.[56] A stirred autoclave consists of a closed container with a mixing blade or stirrer, into which chemicals may be admitted. A shaker autoclave is similar, but is agitated by shaking as opposed to stirring. The fixed bed reactor consists of a container in which the catalyst is packed in a column, reactants

---

**48.** *Weininger, supra* note 33 at 33–41.

**49.** Tr., pp. 2666, 9110–11. Some scientists in this trial claimed that these bands appeared at slightly different wavelengths, i. e. 10.3 microns as opposed to 10.27 microns. This Court has therefore only indicated that the bands appear "near" the listed wavelengths.

**50.** Tr., p. 9110.

**51.** *Id.,* pp. 9110–11.

**52.** Zletz Record, *supra* note 16, p. 4001.

**53.** *Id.,* p. 4000. It is possible, through infrared analysis, to calculate the relative amounts of various structures that are present in a molecule. This is done by choosing a peak as a proxy for each structure that is to be compared. Total absorbance at each peak is then divided by the amount of infrared radiation absorbed by each such structure, and the resulting values are then compared. For example, a hypothetical scan shows four units of absorbance at 10 microns caused by the presence of X structure and six units of absorbance at 13 microns caused by Y structure, and it is known that X structure normally absorbs one unit of infrared radiation and Y structure three. It is possible to calculate that the compound contains twice as much X as Y structure:

$$\frac{X}{Y} = \frac{4}{1} \div \frac{6}{3} = 2 .$$

*See e. g.,* text accompanying note 181, *infra.*

**54.** Verhoek, *supra* note 40 at 291–95; P–144.

**55.** Tr., pp. 2878, 6832–22, 9423 and 9678.

**56.** P–1081.

are admitted at the bottom of the reactor, and agitation is achieved by upward flow of the materials through the catalyst, with the finished product being removed from the top of the reactor.

Reactions were generally run for two to ten hours or more at elevated temperatures and pressures.[57] Propylene was admitted to the reactor along with a hydrocarbon solvent known as a "diluent". When the run was completed each party removed the diluent and product from the reactor and washed any remaining polymer from the catalyst with a hydrocarbon solvent. The diluent and wash solvent were then separated from the crude polymer. Finally, the crude polymer was usually fractionated, or purified, by dissolving any impurities in a variety of organic solvents. The parties claim that the remaining residue was the product of the Count.

## THE LAW OF PRIORITY

■ A priority date may be established by proving either an actual or a constructive reduction to practice.[58] In the former case, one looks to the adequacy of the inventors' experiments, while in the latter case, one looks to the adequacy of the application as filed in the Patent Office.

*Actual Reduction To Practice.*

■ Three elements must be proven in order to establish that a product has been actually reduced to practice:[59] (1) Production of a composition of matter satisfying

the limitations of the Count; (2) Recognition of the composition of matter; and (3) Recognition of a specific practical utility for the composition.[60]

■ The production requirement may be satisfied by proving that a product was produced and that it meets the limitations of the Count. The results of subsequent (*nunc pro tunc*) testing are admissible for this purpose.[61] This proposition is most clearly supported by *Silvestri v. Grant,*[62] where the junior party, Silvestri, sought to prove that he had made the invention, a new form of ampicillin, prior to the filing date of the senior party. The junior party introduced the expert testimony of Bomstein who, subsequent to Silvestri's work, examined an infrared scan made from the two parties' products and concluded they were identical. The Court of Customs and Patent Appeals (C.C.P.A.) noted:

[T]he board was critical of Bomstein's testimony on the ground that it came after the issue of [the senior's party's] patent. That criticism would, of course, be relevant if the testimony were relied on to show that Silvestri had appreciated in 1962 that a new form of ampicillin had been made. However, Bomstein's testimony is used only to establish that Silvestri had *obtained* the new form of ampicillin before December 26, 1962. Accordingly, we accept this testimony as establishing that the ampicillin obtained by Silvestri and that of the count have the same spectrograph.[63]

---

57. Pressure is usually reported in units of pounds per square inch (psi) or pounds per square inch gauge (psig). Psig is converted to psi by adding 14.7. In this litigation, unless a scientist specifically indicated that measurements had been made in psig, the Court has assumed that psi was employed. Since none of the parties have claimed that small pressure changes were significant to their ultimate results, the Court believes that the error, if any, of this assumption is insignificant.

58. Chisum, Patents §§ 10.05, 10.06 (1979).

59. Patent law generally distinguishes between patents for products and processes. *Cf., Chisum, supra* note 58 at §§ 1.02–1.03. The in-

stant case involves a product patent, so this Court has limited its discussion to that field.

60. *Meitzner v. Corte,* 537 F.2d 524, 528 (Cust. & Pat.App.1976).

61. The Board refused to consider *nunc pro tunc* evidence in its Opinion in this case. Its Opinion was rendered, however, without the benefit of the cases cited herein.

62. 496 F.2d 593 (Cust. & Pat.App.1974). *See also Langer v. Kaufman,* 465 F.2d 915, 59 CCPA 1261 (1972); *Heard v. Burton,* 333 F.2d 239 (Cust. & Pat.App.1964); *Gianladis v. Kass,* 324 F.2d 322, 51 CCPA 753 (1963); *Searle v. Glarum,* 179 F.2d 974, 37 CCPA 896 (1950).

63. 496 F.2d 598.

Following this precedent, this Court's analysis will include examination of *nunc pro tunc* evidence in determining whether a party obtained the product.

The Board erred in the application of standards to the second requirement of an actual reduction to practice, recognition of the new product. In effect, the Board required that applicants recognize and describe their products' new features using the precise language of the Count.[64] This holding conflicts with case law precedent, and despite the arguments advanced by Montedison[65] and Standard,[66] the Court finds that such *in haec verba* recognition and description is unnecessary. In *Heard v. Burton*,[67] the junior party, Heard, sought to establish an actual reduction to practice for the invention of a process using a catalyst comprising platinum on eta-alumina prior to the senior party's filing date. The Board held against Heard, finding that he had failed to recognize the catalyst by name. The court of Customs and Patent Appeals affirmed the Board's ultimate disposition, but in so doing noted that *in haec verba* recognition was unnecessary:

> We agree with appellant that it is irrelevant that Heard never referred to or appreciated the support material to be *eta* -alumina or to contain *eta* -alumina *by that name*. Nor do we interpret the board's opinion as so requiring. However, we consider it fatal to appellant's case that not until after appellees' filing date did Heard recognize that his "ammonia-aged" catalyst, as appellees put it, *"contained any different form of alumina at all* !"

We point out, as does appellees' brief, that the count calls for a *particular* form of alumina and we think that appellant's failure to recognize that he had produced a new form, regardless of what he called it, is indicative that he never conceived the invention prior to appellees' filing date. (emphasis in original)[68]

Later, the C.C.P.A. reiterated this position in *Silvestri, supra*, stating:

> This standard does not require that Silvestri establish that he recognized the invention in the same *terms* as those recited in the count. The invention is not the *language* of the count but the subject matter thereby defined.

> Silvestri must establish that he recognized and appreciated *as a new form*, a compound corresponding to the compound defined by the count. (emphasis in original)[69]

Du Pont interprets *Heard v. Burton* as requiring that a party not only recognize that his product is new, but that he also appreciate enough about the product to justify the conclusion that it corresponds to the Count.[70] Phillips, on the other hand, argues that it is sufficient if an inventor merely recognize that the product, which happens to correspond to the Count, is a new form of matter.[71]

The C.C.P.A. has opted for the former test, and it is adopted here. In *Meitzner v. Corte*,[72] two years after *Silvestri*, the junior party, Meitzner, sought to establish an actual reduction to practice of a cation exchange resin described by the Count as having a "spongy structure" permeable to liq-

---

**64.** *See* note 136, *infra*.

**65.** Montedison's Main Brief After Trial, p. 13 [hereinafter cited as "Montedison's Brief"]; Montedison's Reply Brief After Trial, pp. 7, 10 [hereinafter cited as "Montedison's Reply Brief"].

**66.** Reply Brief of Plaintiff Standard Oil Company (Indiana) With Respect To Priority, p. 67 [hereinafter cited as "Standard's Priority Reply Brief"].

**67.** 333 F.2d 239, 51 CCPA 1502 (1964).

**68.** *Id.*, p. 243.

**69.** 496 F.2d 599.

**70.** Opening Brief on Behalf of Plaintiff Du Pont, p. 52 [hereinafter cited as "Du Pont's Brief"].

**71.** Phillips's Law Memorandum, pp. 9, 12.

**72.** 537 F.2d 524 (Cust. & Pat.App.1976).

uids. The C.C.P.A. held that, although Meitzner failed to mention the limitation "spongy", he would satisfy the recognition requirement if he appreciated both that his product was new and that it had the "outward manifestations or characteristics" [73] of sponginess. Meitzner was therefore able to satisfy the recognition requirement without mentioning "sponginess" by proving that he appreciated that the product had: "(1) a milky, opaque to non-transparently white appearance, (2) resistance . . . to destruction upon subsequent chemical reaction, including saponification or sulfonation, and (3) the high chemical reactivity . . relative to the corresponding resins having a gel-type structure which are produced without the addition of the organic liquid." [74]

■ Following *Meitzner v. Corte*, then, this Court holds that in order to prove adequate recognition of solid crystalline polypropylene for an actual reduction to practice, an inventor need only recognize the newness of the product and appreciate enough about the outward manifestations of solidity, recurring propylene units, and crystallinity to justify the conclusion that the product falls within the Count.

■ The utility requirement is satisfied when an inventor has learned enough about the product to justify the conclusion that it is useful for a specific purpose. It is possible for an inventor to justify this conclusion by likening the invention to known compounds of demonstrated utility. In *Ciric v. Flanigan*,[75] when an inventor sought a patent for an ion-exchanger, the C.C.P.A. considered the fact that the invention was a form of zeolite, the ion-exchanging and absorptive properties of which were widely known and appreciated. Similarly, in *Sil-*

*vestri v. Grant* [76] an inventor sought a patent for a new form of ampicillin which could be stored longer than older forms, and the C.C.P.A. weighed the fact that the new form was recognized as being very similar to the old form whose utility had been well established.

Significant bench testing has generally been required to the extent that it is necessary to establish the essential properties of the product relevant to utility. For example, the C.C.P.A. required that utility for a thermal insulating foam be based on tests establishing thermal conductivity, density, and compressive strength; [77] utility for an organic photoconductor was based upon three standard tests for photoconductivity; [78] and utility for an explosive was based upon its ability to explode.[79]

This testing need only be sufficient to establish recognition of the most important properties; extensive testing of every detail of the product is not necessary. In *Steinberg v. Seitz*,[80] for example, the Board found that utility for a device for measuring blood clotting rates had been established by positive results in two coagulation rate tests. Upon appeal, the appellants argued that the Board should have required further testing including testing on a larger number of samples, especially blood samples from abnormal individuals, statistical reporting of the results, and comparison of the results with those obtained by the prior art method. In upholding the Board's decision, the C.C.P.A. stated: "We have considered these arguments, but are convinced that they are untenable. The testing which appellants contend is necessary, we believe, would be necessary for commercial refinement of the [product], but not for establishing actual reduction to practice." [81]

73. *Id.*, p. 529.

74. 537 F.2d 529 (Cust. & Pat.App.1976).

75. 511 F.2d 1182 (Cust. & Pat.App.1975).

76. 496 F.2d 593 (Cust. & Pat.App.1974).

77. *Voisinet v. Coglianese*, 455 F.2d 1064, 59 CCPA 958 (1972).

78. *Mattor v. Coolegem*, 530 F.2d 1391 (Cust. & Pat.App.1976).

79. *Hradel v. Griffith*, 367 F.2d 851, 54 CCPA 911 (1966).

80. 517 F.2d 1359 (Cust. & Pat.App.1975).

81. *Id.*, p. 1363.

This position was reiterated in *Cochran v. Kresock*,[82] where the invention, a circuit for improving flesh tones in color television reception, was tested by connecting it to a color television set and observing the quality of the flesh tones. The C.C.P.A. held: "Appellant would appear to require a testing of the [product] for reliability, over a period of time, under adverse conditions. While such testing may be desirable before the circuit could be commercially introduced, such extensive testing is not required for a reduction to practice."[83]

The C.C.P.A. addressed the utility question as applied to polymer compositions in *Anderson v. Natta*.[84] In that case, Du Pont sought to rely upon the work of Anderson and Baxter, who are also involved in this case, to justify the conclusion that various plastic polymers, including polypropylene, had utility as plastic films. Du Pont claimed that manual manipulation of its product showed that it was tough, self-supporting, and flexible, and that its product had been pressed into a film suitable for infrared testing. Finally, Du Pont cited the ensuing infrared analysis and density and viscosity determinations as showing utility. The C.C.P.A. held that although these tests were relevant to the identification of the product as meeting the limitations of the Count, they were not sufficiently directed to ascertaining the utility of the product. Such rudimentary observations were especially insufficient in the absence of standard testing for strength.

In the instant case, Standard, Phillips, and Montedison all introduced evidence concerning the additional testing necessary to justify the conclusion that a polymer had utility as a solid plastic.[85] Standard's Dr. Herman Mark testified that such utility could be proven if the testing cited in *Anderson v. Natta* were supplemented by further testing showing that a polymer was insoluble in xylene and that it was crystalline.[86]

Phillips's Dr. Thomas Fox testified that solid plastics were used principally for making molded articles[87] and that in order to conclude that a material was useful for making molded articles

> [Y]ou would have to know that the material is capable of being molded. You would have to know that it is going to be thermally stable [i. e. would not decompose] at the temperatures you would use to mold it.[88] You would have to know that it is at the use temperature a rigid, high [Young's] modulus. . . .[89]

> [Y]ou should know that you have a high molecular weight polymer[90] because very low molecular weight polymers are very often low in tensile strength, and high molecular weight polymers are in general not low in tensile strength.[91]

Montedison offered Dr. Cecil Bawn and Dr. Frank Reinhart to establish a standard for utility recognition. Bawn agreed with Fox that utility testing should include the determination of the thermal stability[92]

82. 530 F.2d 385 (Cust. & Pat.App.1976).

83. *Id.*, p. 391.

84. 480 F.2d 1392 (Cust. & Pat.App.1973).

85. Phillips also claims utility for the product as a wax modifier. Since Phillips is the only party claiming this utility, discussion of the testing required appears in the section of this Opinion concerning Phillips's actual reduction to practice.

86. Tr., pp. 7072–73.

87. *Id.*, pp. 3891–92.

88. Tr., pp. 1097–98. Later testimony established that the molding temperature of a material is approximately fifty degrees above its melting point. Tr., p. 3148.

89. The Young's modulus is "the force that [is required for] permanently deform[ing] a material by stretching, bending or twisting". *Hackh's, supra* note 30 at 919; Tr., p. 771.

90. Fox testified that a satisfactorily high molecular weight was indicated by viscosity measurements in the range of 0.1 to 3.0. Tr., p. 880.

91. *Id.*, pp. 1097–98.

92. *Id.*, p. 3148.

and Young's modulus,[93] but went further and insisted that it was also necessary to determine that the material "is not cracking up in the mold, . . . [that] it flows easily, . . . [that] the parts coming out are not too brittle. One has to experiment in a mold, is what it comes to, before one can say it can be molded successfully."[94] In addition, impact strength measurements are necessary.[95] If the material were to be used as a fiber, it would have to be tested for reaction to sunlight, washing, and sweat; if it were to be used as a film, it would have to be tested for wearability, tearability, flexibility and brittleness; and, if it were to be used for packaging, toxicity would have to be determined. These opinions of the required extent of testing were supported by Reinhart.[96]

The Court finds that Fox's tests are most closely related to determination of the properties relevant to the utility of a solid plastic because they measure the ability of the plastic to be molded and to retain a molded shape. As the subsequent discussion shows, both of Mark's additional tests, like the infrared analysis in *Anderson v. Natta, supra*, were standard practice for separating and identifying a polymerization product. If these tests are adopted as sufficient to show utility, the utility requirement would melt into the production and recognition requirements. Since the Supreme Court has carefully stated that utility is a distinct requirement of a reduction to practice,[97] this Court rejects Standard's proposed tests.

The extensive tests proposed by Bawn and Reinhart, on the other hand, are overly rigorous. The more than fifteen tests suggested by these witnesses go beyond establishing utility as a solid plastic and extend to the feasibility of commercial production. A fabric that reacts favorably to human

sweat, for example, might sell better than one that does not. There could, nevertheless, still be plenty of uses, such as drapery, carpeting, window shades, or insulation, to which a fiber may be put where its reaction to human sweat is unimportant. Similarly, a plastic that readily cracks during sudden cooling after molding may be difficult to work with, but it is possible that the cooling process could be modified to avoid the negative effects. This Court therefore rejects the idea that patentable utility can be found only by following the extensive testing program proposed by Bawn and Reinhart and holds that utility of a solid plastic may be demonstrated by the successful completion of the tests proposed by Fox.

*Constructive Reduction To Practice.*

■ A constructive reduction to practice is established as of the date that an inventor files an application complying with 35 U.S.C. § 112. Section 112 provides in part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The requirements of a constructive reduction to practice are thus description of (1) the product; (2) a process for making it, such process being the best mode known to the inventors; and (3) the product's utility.

■ The requirement that the product be described is of course adequately satisfied by an application that describes the product in the same words as those used in the Count.[98] The Board apparently believed that such an *in haec verba* description was

93. *Id.*, p. 3139.

94. *Id.*, p. 3148.

95. *Id.*, pp. 3141–42.

96. *Id.*, pp. 7887–7938.

97. *Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

98. *Application of Smith*, 481 F.2d 910 (Cust. & Pat.App.1973).

absolutely necessary.[99] Since the Board's Opinion, however, the C.C.P.A. has ruled that patent entitlement is based on scientific skill and diligence and not on the ability to manipulate English synonyms. An application will thus contain an adequate description of the product if:

> [T]he language which *is* contained in the [original] application is the legal equivalent of the [Count] language, in the sense that the '*necessary and only reasonable* construction to be given the disclosure [in the original application] by one skilled in the art' . . . is the same as the construction which such person would give the language in the claims of the later [Count]. (emphasis in original) [100]

Legal equivalence, or inherency, may be established either by the direct meaning of the language or by inferences drawn from the terms of the initial disclosure.[101] Legal equivalence may also be proven by the use of circumstantial evidence showing successful experiments reproducing the initial application. The instant case raises the issue of what constitutes a successful reproduction experiment. Montedison and Standard [102] insist that the law requires that the product of the Count be "invariably" obtained in every attempted reproduction:

> [I]nherency 'may not be established by probabilities and possibilities.' It 'is not sufficient that a person following the disclosure might obtain the result set forth in the count; it must *invariably* happen.' *Stamicarbon N. V. v. Chemical Constr. Corp.*, 544 F.2d 645, 652 (3d Cir. 1976).

Inherency does not mean that a thing might be done or that it might happen, as in the instant case, one out of twenty odd times; but it must be disclosed, if inherency is claimed, that the thing will *necessarily* happen. . . . *Application of Draeger*, 150 F.2d 572, 574 [32 CCPA 1217] (C.C.P.A.1954).[103]

The weakness of these arguments is that the *Stamicarbon* and *Draeger* cases upon which they rely involved process patents. In a process patent case, the application must disclose a functioning process. If the process is ineffectual, the disclosure must be inadequate. Therefore the process must work every time. In a product patent case, however, the only claim is that when the disclosed process produces a product with certain specified characteristics, that product invariably falls within the Count. The fact that the process might also produce other non-conforming products is not relevant. In *Application of Nathan*,[104] for instance, the applicant sought a patent upon steroids containing fluorine or chlorine substituents bound in a specific geometrical array known as "alpha orientation". The question was whether the original application, which failed to verbalize specifically the geometrical orientation of the fluorine or chlorine substituent, inherently specified it. The C.C.P.A. found adequate description despite the fact that the applicant did not submit any evidence that the disclosed process always and inevitably produced the required product. Rather, all the evidence was directed to showing the similarities between any resulting product that complied with the disclosure and the product described by the Count.[105]

---

99. The Board rejected Phillips's 1953 application for failing to describe "a normally solid polypropylene *consisting essentially of recurring propylene units* or having a *substantial crystalline polypropylene content*." (emphasis in original). Board's Opinion, *supra* note 18 at p. 41.

100. *Wagoner v. Barger*, 463 F.2d 1377, 1380, 59 CCPA 1213 (1972).

101. *Spero v. Ringold*, 377 F.2d 652, 54 CCPA 1407 (1967).

102. Post Trial Brief of Plaintiff Standard Oil Company (Indiana) With Respect to Priority, pp. 163–64 [hereinafter cited as "Standard's Priority Brief"].

103. Montedison's Brief, *supra* note 65, at p. 30.

104. 328 F.2d 1005, 51 CCPA 1059 (1964).

105. *See also Spero v. Ringold*, 377 F.2d 652, 54 CCPA 1407 (1967); *In re Magerlein*, 346 F.2d 609, 52 CCPA 1637 (1965).

 The requirement that the best mode of production of the invention be described is satisfied when the specification is sufficient to guide one skilled in the art to its successful application.[106] The specification need not be as detailed as a "production specification".[107] Rather, an enabling disclosure may presume the knowledge that was commonly known in the art at the time the application was filed.[108] Moreover, an enabling disclosure may require its readers to engage in reasonable experimentation.[109] An inventor must nevertheless disclose the best production method then known to the applicant. The purpose behind this requirement is "to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived."[110] A best mode attack on a patent will fail unless it is proven that the applicant intentionally concealed his knowledge.[111] It will also fail if the best mode, although not expressly disclosed in the application, is generally known to persons skilled in the art.[112]

The requirement that the product's utility be described is mandated by case law. In *Brenner v. Manson*,[113] Manson filed a patent application for a process for producing a known chemical compound whose utility was unknown. The Patent Examiner rejected Manson's application for failing to disclose any utility and was ultimately affirmed by the Supreme Court. Although the case involved the adequacy of the applicant's § 112 disclosure, the Court implicitly assumed that 35 U.S.C. § 112 incorporated 35 U.S.C. § 101,[114] which requires that patentable inventions be useful.

The Court of Customs and Patent Appeals subsequently rearticulated this interpretation of § 112 in *Application of Kirk*,[115] noting: "[S]urely Congress intended § 112 to presuppose *full satisfaction* of the requirements of § 101. Necessarily, compliance with § 112 requires a description of how to use presently useful inventions, otherwise an applicant would anomalously be required to teach how to use a useless invention."[116]

 Section 112 thus requires that an application for a constructive reduction to practice disclose a specific purpose for which the invention may be used. This requirement may be met either by including utility statements within the application[117] or by introducing evidence that the reported properties of the invention were sufficient to justify the conclusion that the material was useful for a specific purpose.[118] In the instant case, the adequacy of utility disclosure for a constructive reduction to

---

**106.** *Minerals Separation, Ltd. v. Hyde*, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916).

**107.** *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir. 1972).

**108.** *Application of Glass*, 492 F.2d 1228 (Cust. & Pat.App.1974).

**109.** *Lever Bros. Co. v. Proctor & Gamble Mfg. Co.*, 139 F.2d 633 (4th Cir. 1943); *Franc-Strohmenger & Cowan, Inc. v. Arthur Siegman, Inc.*, 27 F.2d 785 (2d Cir. 1928).

**110.** *Application of Gay*, 309 F.2d 769, 50 CCPA 725 (1962).

**111.** *Chisum, supra* note 58, at § 7.05(1).

**112.** *Application of Gay*, 309 F.2d 769, 50 CCPA 725; *Chisum, supra* note 58, at § 7.05(3).

**113.** 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1965).

**114.** 35 U.S.C. § 101 provides:
"Whoever invents or discovers any new or useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

**115.** 376 F.2d 936, 942, 54 CCPA 1119 (1967).

**116.** *See also Application of Joly*, 376 F.2d 906, 54 CCPA 1159 (1967); *Application of Gardner*, 475 F.2d 1389 (Cust. & Pat.App.1973); *Yasuko Kawai v. Metlesics*, 480 F.2d 880 (Cust. & Pat. App.1973).

**117.** *Application of Gardner*, 475 F.2d 1389 (Cust. & Pat.App.1973).

**118.** *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, 304 F.Supp. 357 (S.D.N.Y.1969).

practice only arose in the context of Phillips's application, which disclosed that its polymer was useful as a solid plastic as well as other information allegedly supporting this statement. Phillips's statement alone might be sufficient to disclose a utility. Alternatively, the utility requirement may be satisfied by disclosing sufficient information concerning the product's Young's modulus, thermal stability, and molecular weight.

## MONTEDISON'S PRIORITY CASE

Montedison claims two priority dates for a constructive reduction to practice: June 8, 1954 and July 27, 1954.[119] Although Montedison's application for a patent for solid crystalline polypropylene was not filed in the United States until June 8, 1955,[120] Montedison seeks the benefit of the 1954 dates when it filed applications for the same product in Italy. This relation back of the priority date of an American filing to the date of a foreign application is provided by 35 U.S.C. § 119:

> An application for patent for an invention filed in this country by any person who has . . . previously regularly filed an application for a patent for the same invention in a foreign country . . shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest

date on which such foreign application was filed; . . . .

The Board found that Montedison had fully complied with the requirements of § 119 and awarded it the senior priority date of June 8, 1954.[121] Du Pont and Phillips attack this award. This Court finds that the challenges lack merit and affirms the Board's Opinion.

### Inventorship.

Du Pont first argues that the American application does not comply with the requirement in 35 U.S.C. § 111 that the "[a]pplication for patent shall be made by the inventor" because it lists Giorgio Mazzanti, Roberto Pino and Guilio Natta as joint inventors. Du Pont claims that Natta was the sole inventor and that the inclusion of the other names renders the application invalid.[122] Du Pont presented a similar argument to the Board[123] where it was rejected after extensive consideration of the facts.[124] A review of the record fails to disclose any reason to disagree with the Board that Natta, Mazzanti, and Pino were the joint inventors.

■ If Montedison did mistakenly join Pino and Mazzanti as inventors, the remedy would not be the automatic invalidation of its patent as Du Pont contends,[125] but rather Montedison would be afforded the opportunity to amend under 35 U.S.C. § 256, which provides:

> Whenever a patent is issued on the application of persons as joint inventors and it

---

**119.** Montedison's Brief, *supra* note 65, at pp. 5, 11.

**120.** U.S. Patent Application No. 514,099.

**121.** Board's Opinion, *supra* note 18, at p. 30.

**122.** Du Pont's Brief, *supra* note 70, at p. 86.

**123.** Board's Opinion, *supra* note 18, at p. 6.

**124.** *Id.*, pp. 6–31. The Board held in relevant part:

"It is our conclusion that the record presented clearly establishes that the inven-

tion of the count which is described in Italian application U-59 was, in fact, the joint invention of Natta, Pino and Mazzanti.

We [therefore] conclude that Italian application U-59 filed on June 8, 1954 was filed by Montecatini as assignee of Natta, Pino and Mazzanti, the joint inventors of the invention described in that application . . .. We hold, therefore, that Natta et al. are entitled to the date of June 8, 1954 for conception and constructive reduction to practice."

**125.** Du Pont's Brief, *supra* note 70, at pp. 104–107.

appears that one of such persons was not in fact a joint inventor, and that he–was included as a joint inventor by error and without any deceptive intention, the Commissioner may . . . issue a certificate deleting the name of the erroneously joined person from the patent.[126]

The policy behind this provision is to make the amendment remedy widely available.[127] Only when errors in inventorship are intentional or fraudulent will such amendment be disallowed.[128] Du Pont has failed to adduce evidence that Montedison intentionally or fraudulently misjoined Mazzanti and Pino as inventors.

Du Pont argues that Montedison can no longer avail itself of this amendatory provision because it did not exercise the necessary diligence in seeking to amend its application. According to Du Pont, the fact that Montedison has tolerated the allegedly erroneous listing for more than twenty years indicates a lack of diligence.[129] Montedison has however exercised the necessary diligence. Soon after filing Montedison's American application, Harry A. Toulmin, Montedison's American patent counsel, investigated the inventorship three times and concluded that Montedison's application correctly identified the investors.[130] Toulmin's finding was affirmed by the Opinion of the board in 1971. Montedison has therefore had no reason to seek to amend its application since that time.

*Best Mode*

Phillips also attacks Montedison's June 8, 1954 constructive reduction to practice date, claiming that the American application does not disclose the "best mode contemplated by the inventor of carrying out his invention" as required by 35 U.S.C. § 112.[131] Phillips concedes that Montedison's Italian applications disclosed the best mode known as of their filing dates, but contends that by 1955, when Montedison filed its American patent application, it had discovered a better catalyst. Specifically, Phillips argues that Montedison had discovered that the titanium tetrachloride (TiCl$_4$) catalyst disclosed in 1954 was inferior to a titanium trichloride (TiCl$_3$) catalyst and that Montedison's American patent application should have disclosed this improvement.

It is well established that "the critical date with regard to disclosing the best mode contemplated is the date of the filing of the application".[132] The question in this case is *which* date is critical in a § 119 setting: that of the United States filing, or that of the prior foreign filing. Phillips claims that compliance with the best mode requirement of § 112 is to be measured by the date of filing of the American application, and that Montedison's failure to disclose the TiCl$_3$ method in this application constitutes non-compliance sufficient for invalidation. Phillips bases this argument on a reading of § 119 that interprets the phrase "the same application" as meaning "the subsequent American application". Phillips claims that this reading justifies the conclusion that Montedison's American patent application should have been updated. Assuming *arguendo* that Phillips's reading is correct, although the law is by no means clear,[133] Phillips's argument never-

---

**126.** Even if the Patent Office had not issued the patent to Montedison, the application itself could have been amended under the similar liberal provisions of 35 U.S.C. § 116.

**127.** Chisum, *supra* note 58, at § 2.04[4].

**128.** *See Patterson v. Hauck*, 341 F.2d 131, 52 CCPA 987 (1965); *In re Schmidt*, 293 F.2d 274, 48 CCPA 1140 (1961); *John Blue Co. v. Dempster Mill Mfg. Co.*, 172 F.Supp. 23 (D.Neb. 1957).

**129.** Du Pont's Brief, *supra* note 70, at p. 106.

**130.** Inspection was made in 1956, Tr., pp. 11,-195–96; in 1957, Tr., p. 11,200; and in 1958, D–300B.

**131.** Phillips's Brief, p. 202 [hereinafter cited as "Phillips's Brief"].

**132.** *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, 433 F.2d 1034, 1038 (2d Cir. 1970).

**133.** *See Tummers v. Kleimack*, 455 F.2d 566, 59 CCPA 846 (1972).

theless *ignores* the clear language of the statute, which provides that the effective date of the subsequent American application is the date of Montedison's Italian filing. It is not contested that as of that date, June 8, 1954, Montedison honestly believed that its best catalyst was $TiCl_4$. Since Montedison's subsequent American application accurately disclosed what Montedison honestly believed as of that application's effective date, this Court finds that Montedison's application satisfied the best mode requirements of § 112.

## DU PONT'S PRIORITY CASE

Du Pont claims two priority dates: May 17, 1954 for an actual reduction to practice,[134] and August 18, 1954 for a constructive reduction to practice based upon United States Application 451,064.[135] The Board rejected Du Pont's claim for an actual re-

duction to practice, finding no production of the product, no recognition of the product,[136] and no recognition of utility.[137] The Board accepted Du Pont's claim for a constructive reduction to practice, and awarded Du Pont August 19, 1954 as its earliest possible priority date.[138]

After careful analysis, the Court finds that Du Pont did indeed produce, by May 17, 1954, a product meeting the limitations of the Count, but that since its inventors failed to recognize both the product and a utility for it by that date, the Board was correct in failing to find an actual reduction to practice. The Court also affirms the Board's determination that Du Pont's constructive reduction to practice was complete as claimed, and finds that Du Pont was properly awarded the benefit of August 19, 1954 as its earliest priority date.

---

**134.** Du Pont Brief, *supra* note 70, at pp. 13–79.

**135.** *Id.*, pp. 80–84.

**136.** In relevant part, the Board held:
"It is fundamental that in order to establish either conception or reduction to practice it must appear that the product includes all the limitations of the count and be appreciated by the *inventor at the time it was made*. Here, we do not find any evidence that Baxter et al. had even a conception of a polypropylene product having a substantial crystalline polypropylene content at the time of the above experiment. None of the reports or letters written *at that time* referred to a substantial crystalline polypropylene content.
. . .
Although Anderson stated that at the time he saw the solid produced by Baxter he 'considered the possibility' of crystallinity present therein, it does not appear that this possibility was communicated to Baxter by Anderson at that time and Anderson made no written record relating to his so considering this product. . . .
Nor do we regard the testimony of Beck relative to crystallinity sufficient to establish a conception or reduction to practice by Baxter et al. on May 17–18, 1954. It is clear to us that the infrared spectrum run by Beck did not show that the product had any polypropylene crystallinity. . . . We note that the sample prepared on May 17–18, 1954 was not submitted for X-ray examination until July 6, 1954, (after the Natta et al. effective

filing date of June 8, 1954) which Beck stated might have been due to a lack of interest in crystallinity by Baxter. . . .
Although the testimony of Ryland and Beck indicates that sample 4427–86 (prepared May 17–18, 1954) was found to include some crystalline content (which was reported to Beck by Ryland on or about August 2, 1954, BX–38) there was no indication of the amount of crystallinity in this sample or whether it could be considered as a substantial crystalline content. . . .

. . .

Further, a reduction to practice cannot be proved *nunc pro tunc*, *Searle v. Glarum et al.*, [179 F.2d 974] 37 CCPA 896, 84 USPQ 454, 457. Certainly the above exhibits do not establish that Baxter et al., in May 1954, had any conception of a product with the crystalline polypropylene content of the count."
Board's Opinion, *supra* note 18, at pp. 106–110.

**137.** In relevant part, the Board held:
"We do not find sufficient evidence to establish the utility of the product prepared on May 17–18, 1954. All that was done was that the small film about 1½ inches by ½ inch was pulled on by Baxter and that he considered that the material was 'tough and elastic.' There was no indication at that time that Baxter considered it useful for any practical purpose. We cannot agree that its utility was obvious; . . . .."
Board's Opinion, *supra* note 18, at p. 111.

**138.** *Id.*, p. 90.

*Du Pont's Actual Reduction To Practice.*

Du Pont's development of crystalline polypropylene began in 1953 in the Exploratory Research Section of the Research Division of the Polychemicals Department located in Wilmington, Delaware.[139] During the relevant time period, Dr. W. F. Gresham headed the section,[140] Drs. I. M. Robinson and Arthur Anderson served as Research Supervisors,[141] and Drs. Nicholas G. Merckling, Gelu S. Stamatoff and Warren N. Baxter worked as Research Chemists.

In late 1953[142] Merckling began research aimed at "the preparation of hydrocarbon polymers of superior properties including toughness and stiffness at elevated temperatures."[143] By February, 1954, Merckling had found a German patent that disclosed a reduced titanium tetrachloride ($TiCl_4$) catalyst useful "for the obtaining of solid polymerizates from ethylene."[144] The catalyst was made by reacting aluminum trichloride ($AlCl_3$), titanium tetrachloride ($TiCl_4$) and powdered aluminum at elevated temperatures and pressures. Using this catalyst,[145] Merckling produced a homopolymer from ethylene which was surprisingly stiff.[146]

Following this encouraging lead,[147] Du Pont scientists began to explore the potential use of reduced metal halides such as $TiCl_4$ as catalysts for the polymerization of olefins, including propylene.[148] By April 1954 Du Pont scientists had slightly modified the German catalyst by reducing $TiCl_4$ with various "Grignard reagents" rather than aluminum metal.[149] With this improved catalyst they produced a polyethylene having an "essentially linear structure".[150] This polyethylene was "different in that it had a much lower amount of branching in the polymer chain."[151] Robinson expected that the new catalyst could be used to produce other polymers from various olefinic compounds including propylene, which would demonstrate "different structure (less branching)."[152] As early as April 22, 1954 Merckling may have realized this expectation by polymerizing what Robinson considered to be their first solid polypropylene.[153] Merckling produced too little product for further analysis, however.[154]

By May 1954 Stamatoff and Baxter had joined the olefin polymerization project,[155] and on May 5, 1954 Stamatoff obtained a small amount of solid polymer, which he assumed was polypropylene.[156] Although the sample, containing about ".1 to .2 grams" of polymer,[157] was again too small to analyze,[158] certain gross characteristics were observed: the sample was "solid polypropylene, and it was flexible",[159] and it had

139. Tr., pp. 8590–93.

140. *Id.*, p. 8730.

141. *Id.*, pp. 8591–92.

142. Baxter Record, *supra* note 16, at p. 9.

143. Du Pont Trial Exhibit No. 7. Du Pont's Trial Exhibits are hereinafter referred to by number with the prefix "D".

144. D–782.

145. D–4, p. 153.

146. Baxter Record, *supra* note 16, at pp. 9–10.

147. Encouragement is evidenced by Robinson's enthusiasm for Merckling's development, which led Robinson to encapsulate the original polyethylene sample in polymethylmethacrylate, encircle it with a gold band, and use it as a paper weight. Baxter Record, *supra* note 16, at p. 51.

148. D–1, p. 2.

149. Baxter Record, *supra* note 16, at p. 16. Grignard reagents are discussed at Weininger, *supra* note 33, at pp. 231–33.

150. D–2, p. 3.

151. Tr., p. 8752.

152. D–2, p. 2.

153. D–5, p. 16.

154. Baxter Record, *supra* note 16, at pp. 60–61.

155. D–36, p. 115.

156. D–36, p. 115.

157. *Id.*

158. Baxter Record, *supra* note 16, at p. 246.

159. *Id.*, p. 247.

a stick temperature [160] greater than 122°F. (50°C.) to 167°F. (75°C.).[161]

Then, on May 17, 1954 Baxter conducted Run 4460–41 [162] and produced the product upon which Du Pont premises its claim for an actual reduction to practice. Baxter began this Run on May 11, 1954 when he prepared a catalyst by mixing six grams of $TiCl_4$, forty milliliters (mls.) of phenyl magnesium bromide and 200 mls. of cyclohexane. The resulting solid catalyst was then separated from liquid cyclohexane by filtration under an atmosphere of nitrogen gas,[163] and stored for subsequent use. On May 17, 1954 Baxter charged a stainless steel lined Shakertube [164] with three grams of the catalyst, 100 mls. of cyclohexane, and 50 g. of propylene. The reaction proceeded for two hours at a temperature of about 86°F. (30°C.). The product was then removed from the reactor and washed from the catalyst with toluene.[165] Baxter then dissolved as much of the crude product as he could in methanol, hydrochloric acid, and acetone, and dried the residue in an oven at 150°F. (70°C.).[166] Careful analysis clearly and convincingly shows, despite the finding of the Board, that the 0.5 g. of resulting polymer satisfied the three limitations of the Count, although Du Pont's scientists did not recognize what they had nor did they sufficiently prove the utility of their product.

### 1. Production of The Product of The Count.

The first evidence that the product of Run 4460–41 was *normally solid* was an entry in Baxter's Notebook describing it as "solid polypropylene" and further describing it as "tough" and "elastic".[167] This description is supported by Baxter's testimony at trial, where he remembered:

> The film was solid, it was tough, it was translucent, it wasn't sticky, it was slightly elastic in that when I gripped the ends with my fingers and pulled it, it might extend a little bit, perhaps 5 percent, and then recover.[168]

. . . . .

> The solid polymer I then pressed into a film that was a tough film, it was flexible, elastic, it was translucent in appearance.[169]

Anderson testified that this film resembled a "rigid, tough plastic",[170] and that it was non-tacky.[171] Michael Beck, who subjected this material to infrared analysis for Du Pont, remembered that this film appeared "hard".[172] The Court finds that this evidence is sufficient to establish that the

---

**160.** Stamatoff defined "stick temperature" as "the temperature at which the polymer can be still removed from the beaker or watchglass without having to break the watchglass. In other words, it is the temperature at which the polymer does not stick on the watchglass in which it is dried." *Id.,* pp. 249–50.

**161.** *Id.,* pp. 246–47 and 250.

**162.** "4460" refers to the notebook number and "41" refers to the page upon which it was first recorded. D–28, p. 41. Since different parts of this experiment were recorded in different places, scientists used several different numbers, including 4427–86, to designate it. For simplification, the Court will refer to this run as "4460–41".

**163.** D–27, p. 71.

**164.** The Court understands that the term "Shakertube" describes what is usually known as a shaker autoclave reactor.

**165.** D–28, p. 41.

**166.** D–27, p. 86.

**167.** *Id.*

**168.** Tr., p. 8216.

**169.** *Id.,* p. 8306.

**170.** *Id.,* p. 8882.

**171.** *Id.,* p. 8827. Robinson also recalled that "[T]he polymer that Baxter obtained was quite flexible, but tough . . . was flexible, tough, off-white, thin and small . . . [I]t was elastic." Baxter Record, *supra* note 16, at p. 20.

**172.** Baxter Record, *supra* note 16, at p. 1592.

product met the first limitation of the Count.

Analysis of available infrared spectra convinces the Court that the product of Run 4460–41 was *polypropylene, consisting essentially of recurring propylene units.* Infrared absorption over the range of two to fifteen microns was measured and recorded on May 18, 1954 by Beck, producing scan D–35. At trial, Dr. Edward Brame testified that he had analyzed this scan and found bands at wavelengths near 7.25, 8.6, 10.03, 10.27, and 11.85 microns, and no absorbance peaks at 13.7 microns or 13.9 microns.[173] On the basis of this information, Brame concluded "that this was a homopolymer of propylene".[174] Brame also concluded that, although there were some possible signs of head-to-head[175] and tail-to-tail[176] polymerization, the scan showed "primarily the structure of propylene polymerized head-to-tail".[177]

Brame also testified that he noted absorptions at 13.3 to 13.35, 13.75, 13.95, 14.4 and 15.03 microns, and that these absorptions were "not associated with the fundamental chain structure of the polypropylene."[178] Upon further investigation, he

attributed these absorptions to the presence of trace amounts of the catalyst, which had contained chloride and phenyl groups,[179] and dismissed the possibility that these absorbances indicated that the product was a copolymer of propylene and ethylene.[180] Since the accuracy of Brame's conclusions is not contested, the Court adopts them as true and finds that Run 4460–41 produced a homopolymer of propylene having primarily head-to-tail polymerization that satisfied the second limitation of the Count.

That the product of Run 4460–41 had a *substantial crystalline polypropylene content* was proven by testimony of Brame and also by analysis of x-ray scans and other physical testing data. Brame further analyzed scan D–35, at trial. Following a method first described by Dr. W. Heinen for determining the crystallinity of propylene samples,[181] Brame compared infrared absorptions at 11.85 microns indicating the number of propylene units in the crystalline lattice and at 8.6 microns indicating the total number of propylene units in this sample. In this manner he estimated that the product of Run 4460–41 was about 28% crystalline.[182]

173. Tr., pp. 9110–11.

174. *Id.*, p. 9111.

175. This was indicated by the appearance of a slight absorbance "shoulder" at 8.95 microns. Tr. p. 9171.

176. This was indicated by the absorbance at the 13.3 micron range. *Id.*

177. Tr., pp. 9172–73.

178. Tr., pp. 9128–29.

179. Brame used a computer to search data files of the American Society of Testing Engineers (ASTM) for compounds exhibiting similar spectra:

> The Sadtler Research Laboratory in Philadelphia has a file of roughly 100,000 spectra that they have published commercially now for some twenty-odd years, maybe longer, twenty-five years. They have quite a large collection, the largest of any of the collections.
> In addition to them, Coblentz has a nice, small but nice file of model compound spectra.
> And the Aldrich Company has a compilation of infrared spectra.

> There are miscellaneous from the literature, from various sources, but they are all contained within the ASTM. The ASTM has been in the business of doing this for a number of years.

Tr., p. 9138.
The first spectrum that Brame found, D–794, was of a compound containing bi-phenyl. This spectrum showed absorptions, corresponding in size and shape to those in the 13.75 and 14.4 micron ranges on D–35. Tr., p. 9140. The other spectra, D–795, were for alkyl chloride compounds. All of these spectra showed absorptions, corresponding in size and shape to those in the 13.3 to 13.35 and 13.95 and 15.03 micron ranges on D–35. Tr., pp. 9144–51.

180. Tr., pp. 9175–76.

181. D–784.

182. Brame estimated that the height of the 11.9 micron peak was 0.180 units and the height of the 8.6 micron peak was 0.603. Tr., p. 9123. The ratio of the former to the latter was 0.2985, which, according to Figure 2 of Heinen's article, corresponded to 28% crystallinity. *Id.*, p. 9117. Brame's calculations are contained in Exhibit D–790.

The presence of crystallinity was confirmed by x-ray analysis. On July 7, 1954 Dr. A. Ryland prepared an x-ray photograph, D–46. The appearance of crystalline diffraction maxima on the photograph indicated that the polymer was partially crystalline. The diffraction maxima were "represented by the relatively sharp circles which are apparent on this film, as contrasted to the rather diffuse blackening of the film which is characteristic of an amorphous portion of the polymer."[183] Ryland subsequently informed Beck that Baxter's product was partially crystalline.[184] On August 2, 1954 she reported: "standard pattern taken for our files",[185] and later testified: "The fact that I have referred to a standard pattern of this material indicates to me that I detected discrete diffraction maxima since I would not have used that terminology to refer to an amorphous material."[186] Ryland compared scan D–46 to x-ray pictures of polyethylene and other polymers and concluded that the new scan showed a "diffraction pattern which was distinctly different from that of any of the other polymers in our files."[187] In her testimony before the Board, Ryland reexamined the x-ray diffraction patterns. She measured the interplanar spacings represented on those patterns and concluded that the partial crystallinity demonstrated by the product of Run 4460–41 was of the propylene type.[188]

Crystallinity was also confirmed by density and softening point measurements made of the product of Run 4460–41. In September 1954 Baxter reported that his polymer had a density of 0.88 g./cm.$^3$.[189] In addition, Baxter reported in a June 17, 1954 memorandum to Gresham that the product of Run 4460–41 had a transition temperature, which Baxter called a "softening point", of 150°C. (302°F.).[190] These numbers are within the range of values normally associated with crystalline polypropylene.[191]

## 2. Recognition of The Product.

Recognition of the product for the purpose of establishing an actual reduction to practice is established by appreciation that the product is a new form, and knowledge of sufficient of its properties to justify the conclusion that it corresponds to the compound defined by the Count. Baxter clearly recognized by May 1954 that he had made a new product:

Q. Well, do you recall what if any significance there was to you then in mid-May 1954 from this polypropylene film [from Run 4460–41] after you had made it and examined it?

A. I recall that I thought it was significant that I had made a new, solid polypropylene, and to my knowledge solid polypropylene had not been made previously. . . .[192]

Du Pont knew or appreciated very little else about its product prior to Natta's priority date of June 8, 1954. It has not been established that the 302°F. (150°C.) transition temperature was measured before June 17, 1954. An x-ray picture was not prepared until July, 1954. The infrared scan was not thoroughly analyzed until August, 1954, and an accurate estimate of density was not made until September, 1954. Although Du Pont did ultimately obtain this information, it cannot be used to retroactively supplement an otherwise inadequate recognition.

183. Baxter Record, *supra* note 16, at p. 2607.

184. *Id.*, p. 2617.

185. D–44.

186. Baxter Record, *supra* note 16, at pp. 2621–22.

187. Baxter Record, *supra* note 16, at p. 2609.

188. *Id.*, p. 2618.

189. D–33, p. 3.

190. D–32, p. 2.

191. *See* text accompanying note 178, *supra*.

192. Tr., p. 8217.

Du Pont's recognition that the product of Run 4460–41 was *normally solid* is adequately demonstrated by the contemporaneously recorded observations of the scientists who first saw Du Pont's polymer.[193] Since no party has challenged the adequacy of this evidence, the Court finds that Du Pont recognized enough about its product to justify the conclusion that it complied with the Count's first limitation.

As noted above, scan D–35, prepared on May 17, 1954, contained enough information to establish that Baxter's product was a *polypropylene consisting essentially of recurring propylene units.*[194] The recognition requirement, however, cannot be satisfied by merely obtaining a diffraction scan, be it x-ray or infrared. The inventor must also focus his attention on the critical peaks in each scan. In *Langer v. Kaufman*[195] for instance, the alleged inventor, Tornqvist, subjected the sample to x-ray testing. His machinery traced diffraction patterns and printed photographs that were sufficient to show that the product fitted within the count. Since he failed to produce any evidence that he appreciated the importance of particular peaks, however, the C.C.P.A. held that there was no recognition of the product.

In the instant case, Beck testified before the Board that immediately after preparing infrared scan D–35, he identified certain absorption bands as being possibly correlated with known vibration modes and made notes to this effect on the scan itself.[196] Beneath the near 8.6 micron peak, he wrote:

isolated internal
methyl groups

R—CCC—R
 |
 C

and beneath the 10.27 micron peak, he drew an arrow. Beck informed Baxter of these observations and confirmed them in writing on May 21, 1954: "Spectrum scanned 2–15 microns. Spectrum shows strong absorption at 7.25u [microns] (methyls). Band at 8.69u [microns] may be due to isolated internal methyl groups (R—CCC—R)."[197]
 |
 C

At trial, Baxter testified that he had expected his product to evidence characteristics consistent with the second limitation of the Count:

> I expected it would be a linear molecule, that is, the carbon atoms in the backbone would be joined together in the chain with a methyl group pendant from every other carbon atom, and that this polymerization would have taken place in a head-to-tail manner at the number 1 and 2 positions of the propylene molecule where the double bond is located.[198]

He also testified that Beck's report confirmed these expectations,[199] and that he probably "wrote down the structure on a piece of scrap paper, but . . . did not write it down to preserve it to this day".[200]

Careful analysis of this testimony shows that Du Pont failed to adduce even a preponderance of the evidence that its scientists recognized enough about their product by late May 1954 to justify the conclusion that it was composed essentially of recurring propylene units. Although Beck might have recognized the three peaks at 7.25, 8.6 and 10.27 microns indicative of the presence of recurring propylene units, he did not note the peak at 10.03 microns, and failed to remark on the absence of peaks at 13.7 and 13.9 microns. The mere presence of the three observed peaks without recognition of

193. *See* text accompanying notes 167–172, *supra.*

194. *See* text accompanying note 173, *supra.*

195. 465 F.2d 915, 59 CCPA 1261 (1973).

196. Baxter Record, *supra* note 16, at p. 1598.

197. D–29.

198. Tr., pp. 8217–18.

199. *Id.*, p. 8220.

200. *Id.*

the other critical peaks is insufficient to justify the conclusion that a polymer is composed essentially of recurring propylene units. The Court can give little weight to Baxter's testimony that he recognized the second limitation, unsupported as it is, by a shred of documentary evidence. The Court therefore cannot find that he or anyone else at Du Pont appreciated enough about their polymer to justify the conclusion that it conformed to the Count's second limitation.

In seeking to show that its scientists recognized enough about their product by May 17, 1954 to justify the conclusion that it had a *substantial crystalline polypropylene content*, Du Pont relies principally upon Anderson. He testified that he had expected Baxter's polymerization to produce a rubbery product similar to polyisobutylene but upon examining the non-tacky results of Run 4460-41, had found that it more closely resembled crystalline polyethylene.[201] Anderson further stated that he was not surprised when he later learned that Baxter's product was crystalline:

[T]he properties were of such a nature that it would have been more surprising had it not been crystalline. . . .

It was my understanding at that time that the crystal forces would tend to hold the polymer molecules together so that it would be more difficult to allow them to slip by each other when stretched or bent or otherwise subjected to physical deformation.

As a consequence of this, a crystalline material will always be stiffer and usually higher melting or higher softening than a material that is not crystalline having the same structure.[202]

Anderson's trial testimony, however, conflicts with an earlier statement of his:

I cannot honestly say that I remember having made a comparison between this film and polyethylene. It may well be that I did so, but I do not recall it now.

. . . [A]t the time this testimony was taken I stated that the film tended to resemble polyethylene. But it does not indicate that I made this comparison mentally back at the time that I was shown this film. I still cannot honestly testify that I recall having made the comparison at that time. It is undoubtedly true that this entered my mind at that time, but I don't recall it.[203]

The Court also rejects Anderson's testimony because of the lack of corroborating documentary evidence. It is illogical to believe that anyone who discovered a new product and realized that its distinguishing feature was its crystalline nature would fail to record that realization. More likely, Du Pont's scientists were unwilling, without the x-ray testing and further infrared analyses which they subsequently carried out to conclude that Baxter's product was crystalline.

Dr. Paul J. Flory testified that a polymer might be either tough and elastic and therefore crystalline, or rubbery and therefore amorphous.[204] The Court is reticent, however, to hold that observations that a material is tough and elastic but not rubbery, is sufficient to justify the conclusion that the product is crystalline, especially when such observations are based solely on manual manipulation. For example, Baxter used the words "tough", "elastic", and "rubbery" to describe the same product—polybutadiene.[205] Apparently the qualitative observations of Du Pont's scientists were not intended to carry the meaning that Flory sought to extract from them.

Du Pont also notes that when Baxter first made his polymer it appeared as a granular powder, and when dried overnight at 150°F. (70°C.) remained granular. Flory testified that this indicated:

[T]hat the melting [or softening] point of this polymer was above the temperature of the oven, 70 degrees Centigrade. Oth-

**201.** Tr., pp. 8826–27.

**202.** Tr., pp. 8837–38.

**203.** *Id.*, pp. 8923–24.

**204.** Tr., pp. 9480–81.

**205.** *Cf.*, D–32, pp. 2–3, with D–33, p. 5.

erwise the polymer would have been—the particles of the powder would have coalesced and have formed a sticky mass. So it must have had a [. . . transition] temperature above that of the oven. . . . [206]

Since all previously produced polypropylenes were amorphous and softened below 158°F. (70°C.),[207] Flory assumed that the distinguishing feature that raised the transition point of Baxter's product was the presence of crystallinity.[208] This argument presumes that Baxter's product was polypropylene, a conclusion that could not have been justified by the data available to Du Pont prior to Natta's priority date.[209] Since there are many substances with melting points higher than 158°F. (70°C.), the mere fact that a product falls into this category is not a sufficient ground for the conclusion that it is solid crystalline polypropylene.

Finally, Du Pont noted that Baxter made a preliminary determination of the density of his polymer prior to Natta's June 8, 1954 date and recorded that it was "less than 0.89" g./cm.$^3$.[210] Since Du Pont did not offer any evidence that this datum would justify the conclusion that the material was crystalline, the Court will hold otherwise. Accordingly, this Court concludes that Du Pont's scientists failed to appreciate enough information to justify the conclusion that Baxter's product was crystalline polypropylene.

### 3. Recognition of A Utility for The Product.

Du Pont offers three principle witnesses in an attempt to prove that its scientists recognized enough about the product of Run 4460–41 by May 17, 1954 to conclude

that it had utility as a solid plastic. Baxter indicated that he believed his product "could be converted into an article such as a film".[211] Anderson concluded that Baxter's product was a "novel and useful polymer"[212] and believed that the product was similar to polyethylene which he knew was used for "coating wire as insulation, for extrusion into film, and for making molded objects".[213] Flory testified that it was widely known in 1954 that semi-crystalline polymers were useful for "a whole array of uses [including] molding materials, insulation, films, and if sufficiently highly crystalline and high melting, especially fibers."[214]

Du Pont in effect seeks to premise its utility argument upon the same type of information rejected in *Anderson v. Natta*[215] as insufficient to demonstrate utility. Du Pont did not introduce evidence of testing to determine thermal stability, Young's modulus, or tensile strength. Since these tests are necessary to support the conclusion that the polymer can be used as a solid plastic, the Court finds that Du Pont did not have sufficient information to show utility. Therefore, the Board's determination that Du Pont did not recognize utility is affirmed.

### Du Pont's Constructive Reduction to Practice.

The Board awarded Du Pont the date of August 19, 1954 for a constructive reduction to practice. Montedison has challenged this award on the ground that Du Pont's application failed to set forth the best mode contemplated by the inventors for carrying out their invention.[216] Specifically, Montedison claims that Du Pont's scientists failed

---

206. Tr., p. 9488.

207. Tr., p. 9476.

208. *Id.*, p. 9488.

209. *See* text accompanying note 194, *supra.*

210. D–27.

211. Tr., p. 8222.

212. *Id.*, p. 8835.

213. *Id.*, p. 8828.

214. *Id.*, p. 9485.

215. *Supra*, note 84.

216. Montedison's Proposed Findings of Fact and Conclusions of Law Nos. 533–539, pp. 201–03 [hereinafter "Montedison's Findings of Fact"].

to disclose the best catalyst known to them at the time of filing. Du Pont's patent application disclosed a catalyst composed of $TiCl_4$ and a reducing agent such as phenyl magnesium bromide,[217] LiA1(n-hexyl)$_4$,[218] or tetrabutyl tin.[219] Montedison insists that at the time of filing their application Du Pont's scientists knew that LiA1(Butyl)$_4$ was a more efficient reducing agent than those reported in the application. Montedison points to a September 2, 1954 memo from Robinson to Gresham that discusses the success of LiA1(Butyl)$_4$ without mentioning the reducing agents listed in the patent application,[220] and also to a December 16, 1954 report by Robinson that "the most efficient catalyst employed thus far is that obtained from the action of LiA1(Butyl)$_4$ or $TiCl_4$".[221] Montedison further contends that Du Pont based Example 3 of its application on one of Baxter's experiments, but in order to disguise the fact that the more effective LiA1(Butyl)$_4$ had been used, intentionally reported the use of LiA1(n-hexyl)$_4$.[222] The September memo, however, fails to support Montedison's case because it has not been established that Robinson performed the underlying work prior to August 19, 1954. More importantly, the memorandum only discusses ethylene, not propylene, polymerization. Since Montedison has made no showing that information regarding ethylene polymerization is directly applicable to propylene polymerization, the Court finds that the memo is insufficient to

prove that Du Pont knew of a better propylene catalyst.

The December report also lends but little support to Montedison's case since it concerns work performed during the period between August 30, 1954 and September 28, 1954. Since Montedison has failed to show that any of the work discussed in Robinson's memo and report was done prior to the reported dates, this Court finds that Du Pont learned of the superiority of LiA1(Butyl)$_4$ only after filing its application on August 19, 1954.

Finally, Montedison has failed to show that Du Pont's Example 3 was modeled on Baxter's LiA1(Butyl)$_4$ experiment or that this example was changed to disguise the use of LiA1(Butyl)$_4$. The only evidence claimed by Montedison to establish this modeling was testimony by Robinson.[223] He testified, however, that he did not know whether or not Example 3 had been based on earlier Baxter experiments that had employed LiA1(Butyl)$_4$.[224] Moreover, Robinson specifically denied that "there was a conscious decision at Du Pont in August of 1954 to specifically exclude reference to lithium aluminum tetrabutyl catalyst", in Du Pont's August 1954 patent application.[225]

Without disclosing the legal basis for its objections, Montedison finally faults Du Pont's application for failing to disclose adequately the "vital catalyst ratio information"[226] relating to the amounts of $TiCl_4$

217. D–11, Examples I and IV.

218. *Id.*, Examples II and III.

219. *Id.*, Example V.

220. M–1238.

221. D–269, p. 2.

222. Du Pont had little opportunity to answer these accusations. Montedison initially failed to include them in the July 1, 1977 Pre-Trial Order because, according to Montedison, it was unclear that these accusations could be addressed in a § 146 proceeding until the early 1978 decision in *Weil v. Fritz,* 572 F.2d 856 (Cust. & Pat.App.1978). In its Brief, *supra* note 65, p. 94, Montedison mistakenly claimed that the second example, not the third in Du Pont's

patent application was the one that failed to correspond to the laboratory work upon which it was based. Montedison finally presented its argument against the third example in its Reply Brief, *supra* note 65, at p. 41, too late for Du Pont to respond in its Reply Brief which was due the same day. This Court has not requested additional briefing since its careful study of the record has been sufficient to show the untenable nature of Montedison's arguments.

223. Montedison's Reply Brief, *supra* note 65, at p. 41.

224. Tr., pp. 12384–86.

225. *Id.*, p. 12386.

226. Montedison's Reply Brief, *supra* note 65, at p. 41.

and reducing agent to be used in preparing the catalyst for each experiment. Montedison claims that Du Pont did not disclose this ratio in Example 4 and intentionally changed the Example 2 ratio from the one used in the run upon which Example 2 had been based. If Montedison's argument here is that Du Pont's application does not enable the production of crystalline polypropylene, this Court rejects it. Robinson's testimony indicates that Du Pont's patent application would have enabled a "chemist skilled in the art" to "make polypropylene. . . . He would be able to run any one of a number of possible ratios. . . . In fact that is what I would do in the laboratory." [227] If, on the other hand, Montedison's argument is that Du Pont's application failed to teach the best mode, it must also be rejected since Montedison failed to prove not only that the catalyst ratio disclosed by Du Pont was inferior to any other, but also that Du Pont's scientists appreciated any differences that might have existed. This Court therefore affirms the Board's Opinion awarding Du Pont a priority date of August 19, 1954.

## STANDARD'S PRIORITY CASE

Standard claims several priority dates: September, 1950 and April-July 1953 for actual reductions to practice, and October 15, 1954 for a constructive reduction to practice based upon United States Application No. 462,480.[228] The Board rejected Standard's first two claimed dates, finding no production of the product, no recognition of the product,[229] and no recognition of utility.[230] The Board determined, however, that Standard's application supported the Count and awarded it a date of October 15, 1954 as its earliest priority date.[231] Careful consideration leads this Court to affirm the rulings of the Board's award of the priority date of October 15, 1954 to Standard.

*Standard's Actual Reduction to Practice.*

Standard's development of crystalline polypropylene began in its Exploratory Research Division in Whiting, Indiana.[232] During the relevant time, Dr. Bernard Evering served as a Group Leader in this Division,[233] and Zletz,[234] Carmody[235] and Peters[236] worked in Evering's group as research chemists.

---

**227.** Tr., p. 12384.

**228.** Standard's Priority Brief, *supra* note 102, at pp. 7–44.

**229.** The Board held:
"There was no appreciation or even mention at that time that [Doty's] infrared scans show *crystallinity of the products.* . . .

. . . . .

No quantitative measure of the proportion of crystallinity in the [P–1 and P–9] samples was made. Kimball who ran the X-ray diffraction pattern testified . . . that he could not exclude the presence of amorphous ethylene-propylene copolymer and also the presence of crystalline ethylene-propylene copolymer on the basis of these scans, depending upon the amount. . . . There was no identification of the sample of polypropylene said to have been made by Peters that was shown [to Standard's Professor Mark] on December 11, 1953. [Professor Mark] also stated that an X-ray diagram was shown to him at that time but this was not identified with any Peters run and was not submitted as an exhibit in the Zletz record. . . . " (emphasis in original). Board's Opinion, *supra* note 18, at pp. 84–86.

**230.** The Board held:
"Since Zletz has not shown utility for his products we hold that there has been no reduction to practice. We fail to see that the utility of the product of the count would be obvious. According to the assertions of the Zletz brief . . . the party Zletz was the first to produce and characterize this material. Since the material was assertedly up to then unknown, . . . there would be no reason that the polypropylene of the count should have the utility of crystalline polyethylene. . . . "
*Id.*, p. 86.

**231.** *Id.*, p. 71.

**232.** Tr., p. 5314.

**233.** *Id.*, pp. 5308–9.

**234.** *Id.*, p. 5308.

**235.** *Id.*, p. 5985.

**236.** *Id.*, p. 5989.

In June, 1950 Zletz began to study polymerization catalysts with which he had previously worked very little.[237] On or about June 15, 1950 Zletz realized that catalyst containing molybdenum oxides supported on an alumina base that had been reported as suitable for the production of ring compounds from ethylene might be used to polymerize olefins.[238] Between July 18 and 20, 1954 Zletz successfully employed such catalysts to polymerize ethylene.[239] Zletz then turned his attention to "other olefins", proposing the polymerization of propylene.[240] Between August 11, 1950 and September 27, 1950 Zletz conducted at least six experiments aimed at polymerizing propylene.

It appeared at trial that Standard did not rely upon any of these runs for an actual reduction to practice because "they [were] totally uncorroborated. . . . Nobody was with Zletz when he made [them]".[241] One may argue, however, that Standard's Brief takes an opposite position.[242] This Court has accordingly investigated Zletz's runs and has determined that Zletz's polymers did not meet the limitations of the Count. Since Zletz's runs produced products that were no more satisfactory than those of Carmody,[243] the Court will focus its attention solely upon the Carmody products.

Carmody's work began on July 21, 1950 when he repeated one of Zletz's ethylene polymerization experiments.[244] Carmody subsequently turned to the polymerization of propylene, substituting a cobalt molybdate catalyst for the molybdenum oxide catalyst used by Zletz. Standard relies for an actual reduction to practice upon two of these experiments, designated Runs EP–34 and EP–35, conducted on September 28 and 29, 1950.[245]

In Run EP–34 Carmody placed fifty grams of cobalt molybdate catalyst in a 100 ml. "rocker bomb".[246] He activated the catalyst by heating it to 850°F. (455°C.) and twice exposing it to hydrogen at 400 psi for a period of seventy-five minutes.[247] He next placed 49.5 g. of xylene and 20.4 g. of propylene in the reactor which he subsequently heated to 302°F. (160°C.) under pressures of up to 420 psi. After about three hours, he poured the xylene solvent and much of the polymer product from the reactor. Carmody added methyl ethyl ketone,[248] an anti-solvent, to this solution, and filtered out 0.6 g. of the resulting precipitate product.[249] Carmody subsequently boiled the catalyst in xylene, again added methyl ethyl ketone to the resulting solution, and recovered another 0.1 g. of product.[250]

In EP–35 the same procedures were followed, with the exceptions that the prewash product yield was 20.4 g., the final separated product weighed 1.13 g. Carmody later recovered an additional 2.7 g. of product from the catalyst.[251]

237. *Id.*, pp. 5309–10.

238. *Id.*, p. 5310. Standard's Trial Exhibit No. 1, pp. 45–46. Standard's Trial Exhibits will hereinafter be referred to by number with the prefix "S".

239. *Id.*, pp. 5338–39; S–1, pp. 64–70.

240. *Id.*, p. 68.

241. Tr., p. 5357.

242. Standard's Priority Brief, *supra* note 102, at pp. 7–38.

243. *Compare* S–7, S–79, Zletz Record, *supra* note 16, at p. 3999, and Tr., pp. 7595, 7607 and 7614–16, with text accompanying note 244, *infra*.

244. Tr., pp. 5660–64.

245. Standard's Priority Brief, *supra* note 102, at pp. 14–19.

246. The Court understands that the term "rocker bomb" describes what is usually known as a shaker autoclave reactor.

247. S–11, p. 44; Tr., pp. 5708–09.

248. Tr., p. 5743.

249. S–11, p. 44; Tr., p. 5743.

250. S–11, p. 44; Tr., pp. 5743–44.

251. S–11, p. 45.

In addition to Carmody's runs, Standard also relies upon two experiments performed by Peters, designated P–1 and P–9, and begun on April 30 and July 17, 1953, respectively. Peters had worked on a number of polymerization experiments along with Zletz and Carmody from 1950 through 1952.[252] During the summer of 1952 Evering asked him to collect and organize the work of Zletz, Carmody, and others,[253] and a draft report[254] was completed in April, 1953.[255] As a result of this research, Peters came to believe that an increased quantity of product could be obtained by carrying out the polymerization at a lower temperature for a longer period.[256] He effected these changes in Runs P–1 and P–9.[257]

Run P–1 began on April 30, 1953 when Peters placed in a rocker bomb 189 g. of cobalt molybdate catalyst which was activated by heating to 805°F. (429°C.) and thrice exposing it to hydrogen at pressures ranging between 200 and 500 psi.[258] On May 4 he placed between sixty-five and seventy-one grams of propylene in the rocker bomb. Peters raised the reaction pressure to about 160 psi[259] and left the reactor sitting at room temperature from May 4 to June 1, 1953. He then removed the catalyst and the polymer, which had adhered tightly to the catalyst. Peters tried to separate them by dissolving the polymer in benzene, and when this proved unsuccessful, he finally undertook the more extreme measure of crushing the catalyst and polymer and boiling them in xylene.[260] The polymer eventually dissolved and in a series of further separations Peters recovered a variety of products, including 7.0 g. of a product that precipitated "from boiling xylene solution when cooled to room temperature".[261]

Run P–9[262] was performed between July 17 and July 24, 1953. Peters used 415 g. of the same catalyst in a fixed bed reactor.[263] The hydrogen exposure was conducted at a pressure of 800 psi. The feed was composed of a mixture of 1026 g. of propylene and 638 g. of xylene, and the reaction was carried out at a pressure between 300 and 600 psi, and at a temperature between 205°F. (91°C.) and 260°F. (127°C.). The product dissolved in xylene was removed continuously in a series of twelve cuts, made between 4.25 hours and four days after the initial feed. Peters separated the product from the xylene. He combined cuts one through seven and obtained 4.6 g. of product, and combined cuts eight through twelve and obtained 2.9 g. of product.

The Court's analysis reveals that the products of Runs EP–34 and EP–35 and P–1 and P–9 do not support Standard's claims for actual reductions to practice. Although Carmody's products may have been solid and may have contained a substantial crystalline component, they were not composed essentially of recurring propylene units, they were not recognized as meeting the Count, and further, no utility was recognized. Although Peters's products did meet the Count and he recognized enough about the product of P–1 to justify such a conclusion, he failed to recognize enough about his products to establish utility.

*1. Production of The Product of The Count.*

All the products of Standard's four runs were *normally solid.* Carmody recorded that Run EP–34 yielded a "solid product

---

252. Tr., pp. 4590–608.

253. Tr., pp. 4609–09.

254. S–132.

255. Tr., pp. 4609–10.

256. *Id.*, p. 4625.

257. S–38, p. 1.

258. *Id.*, pp. 1–2.

259. S–38, pp. 4–5.

260. *Id.*, p. 9.

261. *Id.*, p. 12.

262. S–38 pp. 31–39, 46–48.

263. *Id.*, p. 26.

that was rubbery, non-tacky",[264] and that Run EP–35 yielded 1.13 g. of a precipitated "solid" that was "somewhat sticky to touch".[265] Peters recorded that the combined product of Run P–1 was "solid-non-tacky, tough and flexible",[266] and that this product was fashioned into an "extremely tough and stiff film ⅛″ thick".[267] At trial, he testified that "it is a molded piece, much like the polyethylenes that we made as far as being a solid material that you could mold into objects, or so forth . . . you could bend it, and pull it, work with it."[268] Peters also recorded that both of the products from Run P–9 were "solid".[269]

In attempting to establish that the products of Runs EP–34 and EP–35 were *polypropylenes, consisting essentially of recurring propylene units*, Standard relied principally upon the Zletz record, the deposition testimony of Drs. Raymond R. Hopkins and Paul M. Doty, and the live testimony of Dr. Jack L. Koenig. Hopkins testified that he had subjected samples of the products of Runs EP–34 and EP–35 to infrared analysis in October 1950 and had produced scans

S–91, S–92 and S–93 for EP–34 and the partial scan S–95 for EP–35.[270] Hopkins again tested EP–35's infrared absorption on June 18, 1953, producing scan S–76.[271] These scans showed absorptions near 7.25,[272] 8.6, 10.03, 10.27 and 11.85 microns. Doty's testimony generally supported Hopkins's observations,[273] although Doty also noticed absorptions at 13.7 and 13.9 microns indicative of methylene chains.[274] Doty dismissed the importance of these peaks, however, testifying that they had "almost vanished" and that "the amount of polymethylene[275] structure had been reduced to an insignificant component".[276]

Koenig also recognized these methylene absorptions but dismissed them as insignificant since the methylene to methyl ratio was less than 1.03.[277] He subsequently testified, however, that the methylene to methyl ratio might be as high as 1.6.[278]

These conclusions that the methylene content of the products of EP–34 and EP–35 was insignificant were disputed by Phillips's Dr. David M. Wiles and Du Pont's

264. S–11, p. 44; Tr., p. 5744.

265. S–11, p. 45; Tr., p. 5803.

266. S–38, p. 12.

267. *Id.*, p. 13.

268. Tr., p. 4675.

269. S–38, pp. 63–64.

270. Tr., pp. 6134–54.

271. *Id.*, p. 6193.

272. S–95 only traced absorption between 7.6 and 15 microns, and did not therefore show absorption at 7.25 microns. Tr., pp. 7319–20.

273. Zletz Record, *supra* note 16, at p. 4001.

274. *Id.*

275. This Court understands the term "polymethylene"·to refer to polymer chain sequences of more than one methylene unit.

276. Zletz Record, *supra* note 16, at p. 4001.

277. Tr., p. 6339. Koenig actually testified that for every 1000 pendant methyl groups, EP–34

contained no more than one methylene sequence having four or more methylene units. This Court transposed Koenig's estimates by noting first that since methylene sequences are separated by dangling methyl groups, there must be an equal number of methylene sequences and methyl groups. The total number of methylenes is calculated by summing the number of methylenes in each sequence. The methylene to methyl ratio may thus be determined by dividing this sum by the total number of methylene sequences.

For the purpose of this analysis, this Court assumed that each methylene sequence reported by Koenig to contain at least four methylene groups contained precisely four and that the remaining sequences contained exactly one methylene unit. Both assumptions tended to produce results favorable to Standard. The methylene to methyl ratio thus equals

$$\frac{(4 \times 1) + 999}{1000} = 1.03.$$

278. Tr., pp. 6441–50. Koenig actually testified that for every 100 percent Methyl groups EP–34 might contain as many as twenty methylene sequences containing four or more methylene units. This Court then transposed Koening's estimates following the methods outlined in note 277, *supra*.

Brame. Wiles examined S–91 and S–92 and found absorptions near 13.7 and 13.9 microns which indicated "significant" incursions of long methylene sequences inconsistent with a description of an essentially propylene structure.[279] Wiles concluded: "In view of the fact that there are significant amounts of long methylene sequences in the specimen giving rise to these spectra, [the product of EP–34] could not possibly have the properties of polypropylene.

279. Tr., pp. 7305–08.

280. *Id.*, p. 7310.

281. *Id.*, pp. 7311–15.

282. *Id.*, p. 7320.

283. *Id.*, p. 7321. Phillips attributes this high concentration of methylene to disproportionation. When propylene disproportionates it breaks up into molecules of butylene and ethylene; the ethylene then polymerizes with the remaining propylene, producing a copolymer which accounts for the methylene chains. According to Phillips's Dr. William Bailey, such disproportionation is likely when propylene is polymerized with the molybdenum catalysts employed by Standard. Bailey testified:

> In related runs with similar catalyst practically all the data that I have seen with offgases have indicated some evidence for disproportionation and, therefore, since I haven't seen data which would exclude disproportionation in these catalysts, I assume that this is a common reaction for these molybdenum catalysts. And therefore it would be very likely that this disproportionation reaction would have taken place in the four runs in question.

Tr., p. 7459.

284. Tr., pp. 7595, 7600, 7604.

285. Brame explained the method that he used to calculate the mole percent of methyl to methylene sequences in Standard's products:

> For those samples that were high in methylene content, I took the ratio of the methyl to methylene, the 8.6 micron band which is due to methyl and the 13.9 micron band which is attributable to long sequences of methylene, and obtained the absorbance values of each of those bands, and took the ratio of the absorbance values of those bands and, using the absorptivity or extinction coefficient supplied in the literature articles by either McMurray and Thornton [P–57; *See* Tr., p. 7614], or Bucci and Simonazzi [D–77; *See* Tr., p. 7614], I calculated the relative concentration of the methyl to methylene.

Tr., pp. 7610–11.

. . . ." [280] He found the same peaks in S–76[281] and S–95,[282] and concluded that the product of Run EP–35 was a copolymer of ethylene and propylene.[283] Brame generally agreed with Wiles that significant concentrations of methylene chains were interspersed through the products of the two runs.[284] He testified that the methylene to methyl group ratio was between 2.06 and 2.10 in EP–34 and between 2.22 and 2.6 in EP–35.[285]

In this way Brame calculated that for every 100 methyl groups in the product of EP–34 there were between fifty-three and fifty-five sequences of three or more methylene groups. *Id.*, p. 7616. This Court transposed Brame's estimates following procedures outlined in note 277, *supra*. Here, however, this Court assumed that each methylene sequence reported by Brame to contain at least three methylene groups contained exactly three methylene groups and that all other sequences contained exactly one group.

For EP–35, Brame calculated between twenty-five and forty-four sequences of three or four methylene groups, plus eighteen sequences of five or more methylene groups per 100 methyl groups. Tr., p. 7617. In this latter analysis, Brame concentrated on the 13.68 micron peak as an indicator for the three unit sequences and the 13.9 micron peak as an indicator for the five unit sequences, and compared both to the 8.6 micron peak. *Id.*, p. 7610. This Court transposed Brame's estimates by assuming that each methylene sequence reported by Brame to contain three or four methylene groups contained exactly three, that each methylene sequence reported by Brame to contain at least five methylene groups contained exactly five, and that all other sequences contained exactly one methylene group.

This Court notices that in comparing the 13.9 and 8.6 peaks, Brame inverted his ratio from the previous calculations, and further, that he calculated the five group sequences ratio directly while having determined the three group sequence ratio in EP–34 by first determining the number of methyl groups and then deriving the methylene ratio. *See* D–779. Since none of the parties questioned these possible inconsistencies, this Court assumes that they are immaterial.

Standard objected to Brame's calculations, arguing that Brame had failed to follow the accepted procedures and had devised instead his own technique. Standard's Priority Brief, *supra* note 228, at pp. 64–71. Brame's findings that the ratio was high, however, are consistent with those of Standard's Hopkins, who reported a ratio of 4.2 in EP–34, and 4.0 in EP–34, S–81.

Both Standard and Du Pont thus produced witnesses who testified that Carmody's products showed infrared absorptions in the 13.7 and 13.9 micron regions indicative of long sequences of methylene units. Since the presence of these sequences is inconsistent with a recurring propylene unit structure, the remaining question is their significance.

The second limitation of the Court does not require that the propylene units recur in a perfect manner, i. e., without any random methylene interspersion, but only that the product consist *essentially* of recurring propylene units. Small amounts of impurities may be tolerated as long as their amount is insufficient to effect the basic character of the composition.[286] A Natta patent application indicates that propylene polymers with a methylene to methyl ratio of at least 1.105 are "only slightly altered".[287] On the other hand, Brame testified without refutation that when the methylene to methyl ratio rises as high as 1.53, a polymer of propylene would change from the amorphous to crystalline states, clearly altering the basic character of the composition.[288]

Since Standard has failed to introduce any evidence that a product could have a methylene to methyl ratio at the high end of the range between 1.105 and 1.53 and still consist essentially of recurring propylene units, the Court finds that the maximum ratio consistent with the Count is closer to 1.105.

Brame testified that both of Carmody's products had ratios above 1.53. Standard's own witness, Koenig, ultimately testified

that they exhibited ratios of 1.6. Koenig's remaining testimony and the testimony of Doty that the methylene content was insignificant were too conclusionary to be afforded much weight, since neither witness ever provided any basis for his conclusions that the peaks in the 13.7 and 13.9 micron regions were insignificant. In the absence of even a preponderance of evidence to the contrary, the Court affirms the Board's finding that Carmody's products did not consist essentially of recurring propylene units.

In attempting to show that the products of Runs P–1 and P–9 were propylene, consisting essentially of recurring propylene units, Standard relied principally upon depositions of Hopkins, Doty, and William E. Kaminsky, and upon the trial testimony of Koenig. Under Hopkins's supervision, the product of Run P–1 was twice subjected to infrared analysis, resulting in the preparation of scans S–77 dated June 18, 1953, and S–100 dated February 16, 1954.[289] Both spectra showed absorption in the regions expected for homopolymers of propylene. On February 23, 1954 Hopkins reported that P–1 absorbed infrared radiation near 7.25, 8.6, and 11.85 microns and contained little if any chain methylene absorption based on observation of the lack of a strong doublet near 13.7 and 13.9 microns.[290]

Finally, Koenig compared Hopkins's scans of the product of P–1 with scans of crystalline polypropylene known to meet the Count which had been filed by Natta in U.S. Application No. 516,099, and found that the infrared spectra were "virtually the same".[291]

---

**286.** Interference Record, Paper No. 132, pp. 3–4.

**287.** M–1176, p. 9. Natta never actually indicated the methylene to methyl ratio but only stated that propylene polymers were only slightly altered when they were prepared from a feed containing five percent ethylene. Since Natta observed that ethylene polymerizes more rapidly than propylene, this Court therefore assumed that Natta's polymers must have contained at least five percent ethylene. M–1261 shows that the methylene to methyl ratio in

propylene polymers containing five percent ethylene is at least 1.105, if the percentage reflects a molar ratio, and 1.16 if the percentage reflects a weight ratio.

**288.** Tr., p. 7715; M–1261.

**289.** Tr., pp. 6188–94.

**290.** S–44.

**291.** Tr., p. 6381.

As for P–9, Kaminsky testified that on August 26, 1954, he subjected the product of that run to infrared analysis, producing Scan S–61.[292] Reviewing this scan, Doty testified that the major constituent of the P–9 material was "crystalline head-to-tail 1, 2–polypropylene".[293] He found no evidence of substantial methylene chains that would disrupt an essentially propylene structure in the products of either P–1 or P–9.[294]

On the other hand, Brame thought that Peters's products were copolymers because he found methylene to methyl ratios of between 1.32 and 1.38 for P–1, and between 1.48 and 1.66 for P–9.[295] Phillips's Wiles did not testify regarding these products. The best argument against Peters's products was thus that their methylene to methyl ratios were in the middle of a range of possibly acceptable values. In addition, Doty and Koenig never acknowledged the existence of any peaks showing substantial methylene chains in these products, as they had for those of Carmody. The Court cannot say as a matter of fact that the methylene concentration reported by Brame would alter a propylene sufficiently so that it could not be said to consist essentially of recurring propylene units. Further, scan S–100 of P–1 is very similar to Natta's infrared scan of products found to fall within the Count. Considering this evidence, the Court finds that Peters's products were polypropylenes consisting essentially of recurring propylene units.

Standard's arguments that the products of Runs EP–34 and EP–35 had a *substantial crystalline polypropylene content* are based solely on analysis of infrared spectra since no x-ray diffraction scans were made. Doty testified that there are two standards for determining the degree of polypropylene crystallinity from infrared spectra: the Heinen scale which compares absorptions at 11.85 microns indicating the number of propylene units in the crystalline lattice and at 8.6 microns indicating the number of propylene units in the sample and the Luongo scale, which focuses on the 10.03 and 10.27 micron bands as the respective indicators.[296] Applying these two standards, Doty calculated that the product of Run EP–34 was between 27% and 38% crystalline,[297] and that the product of Run EP–35 was between 34% and 41% crystalline.[298] Since none of the parties disputes Doty's testimony, the Court accepts it as true and finds that the products of Runs EP–34 and EP–35 had a substantial crystalline polypropylene content.[299]

Infrared scans of the products of P–1 and P–9 also exhibited the 10.03 and 11.85 micron peaks signifying that the products had a substantial content of crystalline polypropylene.[300] The crystallinity of these products is further established by examination of x-ray diffraction scans. On September 14, 1953 Standard's Kimball prepared two x-ray diffraction scans, S–45 and S–47, and a photograph, S–48, of the product of

**292.** Zletz Record, *supra* note 16, at pp. 2811–13.

**293.** *Id.*, p. 4014.

**294.** *Id.*

**295.** Tr., pp. 7618–19. Brame actually testified that for every 100 pendant methyl groups, P–1 contained between four and ten sequences of three or four methylene groups and six sequences of five or more methylene groups. Brame also calculated that for every 100 pendant methyl groups, P–9 contained between twelve and twenty-one sequences of three or four methylene groups and six sequences of five or more methylene groups. D–779. These values were transposed following procedures noted in note 277, *supra.*

**296.** Zletz Record, *supra* note 16, at pp. 4007–08.

**297.** *Id.*, p. 4009.

**298.** *Id.*, p. 4010.

**299.** This finding in no way implies that the products of EP–34 and EP–35 consisted of essentially recurring propylene units. Apparently, propylene samples will absorb infrared radiation in the 10.03 and 11.85 micron regions when the polymer contains some segments of as few as ten propylene units arranged in a recurring fashion. Tr., p. 7423. Absorption in this region therefore does not eliminate the possibility that long methylene sequences might interrupt these segments.

**300.** S–44.

P-1,[301] and on November 16, 1953 he prepared another x-ray diffraction scan, S-50,[302] In his interference testimony, Kimball testified that at least scans S-45 and S-47 indicated that the products were crystalline.[303] This conclusion was buttressed by the interference testimony of Dr. Charles Ehrhardt.[304] In March, 1954 Kimball again subjected the product to x-ray analysis, preparing films S-52, S-54, S-55 and S-56, which also led Kimball to conclude that the product was crystalline.[305] Dr. Robert H. Marchessault testified that the photograph, S-48, indicated that P-1 produced a crystalline polymer that was not polyethylene.[306] He also testified that S-50 indicated that the degree of crystallinity was 50% to 55%.[307] Standard's case was further buttressed by Mark, who described S-48 as indicating a product that is "distinctly crystalline".[308] Subsequently, on December 11, 1953 Mark recorded in his notebook: "solid pp sample of Peters X-ray diagram shows crystallinity." [309]

As for the product of P-9, Kimball subjected it to x-ray analysis on September 21 and 22, 1953 and prepared the scans comprising S-49. Marchessault testified that these scans "capture[d] all the diffraction peaks which were seen previously. . . . The material is distinctly crystalline." [310] In view of this uncontested testimony, the Court finds that the products of P-1 and P-9 exhibited substantial propylene crystallinity.

### 2. Recognition of The Product.

The Court found that all the presently available information regarding Carmody's products failed to justify the conclusion that they *consisted essentially of recurring propylene units.* Since Standard's inventors could have known no more in the early 1950s than the Court knows today, the Court must conclude that Standard's inventors did not know enough about the products of EP-34 and EP-35 in 1950 to justify the conclusion that they corresponded to the limitations of the Count. Accordingly, this Court finds no recognition of Carmody's products.

The Court also finds that Standard's scientists failed to recognize the product of Run P-9. Mere preparation of an infrared or x-ray scan is not sufficient to establish recognition. An inventor must also appreciate the importance of the relevant peaks in the scan. Standard submitted no evidence regarding contemporaneous interpretations of the infrared scan S-61. As for the x-ray scans, the only evidence adduced concerning contemporaneous interpretations is Kimball's testimony that S-40, a general report of "dA values found for polypropylene", was prepared with reference to x-ray scan S-49,[311] a scan of the product of P-9. This report fails however to indicate that it was actually based upon S-49 rather than on x-ray scans of the product of P-1. Further, Kimball's testimony tends to cast doubt on the fact of contemporaneous interpretation of the scan:

Q. Do you recall at the time you obtained this scan—or I should qualify it—the two scans, which are illustrated on S-49, reaching a decision as to whether or not the sample exhibited crystallinity?

A. It is apparent from the peaks that it does exhibit crystallinity. It would have been apparent at the time.[312]

---

301. Tr., pp. 6580–607.

302. *Id.*, pp. 6633–34.

303. *Id.*, pp. 6597–601.

304. *Id.*, p. 6797.

305. *Id.*, pp. 6640–58.

306. Tr., p. 6858.

307. *Id.*, pp. 6895–96.

308. Standard's Priority Brief, *supra* note 102, at p. 30.

309. S-293, p. 9.

310. Tr., pp. 6870–71.

311. Tr., pp. 6634–35.

312. *Id.*, pp. 6693–94.

The Court interprets Kimball's testimony as only claiming that if he had focused upon particular portions of S–49, he could have concluded that the product of P–9 was crystalline. Kimball did not testify that he actually focused on the relevant peaks. For these reasons, the Court finds that Standard's scientists had insufficient knowledge about the product of Run P–9 to justify the conclusion that it corresponded to the substance of the Count.

On the other hand, the Court finds that Standard has adequately established that the product of P–1 was recognized between June 1, 1953, when Peters removed the product of P–1 from his reactor, and May 17, 1954,[313] Du Pont's earliest claimed priority date. Standard's scientists clearly recognized that Peters had produced a new form of matter. Prior to the production of P–1, Hopkins conducted infrared scans on samples of polyethylene as well as on Carmody's products and observed methylene absorption peaks at about 13.7 and 13.9 microns. In sharp contrast he reported that the product of P–1 contained "little, if any . . . methylene absorption".[314] While Hopkins had previously reported higher methylene to methyl ratios for other products, he estimated that the ratio for the product of P–1 was much lower.[315] Further, Kimball recognized that the x-ray scan S–45 of P–1 "was different from anything I had ever seen before. It was a unique diffraction pattern to me. . . ."[316] The accuracy of Kimball's assertion is supported by a laboratory notebook page dated November 16, 1953 indicating that while a number of previous polymers had a polyethylene structure, the product of Run P–1 had a polypropylene structure.[317]

In addition to recognizing that Peters had prepared a new material, Standard's scientists also recognized enough about the product of Run P–1 to justify the conclusion that it complied with the limitations of the Count. The best support for this is the fact that most of the evidence upon which this Court relied in finding that Standard's product complied with the limitations of the Count was prepared by Standard prior to May, 1954. After preparing the product of P–1, Peters observed that it was a *solid*.[318] By late February, 1953, Hopkins had reported both the presence of all the infrared peaks that are associated with the *polypropylene, consisting essentially of recurring propylene units* and the virtual absence of those peaks that are associated with the sequences of more than one methylene unit.[319] Hopkins also noted the presence of the infrared peaks that are associated with *crystallinity*. Finally, by early 1954 Kimball's work had proceeded to the point where he not only knew that Peters's product was crystalline, but he had begun to speculate about the particular crystalline arrangement.[320] The Court therefore finds that Standard's scientists recognized the product of P–1.

### 3. Recognition of A Utility for The Product.

In attempting to prove recognition of a patentable utility for its products, Standard cites a laboratory notebook entry by Zletz:

Whether the product is a solid, grease or oil it should be very useful. Solids of high specific viscosity should find use as a plastic. Solids of low sp. viscosity should find use as adhesives. Very low specific viscosity solids and greases may be good

---

313. It is unnecessary to establish this date any more precisely since Standard's priority position among the parties will not be advanced by the choice of one priority date in this period over any other such dates.

314. S–42.

315. *Id.*

316. Zletz Record, *supra* note 16, at p. 1768.

317. S–51, p. 5.

318. *See* text accompanying notes 266–268, *supra.*

319. S–81.

320. S–57. *See also* S–51, pp. 17–18; S–41, p. 2.

V. I. improvers while oils should be of interest as lubricants.[321]

Standard also relies upon a patent application submitted by Carmody and Zletz in 1951 regarding polymers such as the products of EP–34 and EP–35:

[T]hese solid polymers . . . can be subjected to such after treatment as may be desired, to fit them for particular uses or to impart desired properties. Thus, the solid polymers can be extruded, mechanically milled, filmed or cast, or converted to sponges or lattices. Antioxidents, fillers, extenders, plasticizers, pigments, etc., can be incorporated in the solid polymerization products.[322]

More importantly, Standard relies upon the testimony of Peters and Mark. In early June, 1953 Peters testified that one of his products ". . . looks and feels like a good polyethylene except it is more flexible".[323] Peters also determined the products' viscosity and density. Peters subsequently formed a portion of one of his products into a self-supporting film in preparation for infrared analysis. In addition, a sample of Peters's first product was stretched in order to orient the crystals so that the dimensions of their unit cells might be determined.[324] Based on this information, Peters testified at trial: "I would expect it to have any applications that polyethylene would have applied to." [325]

Mark reported that he learned on or about January 26, 1954 [326] that Peters had been unable to separate his product from the catalyst because it would not dissolve in benzene, and instead had dissolved it in xylene, heated to its approximately 284°F. (140°C.) boiling point.[327] This information indicated that Peters's products were generally resistant to solvents and that their melting points were very high, "certainly above 100 degrees".[328] Mark concluded that all "these various attributes add(ed) up to a material which would have a wide variety of useful application." [329]

The Court's analysis of this information confirms that Standard's scientists did not learn enough about any of their products to justify the conclusion of a specific utility. Zletz's description is too broad, spanning a range of possible results without identifying where his particular product would fit. Carmody's description is relevant to methods of making the product useful, rather than to particular uses. Peters and Mark rely on tests relevant to identification of the product and speak in terms too general to indicate a specific utility. Although Standard's scientists might have ascertained that their polymers had a high molecular weight, they did not engage in the specific use testing suggested by Phillip's Fox and adopted by this Court as the minimum necessary to justify a conclusion that a material is useful as a solid plastic.[330] Standard failed to introduce any evidence that its scientists tested to determine the Young's modulus for any of its materials. Although the Peters's experiments may indicate that Peters's polymers would not melt below 100 degrees, no one ever determined that the products would not decompose at the higher temperatures required for molding. In the absence of the testing required to prove utility as a solid plastic or

---

321. S–1, p. 133.

322. S–10, p. 26.

323. S–43, p. 2.

324. Standard also claims (Standard's Priority Brief, *supra* note 102, at p. 36) that Dr. Hopkins stretched a small sample "between two pairs of pliers to two or three times its original length." (Tr., pp. 6218–19). On cross-examination, however, Dr. Hopkins testified that he could not recall how much the sample stretched and that he never attempted to measure the amount of stretching. Hopkins also admitted that the sample with which he worked may have been as small as one-quarter of an inch even after stretching. (M–1109, pp. 3587–90).

325. Tr., p. 4675.

326. *Id.*, p. 7062.

327. *Id.*, pp. 7066–68.

328. *Id.*, p. 7068.

329. *Id.*, p. 7069.

330. *See* text accompanying note 87, *supra*.

of a claim for a specific alternate use, the Court affirms the Board's finding regarding utility.

### 4. Standard's Possible Relation Back Argument.

Although Standard's Brief is unclear, it is possible that Standard argues that it is entitled to a date of priority during the summer of 1950 based upon the combination of Zletz's alleged conception and Peters's claimed reduction to practice.[331] Such relation back is provided by 35 U.S.C. § 102(g) which states in relevant part:

In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

This provision is not available to Standard because there is no reduction to practice that could relate back to Zletz's alleged conception. There is also a lack of conception on the part of Zletz, and a further lack of required diligence on the part of Standard's scientists.

■ In the patent field, "conception" is defined as the "mental formulation and disclosure by the inventor of a complete idea for a product or process".[332] It is a "definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice".[333]

It is often difficult in experimental sciences such as polymer chemistry to form a complete conception prior to significant experimentation. This situation was noted by Robinson:

The production of a new means by [experiment] is . . . an inventive act, but at no instant before the experiment success can it be said that the conception of the invention exists in the inventor's mind. Until that instant it is mere speculation, at most a probable deduction from facts already known and the same act which reduces it to practice gives to the conception its definite and final form. Hence the date of the conception in such cases is the date, not when experiments begin, but when they end; and the first to bring the art or instrument into successful operation is the first conceiver of the entire invention.[334]

This observation does not mean that in no chemical patent case may a conception exist independently of the production of the product. Rather the question is one of fact as to the completeness of the conception.[335] In the instant case, the facts indicate that Zletz's conception was in fact incomplete. Although Zletz had the idea of polymerizing propylene with a molybdenum catalyst, he did not have a sufficiently specific idea of the complete and operative product ultimately produced by Peters, as evidenced by an entry in his notebook for September 26, 1950 where Zletz recorded that the product could be either "a solid, grease or oil".[336]

Further, Standard admits that Peters was assigned to report on the experiments employing Zletz's catalyst only after "a large number of experiments had been done by Evering's group on the polymerization of olefins . . . using the Zletz catalysts under varying reaction conditions".[337]

---

**331.** Standard's Priority Brief, *supra* note 102, at pp. 7–35.

**332.** Chisum, *supra* note 58, at § 10.04.

**333.** *Mergenthaler v. Scudder*, 11 App.D.C. 264, 731 (D.C.Cir.1897).

**334.** 1 Robinson, The Law of Patents For Useful Inventions, § 381 (1890).

**335.** *See* Chisum, *supra*, note 58, at § 10.04[5].

**336.** S–1, p. 133.

**337.** Standard's Priority Brief, *supra* note 102, at p. 20.

These experiments were in fact so extensive that it took Peters nearly a year to organize and submit his report.[338] This subsequent experimentation and the corresponding changes made in Zletz's procedure indicate that the conception was not sufficiently complete to support the idea that Peters's work was merely the reduction to practice of Zletz's conception. The applicable rule was stated by the C.C.P.A. in *Alpert v. Slatin* :[339]

> Conception of an inventive process involves proof of mental possession of the steps of an operative process and, if necessary, of means to carry it out to such a degree that nothing remains but routine skill for effectuation thereof. If after the claimed conception date extensive research was found necessary before achieving minimum satisfactory performance obviously the mental embodiment of that date was a mere hope or expectation, a statement of a problem, but not an inventive conception.[340]

Even if Zletz's conception was sufficiently complete to allow a person of reasonable skill in the polymer field to produce the product of the conception, Standard did not prove that it had been diligent for purposes of 35 U.S.C. § 102(g) during the critical period from a date just prior to the earliest reduction to practice by an opposing party until its own reduction to practice. It is true that

> the diligence required is not extraordinary. It needs to be only reasonable under the circumstances of the case, nor does it "involve uninterrupted effort nor the concentration" of all the applicant's energies upon the single enterprise. "The

health, the means, the liberty of the inventor * * * are proper subjects for consideration" in determining the question.[341]

Zletz's alleged conception, Standard argues, occurred during the summer of 1950.[342] Following Zletz, Standard initiated programs to study the polymerization of ethylene,[343] with Carmody conducting experiments on the polymerization of propylene from September through October, 1950.[344] In July, 1952 Peters was then assigned to compile a report of the polymerization data that had been collected using the Zletz catalysts, which he submitted in April, 1953.[345] Peters then began his own propylene polymerization experiments.[346]

The Court does not find that this history presents a convincing argument that Zletz's conception of the polymerization of propylene was diligently pursued from just before the date of Phillips's first actual reduction to practice on or about October 9, 1951,[347] until June 1, 1953, the earliest possible date for Peters's reduction to practice. The only specific instance of propylene polymerization experiments identified by Standard are those of Carmody in the fall of 1950 and arguably Peters's commencement of data compilation in July, 1952. This leaves an unexplained gap of approximately eighteen months during which Standard claims to have been doing no more than studying the polymerization of ethylene, a substance distinct from the product of Zletz's alleged conception. The Court finds, therefore, that Standard has failed to adduce evidence of due diligence in the reduction of Zletz's alleged conception regarding polymerization of propylene.

**338.** Proposed Findings of Fact and Conclusions of Law of Plaintiff Standard Oil Company (Indiana) With Respect to Priority, I., 4.04.

**339.** 305 F.2d 891, 49 CCPA 1343 (1962).

**340.** *Id.*, 305 F.2d p. 894.

**341.** *Dickinson v. Swinehart*, 49 App.D.C. 222, 223, 263 F. 474, 475 (D.C.Cir.1920).

**342.** Proposed Findings of Fact and Conclusions of Law of Plaintiff Standard Oil Company (Indiana) With Respect to Priority, I., 1.02–1.05.

**343.** *Id.*, I., 4.02.

**344.** *Id.*, I., 3.04, 3.09.

**345.** *Id.*, I., 4.04.

**346.** *Id.*, I., 4.06.

**347.** *See* text accompanying notes 363–364, *infra.*

*Standard's Constructive Reduction To Practice.*

Montedison contends that the Board improperly granted Standard's constructive reduction to practice claim since Standard's 1954 application failed to disclose the second and third limitations of the Count as required by 35 U.S.C. § 112. Specifically, Montedison contends that the application is defective because it disclosed products that were not polypropylene consisting essentially of recurring propylene units. Montedison also argues that the application failed to establish sufficiently that the product has a substantial crystalline component.[348] The Board's Opinion addressed these objections and found them insufficient to require denial of Standard's claim.[349] The Court finds that the Board was correct in this determination.

■ If an application describes a broad range of ingredients which taken in various combinations would lead to the claimed product, and the applicant seeks a patent for one preferred combination, rejection is proper if such preference is not explicitly stated.[350] The C.C.P.A. has, however, decided against development of a universal rule barring the use of a generic disclosure as support for a specific claim. In *In re Wertheim*, the Court stated:

That what [applicants] claim as patentable to them is *less* than what they describe as their invention is not conclusive if their specification also reasonably describes that which they do claim. . . As we said in a different context in *In re Saunders*, 444 F.2d 599, 607, 58 CCPA 1316, 1327, 170 USPQ 213, 220 (1971); 'To rule otherwise would let form triumph over substance, substantially eliminating

the right of an applicant to retreat to an otherwise patentable species merely because he erroneously thought he was first with the genus when he filed.' (emphasis in original).[351]

The question of the proper test for determining when a generic application should be allowed for a specific invention was addressed by the C.C.P.A. in 1956:

[W]hether an application forms a proper support for a claim to a composition which is not specifically disclosed, but which falls among compositions suggested by general language in the application . . . must be determined largely by the particular circumstances of each case. . . . [T]he indication or lack of indication of a preference for the composition, in the application disclosure, is an important factor to be considered in making the determination, since anyone attempting to carry out the disclosure of an application would logically begin with the preferred examples given.[352]

This Court has determined that Standard's generic description properly discloses a specific invention. The problem in the instant case is not one of a multiplicity of procedures but a multiplicity of products. Standard's application clearly discloses a product meeting the limitations of the Count. In the application, Zletz describes his invention as relating to the production of solid polymers from propylene:

One object of my invention is to prepare polymers from propylene which are solids at normal room temperature and, at said temperatures, do not exhibit the flow and deformation characteristics of viscous liquids. Another object is to prepare rubbery, elastic solid polymers from propylene. Yet

---

**348.** Montedison's Reply Brief, *supra* note 65, at pp. 83–84.

**349.** Board's Opinion, *supra* note 18, at pp. 65–66.

**350.** This was the context in *In re Ruschig*, 379 F.2d 990, where at 995, 54 CCPA 1551, the C.C.P.A. stated:

Not having been specifically named or mentioned in any manner, one is left to selec-

tion from the myriads of possibilities encompassed by the broad disclosure, with no guide indicating or directing that this particular selection should be made rather than any of the many others which could also be made.

**351.** 541 F.2d 257, 263 (Cust. & Pat.App.1976).

**352.** *Prutton v. Fuller*, 230 F.2d 459, 463, 43 CCPA 831 (1956). *See also Spero v. Ringold*, 377 F.2d 652, 54 CCPA 1407 (1967).

another object of my invention is to provide novel polymers from propylene which can be used to prepare self-sustaining films.[353]

The application discloses a "normally solid polypropylene"[354] with density between .85 and .95, a softening point above 120°C., and a viscosity in excess of .1.[355] The application also discloses infrared spectra for the product with peaks at 7.25, 8.6, 10.03, 10.27, and 11.85 microns and the absence of peaks 13.7 and 13.9 microns.[356] The application further discloses a methylene to methyl ratio of "Ca.1" for the product.[357]

■ Montedison objects because the application also disclosed products with methylene to methyl ratios that do not indicate the product of the Count. The fact that the application discloses other inventions in addition to that of the Count does not, however, mean that one following its teaching would necessarily be "left to selection from myriad possibilities . . . with no guide indicating that this particular selection should be made".[358] Zletz's preference for the product of P–1 is clearly indicated in the language of the application. An experimenter turning to the application for guidance in producing the "normally solid polypropylene" described in the original application would easily discern the desired product from among the copolymers of ethylene and propylene and the homopolymers of ethylene that were also possibly produced by the process. He would be able to discard the copolymers and the polymers of other substances and to select the product of the Count. The problems inherent in some broad disclosures are therefore not apparent here, and there is no reason to apply a restrictive rule to Zletz's application. The Court therefore finds that the Board was not in error in applying the rule of law that allowed Standard's disclosures to constitute a constructive reduction to practice.

Montedison also claims that the data included in Standard's application are not sufficient to establish that the product disclosed has a crystalline content because "crystallinity" was not mentioned in so many words. The description requirement, however, does not mandate *in haec verba* repetition of the formal language of the Count. All that is necessary is that the application describe the product in language that is legally equivalent to that of the Count. Standard's application disclosed that the product of P–1 absorbed infrared radiation at 10.03 and 11.85 microns,[359] indicating that this polymer was crystalline. Standard's application also disclosed that x-ray diffraction data for the product of P–1 indicated that the polymer has an "orthorhombic crystal form" and that its cell dimensions are "unquestionably different from the crystallographic structures of solid polyethylenes or solid polyisobutylenes".[360] Standard's application thus disclosed that its product was crystalline.

Montedison also attacks Standard's application for failing to disclose "substantial" crystallinity. The word substantial, however, requires only that the crystalline content not be inconsequential.[361] The Board held that "the Zletz application sets forth the crystallographic constants for the product of run P–1, which, based on x-ray data, gives an explicit disclosure of crystal form and dimension of the unit cell of the crystal."[362] The inclusion of such complete data shows that Standard claimed a product containing more than an inconsequential amount of crystalline polypropylene. The Board's finding is therefore affirmed.

### PHILLIPS'S PRIORITY CASE

Phillips claims a priority date no later than January 27, 1953 based upon actual reductions to practice on October 9 and November 19, 1951, and February 12–27 and April 16, 1952, and upon a constructive reduction to practice on January 27, 1953,

**353.** M–1137, p. 2.

**354.** *Id.*, p. 11.

**355.** *Id.*, p. 3.

**356.** *Id.*, p. 11.

**357.** *Id.*, p. 6.

**358.** *See* note 350, *supra.*

**359.** M–1137, p. 11.

**360.** M–1137, p. 12.

**361.** *See* text accompanying note 43, *supra.*

**362.** Board's Opinion, *supra* note 18, at p. 69.

grounded on United States Application No. 333,576. The Board denied Phillips's actual reduction to practice claims, finding that Phillips failed to establish that any of its runs produced a product consisting essentially of recurring propylene units having a substantial crystalline content or having a specific practical utility.[363] The 1953 application was also rejected for failing to disclose the product of the Count and for failing to disclose a utility for the product.[364] The Court finds that Phillips did indeed reduce to practice the product of the Count in each of its claimed actual reductions to practice, that it recognized these products and their utility as wax modifiers, and that the 1953 application constituted an adequate constructive reduction to practice. The Court accordingly awards Phillips a priority date of at least as early as January 27, 1953.

*Phillips's Actual Reduction To Practice.*

Phillips's development of crystalline polypropylene began in June, 1951 in the Catalytic Process Section of its Hydrocarbon Conversion Branch, located in Bartlesville, Oklahoma.[365] At that time, Dr. W. C. Lanning managed the Catalytic Process Section,[366] John Paul Hogan worked as a group leader,[367] and Robert L. Banks, Dr. Gene Nowlin, and Edward Francis[368] worked as research chemists. Some research activities were also done in the Lube Oil Section, managed by Dr. Nelson Axe,[369] who was assisted by A. N. Devault and J. T. Gragson.[370]

Prior to June, 1951 Hogan's group had been working on the conversion of olefins to polymers.[371] Under Hogan's supervision, Banks attempted to develop a commercial process for such conversion utilizing a catalyst containing nickel oxide on a silica-alumina support.[372] On June 5, 1951 Banks modified the catalyst slightly and prepared a new catalyst that contained chromium oxide and nickel oxide supported on silica alumina.[373] A subsequent run with propylene produced a solid product.[374]

Hogan and Banks subsequently switched their attention to a catalyst containing only chromium oxide on a silica alumina support. On October 9, 1951 Francis conducted Run 4721–16 and produced the first product upon which Phillips now relies. In this Run Francis used a fixed bed reactor containing 57.5 g. of catalyst. The catalyst was prepared by mounting chromium nitrate on a commercially produced silica alumina pellatized (14–28 mesh) support. During the five and one-half hour reaction, Francis maintained a temperature of 190°F. (88°C.) and a pressure of 600 psig. As a diluent, Francis used isopentane. Francis obtained between forty and fifty grams of polymer,[375] which Nowlin later fractionated, recovering a "polypropylene gel" that was insoluble in chloroform and benzene.[376]

Hogan, Banks, and Francis again polymerized propylene on November 19, 1951 in Run 4721–26.[377] Phillips's scientists used a fixed bed reactor in this experiment.[378] Their catalyst contained four weight percent chromia on a commercially produced silica alumina pellatized (8–14 mesh) support. It was activated by heating to 730°F. (388°C.).[379] Isopentane was used as a diluent. During the thirty-eight hour reaction, a temperature of about 180°F. (82°C.) and a pressure of between 480 and 500 psig were maintained, and 70.5 g. of "tacky poly-

363. Board's Opinion, *supra* note 18, at pp. 57–64.

364. *Id.*, at pp. 39–44.

365. Tr., p. 18.

366. Hogan Record, *supra* note 16, at p. 11.

367. *Id.*

368. *Id.*

369. *Id.*, p. 637.

370. *Id.*, p. 940.

371. *Id.*, p. 12.

372. *Id.*, p. 215.

373. *Id.*, pp. 12–13.

374. *Id.*, p. 12.

375. P–12, p. 40.

376. P–39.

377. P–12, pp. 53–55.

378. *Id.*, p. 47.

379. *Id.*, p. 53.

mer" were recovered. DeVault later separated out a product that was insoluble in both methyl isobutyl ketone and n–pentane.[380]

Hogan and Banks again polymerized propylene in three experiments during February, 1952, numbered 4958–13, –15, and –18, using the same apparatus as in Run 4721–26. The catalyst contained three weight percent chromia on one-eighth inch pellets of a commercially available silica alumina support. As diluents, Hogan and Banks used isooctane and pentane. During each of the above runs, a reaction temperature of between 200°F. (93°C.) and 230°F. (100°C.) and a pressure of about 400 psig were maintained for fifteen hours. These runs produced a total of nearly eight pounds of crude polymer.[381] DeVault and Gragson later fractionated the combined products of these three runs, obtaining Sample PO–133 which was insoluble in pentane and a mixture of methyl isobutyl ketone and toluene at 200°F. (93°C.).[382]

Hogan and Banks polymerized propylene a fourth time on April 16, 1952, preparing more than two pounds of a solid propylene polymer. In this experiment, numbered 4958–44, they used the same reactor as was used in preparing PO–133. The catalyst, the precise nature of which is unclear, was activated by heating to 925°F. (496°C.). During the twenty hour experiment, Hogan and Banks maintained a reaction temperature of 190°F. (88°C.) and a pressure of about 460 psig. As diluents, they used isooctane and propane.[383] The crude product was fractionated under Hogan's supervision. The result was PO–116, which was insoluble in boiling methyl isobutyl ketone.[384]

### 1. Production of The Product of The Count.

Each of Phillips's four products were *normally solid*. Phillips's infrared expert Ver-

non Thornton observed that the product of Run 4721–26 was a "hard, crystalline translucent solid".[385] DeVault recorded that the product of Run 4721–26 was:

[A] fluffy white powder and upon heating it on a hot plate, it became clear and upon cooling it became opaque and had the appearance of polyethylene samples.

. . . . .

[B]y adding some of this powder into the aluminum [weighing pans] on the hot plate, [the material] would melt and then you could peel, when it solidified, cooled, you could peel the aluminum from the sample. . . . The material was solid. . . . And it would hold the shape of the vessel in which it was melted, and solidified.[386]

DeVault also recorded that PO–133 was "hard",[387] and that it was initially a white powder:[388]

[Following the] procedure I mentioned previously of heating a small amount in an aluminum container on a hot plate, removing it from the hot plate, cooling it and peeling off the aluminum from the sample, [I obtained] . . . a plastic material that maintained the shape of the container that it had been melted in.[389]

Finally, PO–116's solidity was reported in P–14[390] and was evidenced by its being pressed into films suitable for infrared analysis.[391] Since the parties do not argue otherwise, the Court concludes that Phillips's products were indeed normally solid.

All of Phillips's products were *polypropylenes, consisting essentially of recurring propylene units.* On November 26, 1951 the product of Run 4721–16 was subjected to infrared analysis and scan P–20 was prepared. This scan showed the familiar absorption pattern for a polypropylene, consisting

380. P–45, pp. 33–36, 46–47.

381. P–13, pp. 19, 26, 33.

382. P–45, pp. 98–100; P–46, p. 1.

383. P–13, pp. 72–75.

384. P–14, pp. 90–91.

385. Hogan Record, *supra* note 16, at p. 1747.

386. Hogan Record, *supra* note 16, at pp. 1030–31. *See also* P–45, p. 36.

387. P–46, p. 1.

388. Hogan Record, *supra* note 16, at p. 1049.

389. *Id.*, p. 1051.

390. P–14, p. 90.

391. Hogan Record, *supra* note 16, at pp. 1271–72.

essentially of recurring propylene units.[392] In July, 1952 Thornton, who then headed the infrared spectroscopy group at Phillips,[393] thus reported that P–20 showed:

| Microns | | |
|---|---|---|
| 13.86 – 12.74 | no major bands | R-$(CH_2)_n$-$CH_3$; n=0 indicated |
| 10.88 – 10.85 | no major bands | C-C-C-R and C-C-C-R absent |
| 10.80 – 10.73 | no major bands | C-C-R absent |
| 10.73 – 10.71 | no major bands | R-C-C-C-R absent |
| 10.30 | absorption band | isolated $(CH_2)$; (R-C-C-C-R) indicated |
| 8.96 | no major band | no adjacent tertiary carbons |
| 8.63 | absorption band | R-C-C-C-R indicated |
| 8.56 | uncertain | |
| 8.10 – 7 98 | no absorption bands | C-C-C-R absent |
| 7 31 | no absorption band | C-C-R Absent, $CH_3$ indicated |
| 7.25 | absorption band | |
| 7.17 – 7.16 | no major band | C-C-C-R absent |

These observations are consistent with the proposed carbon structure:

$$\left( C - \underset{C}{\overset{}{C}} \right)_n \quad {}^{394}$$

The product of Run 4721–26 was again subjected to infrared analysis on December 22, 1955, producing scan P–117, and on October 19, 1958, producing scan P–118.[395] The peaks in these scans confirm that the product of Run 4721–16 was polypropylene, consisting essentially of recurring propylene units.[396]

Infrared analysis also established that the product of Run 4721–26 was a polypropylene, consisting essentially of recurring propylene units. This product was subjected to infrared analysis on or about December 12, 1951[397] and spectrum P–24 was produced. Along with P–20, P–24 formed part of the basis of Thornton's 1952 report establishing that Phillips's products met the second limitation of the Count.[398] P–24 shows the characteristic absorptions for polypropylenes consisting essentially of recurring propylene units.[399] Hogan thus concluded: "[P–24] appeared to be the spectrum of a sample, the major component of which was crystalline polypropylene of the same structure as the polypropylene gel. . . .[400]

PO–133 was never subjected to infrared analysis. It was produced, however, by following a process which was very similar to that used in making the products of Runs 4721–16 and 4721–26 as well as PO–116. Since infrared scans of those three products clearly indicate that they were polypropylenes, consisting essentially of recurring propylene units, this was probably true of PO–133. Phillips also showed that in December, 1952, Phillips's scientists M. L. Gallaugher measured PO–133's physical characteristics and found that it had a density of 0.914 g./cm.³ and a melting point of $236 \pm 5°F.$ $(113 \pm 3°C.)$.[401] Both of these values are within the ranges normally associated with product of the Count.[402] Combined with the information that PO–133 was a solid[403] made from propylene[404] and

---

**392.** Tr., pp. 4219–31.

**393.** *Id.*, p. 4211.

**394.** P.-56, p. 7. A polymer chemist would understand that "the proposed [carbon] structure $\left(C-\underset{C}{\overset{}{C}}\right)_n$ " "would indicate the essentially recurring propylene unit structure depicted in Figure 2, accompanying note 35, *supra.* Hogan Record, *supra* note 16, at p. 1589.

**395.** Hogan Record, *supra* note 16, at pp. 3402–04; Tr., pp. 2722–23.

**396.** Tr., p. 2623. The witness, Dr. David Wiles did not actually use this precise language; rather he only said that the sample was "polypropylene". His previous testimony, however, indicates that he considered that the word polypropylene subsumed the phrase "polypropylene, consisting essentially of recurring propylene units". Looking at a picture of recurring propylene units, P–1059, Wiles thus testified:

"This is the chemist's way of designating what the repeat units are in a molecule made from propylene; that is to say, polypropylene."

Tr., p. 2673.

**397.** Hogan Record, *supra* note 16, at pp. 352, 356.

**398.** *Id.*, p. 1594.

**399.** Tr., pp. 2699–2701.

**400.** Hogan Record, *supra* note 16, at pp. 1611–12.

**401.** P–59, p. 33; Hogan Record, *supra* note 16, at pp. 2059–68.

**402.** *See* text accompanying note 46, *supra.*

**403.** *See* text accompanying notes 387–389, *supra.*

**404.** *See* text accompanying note 381, *supra.*

insoluble in pentane,[405] yet its viscosity was measured on May 20, 1953 and found to be 0.508,[406] the density and melting point values may, in fact, uniquely describe solid crystalline polypropylene. At any rate, the other parties were unable to point to a single product having these properties that was not the product of the Count.

PO–116 was subjected to infrared analysis on November 25 and 26, 1952 and scans P–48 and P–49 were produced.[407] Both scans indicate that PO–116's product was a polypropylene, consisting essentially of recurring propylene units. A. P. Frenzel, who worked with Thornton at Phillips, observed between December 1952 and about January 25, 1953 that PO–116 absorbed infrared radiation at the wavelengths characteristic of polypropylenes, consisting essentially of recurring propylene units: [408]

[T]here were absorption bands occurring at 6.8 microns, which are characteristic of hydrocarbon systems, methyls and methylenes absorbed there. A very intense band at 7.25 microns, characteristic of methyl groups. An absorption band at [8.6] microns, a very sharp band at [8.6], characteristic of isolated methyl branches. Absorption band at [10.03], which we don't know the exact origin. Absorption band at [10.27] microns, which we think belongs to isolated methylenes. . . . and there is distinct absence of band at [13.7 and 13.9], indicating that this material is not polyethylene.

All of Phillips's products had a *substantial crystalline polypropylene content.*

Wiles concluded from scan P–20 that the product of Run 4721–16 exhibited substantial crystallinity:

Moreover, I now draw your attention to the area around [ten microns]. There is a peak just [over 10.00 microns]. There is a peak about [10.27]. Those peaks are nearly the same size. The [10.03] peak, as I have been calling it, is very nearly as large as the [10.27] peak. Therefore this sample of polypropylene exhibits substantial crystallinity.[409]

Wiles also recognized similar features indicating substantial crystallinity in P–117 [410] and P–118 [411] of this product. On December 12, 1955 the product of Run 4721–16 was subjected to x-ray analysis.[412] Phillips's Dr. Robert Gregg analyzed the resulting scan, P–138, and concluded that the polypropylene gel was "partially crystalline polypropylene",[413] explaining: "I was told it was polypropylene first. Secondly, it agreed with the publication that was available to me from Professor Natta's laboratory." [414] As early as 1958, in fact, Gregg had analyzed scan P–138 and had concluded that the product of Run 4721–16 was 61% crystalline.[415]

Phillips adduced similar testimony regarding the product of Run 4721–26. Wiles testified that scan P–24 showed that that product was substantially crystalline,[416] and Gregg prepared x-ray scan P–139 on July 24, 1959 on which he noted that the product was 35% crystalline.[417]

PO–133 was never subjected to infrared or x-ray analysis. Phillips did adduce other

**405.** *See* text accompanying note 382, *supra.*

**406.** P–196; Natta Record, *supra* note 16, at pp. 1085–92.

**407.** Hogan Record, *supra* note 16, at p. 1274; Tr., pp. 2701–02.

**408.** Hogan Record, *supra* note 16, at pp. 1370 and 1375.

**409.** Tr., p. 2698. Insertion of the parenthetical information was necessitated by Wiles's use of "wavenumbers" (units: 1/cm.) rather than wavelength in microns. Equivalent wavelengths were calculated as the reciprocal of the wavenumber and converted to micron units. (10.00 microns = 1cm.).

**410.** Tr., pp. 2722–23.

**411.** *Id.,* p. 2723.

**412.** *Id.,* pp. 2915–17.

**413.** *Id.,* p. 2915.

**414.** *Id.,* p. 2992.

**415.** Hogan Record, *supra* note 16, at p. 3852.

**416.** Tr., p. 2700.

**417.** *Id.,* p. 2918.

data regarding PO–133's melting point, inherent viscosity, and solubility, all of which corresponded to values normally associated with crystalline polypropylene.[418] The manner in which the melting point data was generated also indicated that PO–133 was crystalline. In measuring the melting point, Gallaugher heated the sample beyond its melting point and then cooled it at a regular rate down to its freezing point. He then plotted a temperature-time curve and noticed a plateau at the point where the sample crystallized.[419] Phillips's Fox testified that this behavior was typical of a crystalline material. At first, the temperature decreases "fairly rapidly"[420] as heat is lost to the surrounding medium. At the point where freezing occurs, however, the temperature stops changing:

[T]he process of changing from an amorphous liquid to a crystalline solid involves giving off heat because the crystalline solid has a lower heat content than the amorphous liquid. [T]here is [therefore] a source of heat internally as the phase change occurs from the amorphous liquid to the crystalline solid. And that heat has to be taken away before the temperature can fall. So as long as the freezing is taking place there is extra heat that has to be taken away. . . . [A]fter freezing is complete . . . that source of heat isn't there any longer and the temperature will once again fall at a higher rate.[421]

Fox testified that this pattern was characteristic of a crystalline material and contrasted it with the temperature-time curve that would be produced by an amorphous substance which contains no thermal reservoir that would produce a similar transition point plateau.[422] The presence of a plateau in a temperature-time curve for PO–133 thus indicates that the sample contained substantial crystallinity.

The information that PO–133 was insoluble in such chemically similar solvents as pentane,[423] yet its inherent viscosity was measured, further indicates that PO–133 was crystalline. As Fox explained:

[W]hen polymer chemists . . . found a polymer sample that would not dissolve in a solvent which was chemically similar . . . they reckoned there were one or two possibilities: Either the polymer was cross-linked or it was a crystalline polymer.[424]

Fox continued:

[T]he fact that an intrinsic viscosity was taken indicates that the polymer was soluble in a solvent at some temperature. Cross-linked polymers are never soluble in any solvent that doesn't chemically degrade it.

So that of the two possibilities, the one that remains is that the polymer was crystalline, it is insoluble in certain solvents at room temperature but soluble in some solvent that was used to take the intrinsic viscosity.[425]

On the basis of all of this information, the Court finds that PO–133 was a crystalline polypropylene.

**418.** See text accompanying notes 401, 406–407, supra.

**419.** Tr., pp. 233–34.

**420.** Id., p. 831.

**421.** Id., pp. 831–32.

**422.** Id., pp. 837, 840.

**423.** Tr., pp. 3864–65.

**424.** Id., p. 808.

**425.** Id., p. 881. Montedison attempted to rebut Fox's testimony with that of Dr. Cecil Bawn. In contrast to Fox, however, Bawn seemed unsure of his testimony. Thus, Bawn asserted that there might be other possibilities besides crystallinity or cross-linking that would explain why PO–133 failed to dissolve in pentane. Tr., p. 3426. He failed to list any of them. The Court, is able to explain why PO–133 failed to dissolve in pentane only by assuming that it was crystalline or that it was cross-linked. Like that of Fox, Bawn's testimony further indicates that cross-linking was an unlikely explanation:

Q. . . . Would you agree with me that cross-linked polymers won't be soluble?
A. Generally this would be true. Lightly cross-linked may swell to give very viscous solutions, but not complete solubility.
Q. And they wouldn't be soluble enough to get an intrinsic viscosity, would they?
A. No.
Id., p. 3427.

Finally, PO–116 was crystalline polypropylene. By early December, 1952 Gallaugher had determined that the melting point of PO–116 was 267° ± 5°F. (130 ± 3°C.), and that its density was 0.906 g./cm.[3].[426] Hogan later recorded this data along with the information that the viscosity of PO–116 was 0.422.[427] As with the product PO–133, this data, combined with the knowledge that PO–116 was a solid polypropylene insoluble in boiling methyl ethyl ketone strongly suggest that PO–116 was crystalline. In addition, Wiles studied infrared scan P–48 and concluded that PO–116 "had substantial crystallinity".[428]

The Court therefore finds that PO–116 as well as the other three products on which Phillips relies was crystalline polypropylene.

### 2. Recognition of The Product.

Recognition requires an inventor to appreciate that he has produced a new form of matter and to learn enough about that new form to justify the conclusion that it conforms to the limitations of the Count. Phillips's scientists clearly recognized that they had produced a new form of matter. Hogan characterized the June 5, 1952 production of a solid polypropylene as a "surprising result".[429] So surprising was this result, in fact, that the very next day Hogan submitted a "Patent Idea Record":

> In the polymerization of propylene over commonly used catalysts, such as phosphoric acid and nickel on silica-alumina, the polymer produced is liquid and contains little, if any, solid polymer.
>
> However, it has been discovered that . . . [a chromia and nickel oxide will produce] a catalyst . . . [in] a considerable amount of the product . . . [which is] solid [and] no doubt completely

olefinic and is therefore a unique solid material. . . . [430]

Phillips subsequently stepped up the research program which had stemmed from this work.[431] This led to production of the four products on which Phillips bases its actual reduction to practice and its January 27, 1953 patent application claiming the production of "novel" solid polymers.[432]

Moreover, Phillips's scientists knew enough about their products to justify the conclusion that they conformed to the limitations of the Count. By January 27, 1953, Phillips's scientists had thus unambiguously characterized all four of its products as solid. Recognition of solidity was not challenged by the Board or by any of the parties.

Phillips also proved that by January 27, 1953 its scientists had learned enough about each of its products to justify the conclusion that the products were polypropylenes, consisting essentially of recurring propylene units. As early as July, 1952 Thornton had observed an infrared scan made from the products of Runs 4721–16 and 4721–26 and had noticed and recorded the recognition pattern characteristic of the product of the Count.[433] Montedison faults Thornton's report, claiming that it had "specifically and unequivocally" ruled out the head-to-tail structure that this limitation requires.[434] This report states:

> The absence of a band at 8.63 microns eliminates structures of the type, R-C-C-R.
> |
> C
>
> Since we have eliminated the possibility of the structure R(C-C)n-R as the
> ( |)
> ( C)
> prominent one and a highly branched molecule is indicated (absence of bands at 12.7-13.9 microns) then the spectrum of the gel portion must indicate a pattern of branching. (emphasis in original).[435]

426. P–59, p. 23.

427. Hogan could not say exactly when he recorded this data. He noted, however, that it was recorded on the back of a lab notebook page dated November 14, 1952. P–14, pp. 90–91. Hogan estimated that he would have recorded this data within two weeks thereafter. Hogan Record, supra note 16, at p. 46.

428. Tr., p. 2701.

429. Hogan Record, supra note 16, at p. 12.

430. Id.; P–10.

431. See Hogan Record, supra note 16, at pp. 14–15.

432. P–1, p. 1.

433. See text accompanying note 393, supra.

434. Montedison Brief, supra note 65, at p. 56.

435. P–56, p. 8.

If Thornton had been required to describe the structure of Hogan's new polymer in the terms used in the Count, this Court might consider his apparent rejection of what later turned out to be the product's correct structure. Thornton was not required, however, to use the precise language of the Count in describing his new product.[436] Rather, he was only required to appreciate enough about the available infrared scans to justify the conclusion that Phillips's material was a polypropylene, consisting essentially of propylene units. Thornton satisfied this requirement by describing and appreciating that 4721–16 and –26 produced the infrared recognition pattern characteristic of crystalline polypropylene.

PO–133 presents a more difficult problem, since it was never subjected to infrared analysis. Infrared analysis, however, is not the only acceptable method of establishing recognition of the second limitation of the Count. Favorable comparison to products known to be composed essentially of recurring propylene units could also justify the conclusion that the product met this limitation. In the case of PO–133, Phillips has shown that its scientists knew that it had been produced in the same manner as the products of Runs 4721–16 and 26, that it was similarly a solid and soluble in pentane, and that it had the same density and boiling points as those materials. All of these properties correspond with those normally associated with the product of the Count. The opposing parties failed to cite a single example of a solid polypropylene having all of these characteristics that was not a polypropylene, consisting essentially of recurring propylene units. This Court accordingly finds that Phillips's scientists recognized enough about PO–133 to justify the conclusion that it was characterized by this feature.

This Court also finds that Phillips's scientists recognized by January 27, 1953 that

the fourth product, PO–116, was a polypropylene consisting essentially of recurring propylene units. Frenzel appreciated by that date that an infrared scan of PO–116 showed the recognition pattern now known to be typical of recurring propylene units.[437] Moreover, Phillips's scientists gathered the same data regarding PO–116's physical properties that they gathered concerning those of PO–133. Since this data was sufficient to justify the conclusion that PO–133 complied with the Count's second limitation, it is also sufficient to justify the same conclusion regarding PO–116.

Finally, this Court finds that Phillips's scientists recognized by January 27, 1953 enough about their polymers to justify the conclusion that they had *a substantially crystalline polypropylene component.* In the case of the products of Runs 4721–16 and –26, this Court need only note that prior to January 27, 1953 Thornton identified the presence of the peaks at 10.03 and 11.85 microns in the infrared scans of these products. Identification of the presence of these peaks in an infrared spectrum of a polypropylene is sufficient to justify the conclusion that the polypropylene is crystalline.

Phillips also recognized that PO–133 was crystalline. By January 27, 1953 Phillips's scientists had measured the melting point for all of its products. Fox testified that this data clearly indicated that Phillips's PO–133 was crystalline.[438] Phillips also offers viscosity data gathered prior to May 22, 1953. As shown above, this information, in combination with density, melting point, and other solubility data, is sufficient to justify the conclusion that PO–133 was crystalline. Phillips's scientists thus recognized that PO–133 was crystalline by May 22, 1953.[439]

Phillips's scientists also recognized that PO–116 was crystalline. Although Frenzel failed to detect in P–49 the presence of the

---

**436.** *See* text accompanying note 64, *supra.*

**437.** *See* text accompanying note 406, *supra.*

**438.** *See* text accompanying note 419, *supra.*

**439.** The adoption of this date as Phillips's priority date would still afford it the senior position in this Interference.

11.85 micron band indicative of crystallinity, he did note the presence of the 10.03 band which is also indicative. Moreover, by January 27, 1953 Phillips's scientists had compiled a great deal of data regarding the physical properties of PO–116, including information concerning its density, melting point, inherent viscosity and solubility. Positive correlation between these data and those normally found for crystalline polypropylene, as well as similar data from Phillips's first two products, which were known to have a substantial crystalline content is, as in the case of PO–133 above, sufficient to justify the conclusion that PO–116 was crystalline. This Court accordingly finds that prior to January 27, 1953, Phillips's scientists recognized that PO–116 was crystalline.

### 3. Recognition of A Utility for The Product.

Phillips asserts that its inventors recognized that their new polymers were useful both as solid plastics and as wax modifiers. The Court finds that Phillips failed to meet the testing standards necessary to demonstrate utility as a solid plastic. Phillips did, however, prove that its scientists recognized enough about their new polymer to justify the conclusion that it was useful as a wax modifier.

Phillips offers DeVault's testimony that in molding polypropylene samples he formed an opinion that the new polymer was similar to the polyethylene samples: "I assumed that applications of this material . . . could be used in the same manner as polyethylene."[440] Phillips also showed that its polymers had viscosities in the

range normally associated with useful polymers.[441] Phillips fails, however, to cite any evidence indicating the Young's modulus for its products. Moreover, although Phillips's scientists measured the melting point, Phillips cites no tests indicating that its polymers were stable at the temperatures required for molding. Phillips has therefore failed to prove that its testing showed that its products conformed to the utility requirements suggested by its own expert, Fox. The Court accordingly finds that Phillips failed to prove that its scientists knew enough about their product to conclude that it was useful as a solid plastic.[442]

Phillips's scientists realized from a very early date that the new product might be used as a wax modifier. Between November 23 and December 4, 1951 Axe subjected the product of Run 4721–26 to "preliminary" candle snapping tests in order to determine its properties as a modifier.[443] Axe described the test: "[O]ne of the simple and standard ways . . . of testing a candle in a candle factory is simply to mold the thing and break it. If it breaks with a loud snap you know that you have modified it [since, otherwise it] would have no snap at all. . . ."[444]

When the preliminary candle tests yielded encouraging results,[445] Phillips prepared sample PO–133 and submitted it to a commercial wax company, Moore and Munger, for more complete wax modification testing.[446] On May 8, 1952 John W. Padgett reported for Moore and Munger that "our preliminary work on a laboratory basis looks very encouraging in regard to wax modification and we would like to continue working with you on this development."[447]

---

440. Hogan Record, supra note 16, at p. 1032.

441. Note 90, supra.

442. This finding in no way weakens Phillips's constructive reduction to practice case, infra, at note 455. In addition to the information already cited, Phillips application disclosed that its polymer could be used in applications where any solid plastics are used. Phillips application also disclosed that its polymer was stable at very high temperatures, far above those used

for molding. All of this information clearly discloses utility as a solid plastic.

443. Hogan Record, supra note 16, at pp. 946–47; P–41.

444. Id., p. 946.

445. P–41.

446. P–42.

447. P–43.

Axe reported that Moore and Munger carried out the following tests on paper waxed with a composition containing Phillips's polypropylene:

[S]eal strength, blocking temperature, gloss, gloss stability, scuff resistance and moisture-vapor transmission. Tensile strength was determined on molded wax modified with polypropylene. Using a modified Tinius Olsen machine, an unmodified wax having a tensile strength of 180 pounds per square inch on modification with 2 per cent of our most soluble sample was found to have a tensile strength of 352 pounds per square inch. This latter value compares with a value of 328 for commercial polyethylene in the same wax at the same concentration. [PO–133] was just as good as polyethylene. This increase of about 100 per cent in tensile strength is quite significant. Blocking tests were quite satisfactory with the polypropylene being the full equivalent of commercial polyethylene. Blocking temperature increases were of the order of 15 to 20 F in paraffin-micro wax blends containing from 7 to 8 per cent of polypropylene.[448]

By June 9, 1952 then, Phillips had submitted PO–133 for standard testing of at least seven properties relevant to utility as a wax modifier. All of these tests showed that PO–133 could be so used; in fact, they were so successful that Moore and Munger wanted to continue working with Phillips for commercial development of the product. On the basis of this information, the Court finds that by June 9, 1952, Phillips knew enough about its product to justify the conclusion that it was useful as a wax modifier.

Montedison argues[449] that Phillips's scientists failed to recognize utility as a wax modifier because they did not test whether the modifier wax would burn.[450] Such testing, however, was unnecessary. As Axe testified: "We made hundreds of candles, but we very seldom burnt one. That is about the way it is in the art, too; we presumed they would burn."[451]

Montedison and Du Pont also argue that Exhibits P–43, the report by Padgett to Axe evaluating the results of the tests performed on PO–133, and P–44, Axe's memorandum relating this information to Phillips, are inadmissible hearsay.[452] Phillips counters that these letters are admissible as business records.[453] Although there may be merit to Phillips's response, the Court finds the documents admissible under Federal Rule of Evidence § 803(24), which permits the admission of a statement not specifically covered by any other hearsay exception providing that the statement is trustworthy and addresses a material fact, other evidence is unavailable, justice requires the statement's admission, and the statement's proponent fairly notifies the adverse party of his intention to use the hearsay statement. Exhibits P–43 and P–44 clearly comply with these requirements. They are trustworthy, having been prepared by the central figures in Phillips's utility testing program at a time when the results were fresh in their minds. Although writings might occasionally be slanted in order to support litigation positions, there is no evidence of such slanting here, since the possibility of this Interference was not known at the time of the reports and the Interference was not declared until more than five years later. The Court is convinced that Phillips only goal was to conduct a thorough utility testing program in order to avoid investing in an unrewarding project.

**448.** P–44. Axe generally received summary analyses from Moore and Munger rather than extensive numerical data since, as he explained, "[Moore and Munger's representative] wasn't one to tell you all his business, that was for sure." Hogan Record, *supra* note 16, at p. 953.

**449.** Montedison's Brief, *supra* note 65, at p. 43.

**450.** Hogan Record, *supra* note 16, at p. 947.

**451.** *Id.*

**452.** Montedison's Brief, *supra* note 65, at p. 44.

**453.** Phillips' Brief, *supra* note 131, at p. 42.

Exhibits P–43 and P–44 address the material fact of whether Phillips's scientists recognized enough about their product to justify the conclusion that it was useful. Phillips's entitlement to an actual reduction to practice hinges on this question, and P–43 and P–44 are extremely probative. They show exactly what testing is necessary to indicate utility as a wax modifier, and they show that Phillips complied with these requirements. Although Phillips might have attempted to introduce more current depositions of Axe and Padgett in substitution for these memoranda, the Court doubts that such testimony would have provided information regarding the specific nature and results of Phillips's testing program that would have been superior to that contained in memoranda written concurrently with the testing, more than twenty-seven years ago.

Further, justice requires the admission of P–43 and P–44 since Phillips might otherwise be prevented from establishing the utility of its product which is clearly shown by these reliable documents.

Finally, this Court finds that Montedison and Du Pont have had ample notice and opportunity to prepare for the introduction of these documents. As early as March 17, 1965 Axe introduced and authenticated these documents into the Interference proceeding.[454] The objecting parties have thus had more than fourteen years to prepare responses.

The Court thus finds that Phillips has satisfied all the necessary conditions for admitting Exhibits P–43 and P–44 under Federal Rule of Evidence § 803(24). Consequently, the Court has relied upon them in finding that Phillips has established that it knew enough about PO–133 to justify the conclusion that its product had utility as a wax modifier. Since Phillips's other products were quite similar to PO–133, the Court finds that they too were useful as wax modifiers.

*Phillips's Constructive Reduction to Practice.*

### 1. Adequate Description.

Phillips concedes that its 1953 application failed to describe its invention in the precise language eventually used by the Examiner.[455] It nevertheless argues that its description is the legal equivalent of the language of the Count[456] and has offered a great deal of direct testimony in support of its claim showing that its application disclosed the product of the Count.

Phillips's application clearly described a *normally solid* polymer; in fact, the word "solid" appears in several places as a description of its invention. Because of this, plus the fact that none of the parties challenge Phillips on this point, the Court finds that the application adequately discloses solidity.

Phillips contends that the limitation *polypropylene, consisting essentially of recurring propylene units* was disclosed by the application's description of the temperature and pressure conditions under which the polymer was to be prepared from propylene:

> The temperature to be used in carrying out the polymerization reaction depends to some extent on various factors, such as the solvent, but normally ranges from about 150 to 450°F. The preferred range for propylene and higher 1-olefins is 150 to 250°F. and that the ethylene is 275 to 375°F.

> · · · · ·

> The pressure must be high enough to maintain the diluent in the liquid phase and to assure that olefins not liquefied under these conditions are dissolved in the liquid phase in sufficient amount. This requires a pressure of at least 100 to 300 psig, depending on the feed and the temperature, and a pressure of approximately 500 psig is to be preferred.[457]

---

**454.** Hogan Record, *supra* note 16, at pp. 950–54.

**455.** Phillips's Brief, *supra* note 131, at p. 57.

**456.** *Id.*

**457.** P–1, p. 5.

Fox testified that when propylene is polymerized under such mild conditions:

> [T]he polymer chemist would have expected that the polymer . . . obtained [would be] polypropylene with recurring propylene units.[458]

Phillips contends that the limitation of *substantial crystallinity* was disclosed by the specification in the application that:

> The solid [polypropylene] fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300°F., a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, . . . The melting point was determined from a cooling curve of temperature vs. time.[459]

Phillips buttresses its case with testimony of Fox, who extensively reviewed this data and concluded that the application necessarily described a polymer with "a substantial crystalline polypropylene content".[460] Phillips also produced Dr. William Bailey, who testified that the reference to a "melting point" distinctly disclosed a crystalline rather than an amorphous product:

> That was true in 1952. I was taught that in school. I was never confused between what a melting point was and what a glass transition [of an amorphous material] was, I have always taught all my students exactly what a melting point was and what a glass transition was and not to confuse them.[461]

In addition to the above testimony, Phillips introduced evidence that six independent research groups polymerized and produced a product complying with Phillips's disclosures, that always and inevitably conformed to the three limitations of the Count.[462]

458. Tr., p. 885.

459. P–1, pp. 30–31.

460. Tr., p. 887.

461. Tr., p. 4045.

462. Du Pont and Standard object to the introduction and use of testimony supporting some of these reproduction experiments. The basis of their objection is that the testimony was depositions taken in the '300 patent litigation, *infra* at note 691, in which Du Pont and Standard did not directly participate. Standard was, however, indirectly involved in that action, since one of the defendants in the '300 litigation was Amoco Chemical corporation, a wholly owned subsidiary of Standard, and during the '300 litigation Amoco was represented by the same attorneys that represent Standard in the present litigation. In the '300 litigation, Phillips's motive was to show the success of the repetition experiments performed by Montedison. Montedison's motive, like those of Du Pont and Standard in the instant action, was to show that these experiments were neither repetitious nor successful. Under the supervision of this Court, the parties aggressively questioned witnesses relative to the reproduction experiments. Montedison, for instance, consumed more than 200 pages of deposition and prepared many trial exhibits in examining Mazzanti on this issue. The record indicates and this Court recalls that Du Pont's and Standard's interests were therefore ably and vigorously protected, and this Court finds it difficult to believe that Du Pont or Standard, if present, could have done more to attack these reproduction runs than was done by Montedison. Under these circumstances, this evidence is admissible under Federal Rule of Evidence 804(b).

This rule first requires that a declarant be unavailable. Phillips contends, without refutation, that the declarants, Italian citizens living in Italy, are unavailable. In this situation, their former testimony may be admitted "if the party against whom the testimony is now offered, or . . . a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination." The Third Circuit recently clarified the meaning of the term "predecessor in interest" holding that the United States Coast Guard, which is charged with "vindicat[ing] the public interest in safe and unimpeded merchant marine service", was a predecessor in interest to an injured seaman seeking compensation for his injuries:

> [T]he basic interest advanced by both was that of determining culpability and, if appropriate, exacting a penalty for the same condemned behavior thought to have occurred.
>
> . . . .
>
> Under these circumstances, the previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the present party.

*Lloyd v. American Expert Lines*, 580 F.2d 1179 (1978).

Clearly Montedison was a predecessor in interest to Standard and Du Pont.

In addition to the runs cited below, Phillips also seeks to rely upon an experiment conducted by Montedison's Dr. Mario Fragiacomo. In explaining this experiment, however, Phillips

A. Capucci's Spring Experiments.

In the spring of 1955 Montedison's Dr. Carlo Capucci performed the first set of reproduction experiments of which Runs 2, 4, and 13 are particularly relevant.[463] In all three runs Capucci first prepared a catalytic support containing 90% silica and 10% alumina.[464] In Run 2 he mounted on this support enough chromium nitrate so that the prepared catalyst contained 3% of chromia versus support;[465] in Run 4 he mounted chromium trioxide, impregnating the support to the same degree;[466] in Run 13 he used a slightly larger proportion of chromium nitrate.[467] In so doing, Capucci complied with the disclosures of Phillips's 1953 application, which provided:

> The supported chromium oxide . . . catalyst is usually prepared by impregnation of particulate silica, alumina, or silica-alumina with a solution of chromium oxide.
>
> . . . . .
>
> . . . [These compounds include] Chromium trioxide, chromium nitrate, chromium chloride, chromium sulfate, and other soluble salts of chromium. The highest conversions were obtained from the catalyst that contained only chromium oxides after activation. Impregnation with chromium trioxide ($CrO3$) is preferred, although chromium nitrate may be used with similar results. . . . The amount of chromia in the catalyst may range from 0.1 to 10 or more weight per cent of the support. The preferred support is a silica-alumina composite containing a predominant portion of silica and a minor portion of alumina. One support that has been found particularly effective is a coprecipitated 90 per cent silica-10 percent alumina support.[468]

Capucci activated the catalyst in Run 2 by heating it three times, twice to 903°F.(500°C.) and once to 1472°F. (800°C.), in flowing dry air.[469] Capucci similarly activated the catalyst in Run 4 by heating it in flowing dry air for eight hours to temperatures ranging between 752°F. (400°C.), and 932°F. (500°C.).[470] In Run 13 Capucci heated the catalyst under flowing dry air to 932°F. (500°C.) for five hours and then to between 990°F. (530°C.), and 1000°F. (540°C.) for ten hours.[471] These procedures closely parallel those described in Phillips's 1953 application which provided for: "drying and activation of the [catalyst] composite at a temperature in the range of 750 to 1500°F. for a period of 3 to 10 hours or more."[472]

---

failed to provide English language translations of Fragiacomo's Italian language notebooks, P-450 and P-451. Since this Court is not conversant in Italian, it is unable to rely upon these notebooks. This Court is aware of the mass of other materials generally cited by Phillips as relevant to the Fragiacomo runs, including more than 24 documents and more than 140 pages of scattershot deposition transcripts. Phillips' Proposed Findings of Fact and Conclusions of Law No. 259. This Court did not think it sufficiently important in view of the extensive record on this point to search through this material without more precise guidance from Phillips as to where reliable information may be found. Accordingly, the Fragiacomo runs have not been considered.

Phillips also asked this Court to consider a repetition run by Montedison's Domenico De-Luca. This run, however, produced a pentane insoluble product that boiled at 303°F.(156°C.). P-436, p. 2. This product therefore does not conform to the Phillips's application which disclosed a product that melted below 300°F. Consequently, this run is irrelevant to the inherency issue.

463. P-425. Capucci never actually saw Phillips's 1953 application until much later, if at all, because American applications are not opened for public inspection until after they issue as patents. Rosenberg, Patent Law Fundamentals 17 (1975). Capucci relied however upon equivalent disclosures in Phillips's Belgian patent and Australian patent applications. See text accompanying notes 701-703, infra.

464. P-425, pp. 1, 4, 7 and 18.

465. Id., p. 4.

466. Id., p. 7.

467. Id., p. 18.

468. P-1, p. 4.

469. P-425, p. 4.

470. P-425, p. 8.

471. Id., pp. 18-19.

472. P-1, p. 4.

In all of these experiments Capucci used a stirred autoclave reactor [473] as suggested by Example IV of Phillips's 1953 application.[474] In further compliance with the application's disclosure of the use of relatively inert, non-deleterious hydrocarbon diluents [475] including isooctane and pentane,[476] Capucci used isooctane in Runs 2 [477] and 4,[478] and a mixture of pentane and isooctane in Run 13.[479]

In Run 2 Capucci maintained the reactor at 208.4°F. (98°C.), and 382 psi for "one night".[480] Run 4 was made at 212°F. (100°C.), and 413 psi for twelve hours.[481] In Run 13 Capucci maintained a temperature of 201.2°F. (94°C.), and a pressure of 529 psi for twenty-two hours.[482] These reaction conditions comply with Phillips's 1953 disclosures cited above.[483]

Capucci followed standard experimental practice in separating his polymer, washing the product with generally available hydrocarbon solvents including benzene [484] and toluene.[485] He then evaporated the solvents, a process which left a crude product. In these procedures, Capucci closely followed the suggestion in Phillips's application that the crude polymer be separated from the catalyst with a hydrocarbon solvent.[486] Capucci then fractionated this crude product by redissolving as much of it as he could in a solvent and then filtering out the purified polymer. In Runs 2 and 4 Capucci used a mixture of acetone and methanol as a solvent,[487] while in Run 13 he used acetone alone.[488] In these procedures Capucci varied slightly from the teachings of the Phillips' 1953 application which suggested that the preferred solvents were pentane at room temperature or methyl isobutyl ketone at 200°F. (94°C.).[489] Careful study has shown that this variation is irrelevant; any of a variety of solvents might be used, and the selection of one over another was purely arbitrary.[490]

In sum, at least three of Capucci's Spring, 1955 runs closely followed the Phillips 1953 patent application disclosures. All of these runs yielded the product of the Count.[491]

B. Capucci's Autumn Experiments.

Capucci again followed Phillips's 1953 disclosures in two runs performed during the fall of 1955 and denominated A and B.

---

473. P–425, pp. 4, 9 and 21.

474. P–1, p. 11.

475. *Id.*, p. 6. Specifically, Phillips's application provided:

> Hydrocarbon diluents, preferably paraffins, serve as solvents for the polymer products to aid in the removal of the product from the catalyst in the reactor. The preferred diluents include aliphatic paraffins from 3 to 12 carbon atoms per molecule. Any of the paraffins which are solvents for the heavy polymer at temperatures in the operating range are suitable. Any hydrocarbon diluent which is relatively inert, non-deleterious, and liquid under the reaction conditions of the process may be utilized. Diluents that have been used successfully include propane, isobutane, normal pentane, isopentane, and isooctane. The heavier paraffinic diluents gave better results probably because they are better solvents for the heavy polymer.

*Id.*

476. *Id.*

477. P–425, p. 5.

478. *Id.*, p. 9.

479. *Id.*, p. 21.

480. P–425, p. 5.

481. *Id.*, p. 9.

482. *Id.*, p. 21.

483. *See* text accompanying notes 457 and 459, *supra.*

484. P–425, pp. 5, 9.

485. *Id.*, p. 21.

486. Tr., p. 1266; P–1, p. 6.

487. P–425, pp. 5, 9.

488. *Id.*, p. 21.

489. P–1, p. 29.

490. Tr., pp. 2090, 2197–98.

491. *See* P–425, p. MP–00717 (Run 2); P–427, p. 10 (Run 4); P–425, p. MP–000733 (Run 13). *See also* text at notes 706–12, *infra.*

Insofar as either run produced a product that complied with Phillips's disclosures, that product was the product of the Count. In both A and B, he mounted chromium trioxide and strontium dinitrate [492] on a commercial silica-alumina support of up to three mls. granules. The resulting catalyst contained 83.78% silica, 9.13% alumina and 1.23% chromia.[493] Apparently the catalyst also contained some unreported amount of strontium.[494] Although the addition of strontium was not taught by Phillips's 1953 patent, its addition did not affect the resulting polymer.[495] Capucci activated Run A's catalyst by heating it under flowing dry air for ten hours at temperatures ranging between 932°F. (500°C.) and 1004°F. (580°C.),[496] and he activated Run B's catalyst by heating it under flowing dry air for more than five hours at temperatures ranging between 932°F. (500°C.) and 1076°F. (580°C.).[497] In Runs A and B, Capucci used a stirred autoclave reactor.[498] In both runs Capucci used isooctane as a diluent.[499] In Run A he polymerized polypropylene for twenty-four hours at temperatures ranging between 194°F. (90°C.) and 206.6°F. (97°C.), and at a pressure of 294 psi,[500] and in Run B he ran the polymerization for eight hours at a temperature of 248°F. (120°C.) and a pressure of 617 psi.[501] In both runs Capucci removed his product from the catalyst using toluene,[502] and in Run B he used benzene as well.[503] He then evaporated some of the toluene and benzene,[504] dumped the remaining material into a solution of antisolvents such as cold acetone and methanol in Run A [505] and cold acetone and ether in Run B,[506] and filtered out the resulting crude precipitate. Finally, Capucci purified his product by dissolving as much of it as possible in hot acetone, in hot ether, and finally in hot heptane.[507] Although the latter extractions vary from those reported by Phillips, the differences are insignificant.[508]

The resulting product was then subjected to testing, including infrared and x-ray analysis.[509] In both runs the undissolved product was determined to be a white "pulverulent" solid.[510] In Run A the product showed an inherent viscosity of 1.02,[511] which is outside the range of .2 to 1.0 specified by Phillips's 1953 patent application.[512] Since this reproduction experiment thus failed to produce a polymer complying exactly with the Phillips disclosures, it might be considered irrelevant to Phillips's case. A polymer chemist, however, would not be concerned about this slight discrepancy.[513] A viscosity measurement only indicates the weight of a molecule of polymer and indicates nothing except as discussed above [514] about the molecule's structure or other physical properties. Since none of the parties mentioned this discrepancy as a pos-

492. P–756, p. 3.

493. Id., p. 9.

494. See P–756, pp. 3, 9; Montedison's Brief, supra note 65, at p. 31.

495. See text accompanying notes 663–64, infra.

496. P–421, p. 1.

497. P–421, pp. 7–8.

498. Id., pp. 2, 8; P–419, p. 9.

499. Id., pp. 2, 8.

500. Id., p. 3.

501. Id., p. 8.

502. P–756, p. 12.

503. P–421, p. 8.

504. P–756, p. 13.

505. Id.

506. P–421, p. 8.

507. P–756, p. 14.

508. See text accompanying note 490, supra.

509. P–756, p. 6.

510. Id., p. 14.

511. P–756, Table 1.

512. See text accompanying note 459, supra.

513. Tr., p. 880.

514. See text accompanying note 425, supra.

sible basis for disregarding the product of Run A, the Court has concluded that the product complied with Phillips's disclosure.

Capucci contemporaneously recorded that this product yielded infrared spectra that were "very similar" to those produced by Natta's head-to-tail polypropylenes, and that this indicated that the product was "highly crystalline".[515] At trial Phillips introduced Exhibit P–393, an x-ray scan of Run A's product.[516] Based upon his scan, Phillips's Dr. Gregg concluded that the product of Run A was "partially crystalline polypropylene".[517] These conclusions were confirmed by others at Montedison.

Run B's product showed a viscosity of 0.88,[518] well within the range specified in the application. Once again Capucci contemporaneously recorded that this product yielded infrared scans "very similar" to those of Natta's head-to-tail polypropylene and that it was "highly crystalline".[519] At trial Phillips introduced P–759, an infrared scan of Run B's product,[520] and according to Phillips's infrared expert Wiles, this scan showed the familiar recognition patterns for a "polypropylene exhibiting substantial crystallinity".[521] This conclusion was confirmed by Montedison's scientists.

In sum, at least two of Capucci's Autumn 1955 runs closely followed Phillips's 1953 patent application. Both runs yielded a product that was a normally solid polypropylene, consisting essentially of recurring polypropylene units having a substantially crystalline polypropylene content.

C. Eleuterio.

Du Pont's Herbert S. Eleuterio also followed Phillips's application and obtained crystalline polypropylene in 1956. In these experiments, Eleuterio sought to follow the directions cited in Belgium Patent 530,-317,[522] which was equivalent to Phillips's 1953 American application. Eleuterio mounted chromium nitrate on a silica-alumina support,[523] and produced a catalyst containing 4% chromium. He then activated the catalyst by heating it at 932°F. (500°C.) for twenty hours in an atmosphere of flowing dry air.[524] In his six hour polymerization run, Eleuterio used an autoclave reactor maintained at temperatures ranging between 194°F. (90°C.) and 212°F. (100°C.) and at a pressure of 5000 psi. Eleuterio used xylene as a diluent and also as a wash to separate the raw polymer from the catalyst. The xylene was then evaporated, leaving a crude product.

Eleuterio recorded that this unfractionated product was 56% crystalline and that the Phillips process "makes a polypropylene which is similar to Natta's crystalline polypropylene."[525] At trial Eleuterio confirmed his conclusion.[526] Phillips further supported this analysis by introducing infrared scan P–287A,[527] which, as Wiles testified,[528] showed the familiar recognition pattern for crystalline polypropylene.

D. Trada.

Dr. Gianni Trada of the Edison Company duplicated Phillips's disclosures in 1962. Trada mounted chromium trioxide on a catalyst support containing between 75% and 87% silica, the balance being alumina. The final catalyst contained about 2% chromium. Trada activated the catalyst by heating it to 932°F. (500°C.) for five hours in an atmosphere of flowing dry air. He then polymerized propylene in an autoclave reactor, maintaining pressures of between 220 and 838 psi at 204°F. (95°C.) for twelve hours.[529] Trada separated the resulting product from the catalyst using boiling xy-

515. P–756, pp. 19–20.

516. M–1268B, pp. 34–36; Tr., p. 2921.

517. Tr., p. 2922.

518. P–756, Table 1.

519. P–756, pp. 19–20.

520. Tr., p. 2730.

521. Id.

522. P–287, p. 2. See note 702, infra.

523. Id., p. 9.

524. Id.

525. Id.

526. Tr., pp. 3656–57.

527. P–287, p. 9; Tr., p. 2725.

528. Tr., pp. 2725–26.

529. P–966, Table III.

lene which he subsequently evaporated. He then dissolved as much of the polymer as he could in cold n-pentane and recovered the residue.

Trada reported that the product had an intrinsic viscosity of 1.31,[530] and that it was 57% crystalline.[531] The sample was subjected to infrared and x-ray analysis. Wiles testified that P–969, the infrared scan,[532] indicated that the product was a polypropylene that was "substantially crystalline".[533]

Trada also dissolved as much of the polymer as he could in boiling n-heptane and separated the residue, which he analyzed. Its viscosity was 2.00,[534] and it was 55% crystalline.[535] Trada subjected this product to infrared analysis, producing scan P–994,[536] and to x-ray analysis, yielding scan P–976.[537] Wiles concluded from P–994 that Trada's product was a "polypropylene" having "substantial crystallinity",[538] and Gregg concluded from P–976 that the product was "partially crystalline polypropylene".[539]

E. Witt.

In 1963 Phillips's Donald Witt performed three more reproduction tests, designated Runs 22, 56, and 67, which produced crystalline polypropylene. In all three runs Witt mounted chromium trioxide on a commercial catalyst support[540] in granular form (14–28 mesh), containing 90% silica and 10% alumina.[541] In Run 22 Witt mounted 2.5% chromium;[542] in Run 56 he mounted 2.3% chromium;[543] and in Run 67 the amount of chromium was not measured. Witt activated his catalyst by heating it for five hours to 1020°F. (549°C.) in Run 22.[544] In Runs 56 and 67 Witt followed a similar procedure, except that he heated the catalyst to a slightly higher temperature, 1100°F. (593°C.).[545]

In Runs 22[546] and 56[547] Witt used a fixed bed reactor while in Run 67 he used a stirred reactor.[548] Witt employed a mixture of propane and isopentane as diluents.[549] In Run 22 Witt reacted the propylene for six hours at 190°F. (88°C.) and at pressures ranging between 580 psi and 630 psi.[550] In Run 56 Witt reacted the propylene for six hours at 190°F. (88°C.) and at pressures ranging between 590 psi and 615 psi.[551] In Run 67 he reacted the propylene for five hours at 190°F. (88°C.) and at pressures ranging between 15 psi and 200 psi.[552] Witt separated the catalyst from the crude polymer and dried it.[553]

In Run 22 Witt dissolved as much of the crude polymer as he could in methyl isobutyl ketone at 200°F. (94°C.).[554] The remaining solid had a specific viscosity of 0.73.[555] Its melting point was 257°F.

530. See text accompanying note 512, supra.

531. P–966, Table V.

532. Tr., p. 2750.

533. Id., pp. 2750–51.

534. See text accompanying note 512, supra.

535. P–966A, Table VI.

536. Tr., p. 2751.

537. Id., p. 2976.

538. Id., p. 2752.

539. Id., p. 2976.

540. P–61, pp. 22, 56, 60.

541. Id., p. 15.

542. P–61, p. 22.

543. Id., p. 56.

544. Id., p. 17.

545. Id., pp. 52, 62.

546. P–61, p. 21.

547. Id., p. 56.

548. Id., p. 67.

549. Id., pp. 22, 56, 67.

550. Id., pp. 22–23.

551. Id., pp. 56–57.

552. Id., p. 67.

553. Id.; Hogan Record, supra note 16, at p. 2129.

554. Hogan Record, supra note 16, at p. 2137.

555. P–108, p. 9.

(125°C.),[556] and its density was between 0.9068 g./cm.$^3$ [557] and 0.9077 g./cm.$^3$.[558] This product was also subjected to infrared analysis, producing scan P–132,[559] and to x-ray analysis, producing scans P–141 and P–142.[560] Wiles testified that P–132 exhibited the normal recognition pattern for a "polypropylene" having "substantial crystallinity".[561] Gregg testified that the scans P–141 and P–142 exhibited the normal recognition pattern for crystalline polypropylene.[562] In fact, they showed that this product was between 46.6% and 48.9% crystalline.

In Run 56 Witt dissolved as much of the polymer as he could in isobutyl ketone heated to 200°F. (94°C.).[563] The melting point of the remaining residue was 266°F. (130°C.),[564] its inherent viscosity was 0.95,[565] and its density was between 0.9095 g./cm.$^3$ and 0.9099 g./cm.$^3$.[566] This product was subjected to infrared analysis, producing scan P–127 [567] which Wiles concluded exhibited the normal recognition pattern for crystalline polypropylene.[568] It was also subjected to x-ray analysis producing scan

P–143 [569] which Gregg testified exhibited the normal scattering pattern for crystalline polypropylene.[570] In fact, this scan shows that this product was 54.8% crystalline.[571]

Run 67 produced four solid products. The first was the residue remaining after Phillips's scientists dissolved all of the crude product that they could in methyl isobutyl ketone at 197°F. (93°C.).[572] Its density was 0.9019 g./cm.$^3$,[573] and it was reported to be 36.7% crystalline.[574] P–145 is an x-ray scan of this product [575] which according to Gregg exhibited the diffraction pattern characteristic of crystalline polypropylene.[576] Run 67's second product was insoluble in methyl isobutyl ketone at 200°F. (94°C.).[577] Its density was 0.9042 g./cm.$^3$ [578] and it was reported to be 40.3% crystalline.[579] P–147 is an x-ray scan of this product [580] which according to Gregg exhibited the normal diffraction pattern for crystalline polypropylene.[581] The third solid product of Run 67 was insoluble in pentane at room temperature.[582] Its density was 0.9086 g./cm.$^3$,[583] and it was reported to be 44.5% crystal-

556. P–109.

557. P–141.

558. P–142.

559. Hogan Record, *supra* note 16, at p. 3477.

560. Hogan Record, *supra* note 16, at p. 3806.

561. Tr., pp. 2664–65.

562. *Id.*, pp. 2876, 2893.

563. Hogan Record, *supra* note 16, at p. 2143.

564. P–110. Phillips contends that the density of this polymer was found to be about 0.9095 g./cm.$^3$. This Court, however, has been unable to locate the information upon which this contention was based. Accordingly, this Court renders no decision on this point.

565. P–108, p. 10.

566. P–143.

567. Hogan Record, *supra* note 16, at p. 3459; Tr., p. 2687.

568. Tr., p. 2687.

569. Hogan Record, *supra* note 16, at p. 3824; Tr., p. 2875.

570. Tr., p. 2895.

571. *Id.*, p. 2906.

572. P–75, p. 8.

573. P–145.

574. *Id.*

575. Hogan Record, *supra* note 16, at p. 3825; Tr., p. 2909.

576. Tr., p. 2910.

577. P–75, p. 5.

578. P–147.

579. *Id.*

580. Hogan Record, *supra* note 16, at p. 3825; Tr., p. 2910.

581. Tr., p. 2910.

582. P–75, p. 6.

583. P–144.

line.[584] P–144 is an x-ray scan of this product [585] which according to Gregg exhibited the diffraction pattern characteristic of crystalline polypropylene.[586] Finally, Witt prepared a fourth solid product which was insoluble in boiling heptane.[587] Its density was 0.9162 g./cm.$^3$,[588] and it was reported to be 48.2% crystalline.[589] It too produced an x-ray scan, P–146,[590] which Gregg analyzed as exhibiting the diffraction pattern characteristic of crystalline polypropylene.[591]

## F. DeLap.

Phillips's Joseph A. DeLap conducted yet another repetition experiment that produced crystalline polypropylene in December 1964. In this experiment DeLap mounted chromium trioxide [592] on a catalyst support prepared by Phillips.[593] This support, which was granular (14–28 mesh),[594] contained 89.3% silica and 10.6% alumina.[595] As finally prepared, the catalyst contained 3.1% chromium.[596] DeLap activated the catalyst by heating it to 1020°F. (559°C.) for five hours in an atmosphere of flowing dry air.[597] DeLap used a fixed bed reactor,[598] and a mixture of propane and isopentane as a diluent.[599] During the six hour polymerization run he maintained the reactor at 190°F. (88°C.) and at pressures ranging between 570 psi and 640 psi.[600] DeLap separated the catalyst from the crude product, evaporated the diluent,[601] and then dissolved as much of the crude product as he could in methyl isobutyl ketone at 200°F. (93°C.).[602]

The intrinsic viscosity of the residue product was found to be 0.68,[603] its melting point 248.9°F. (120°C.),[604] and its crystallinity content 51.6%.[605]

Wiles analyzed P–133, the product's infrared scan,[606] and identified the usual recognition pattern of crystalline polypropylene.[607] Gregg testified that P–148, the product's x-ray scan,[608] showed a diffraction pattern characteristic of crystalline polypropylene.[609]

**584.** *Id.*

**585.** Hogan Record, *supra* note 16, at p. 3825; Tr., pp. 2906–07.

**586.** Tr., p. 2907.

**587.** P–75, p. 9.

**588.** P–146.

**589.** P–146.

**590.** Hogan Record, *supra* note 16, at p. 3825; Tr., pp. 2909–10.

**591.** Tr., pp. 2909–10.

**592.** P–85, p. 2.

**593.** P–83.

**594.** *Id.*, p. 9.

**595.** *Id.*, p. 10.

**596.** P–87.

**597.** P–85, pp. 4, 11.

**598.** *Id.*, p. 5.

**599.** *Id.*, p. 6.

**600.** *Id.*, pp. 8, 14.

**601.** *Id.*

**602.** *Id.*, p. 16.

**603.** P–108, p. 14. Phillips also insists that the density of this material was found to be between 0.9054 g./cm.$^3$ and 0.9117 g./cm.$^3$. Once again Phillips failed to cite the specific source of this information which is apparently contained somewhere within a collection of twenty-seven exhibits and more than 250 pages of deposition. Phillips's Proposed Findings of Fact and Conclusions of Law, Part I Priority and '721 Issues, No. 207. Since this Court is far too busy to spend its time searching through piles of materials without some clue as to the location of the relevant information, it will refuse to find this fact.

**604.** *Id.*, p. 11.

**605.** P–148.

**606.** Hogan Record, *supra* note 16, at pp. 3487–88; Tr., p. 2696.

**607.** Tr., p. 2696.

**608.** Hogan Record, *supra* note 16, at p. 3825; Tr., p. 2912.

**609.** Tr., p. 2912.

## G. Longi.

In 1965, Montedison's Dr. Paoli Longi performed a final set of reproduction experiments at the request of Montedison's Patent Department.[610] These experiments included Runs MB–34/35, MB–38, and MB–60/86, yielding crystalline polypropylene. In Runs MB–34/35 [611] and MB–38 [612] Longi mounted chromium nitrate on a granular support (14–28 mesh) containing 87.3% silica and 12.4% alumina. The resulting catalyst contained 2.77% chromium. In Run MB–60–86 [613] he mounted chromium oxide on the same support, producing a catalyst containing 2% chromium.[614] Longi activated the first two catalysts by heating them for six hours at temperatures ranging between 900°F. (480°C.) and 930°F. (500°C.) in an atmosphere of flowing dry air.[615] He activated the other catalyst by heating it to 994°F. (590°C.) [616] for five hours in an atmosphere of flowing dry air.[617] In all these experiments Longi used an autoclave reactor,[618] and as a diluent n-heptane.[619] In the first experiment he polymerized propylene for twenty hours at temperatures ranging between 190°F. (88°C.) and 194°F. (90°C.), and pressures ranging between 228 psi and 331 psi; [620] in the second he polymerized propylene for two hours at temperatures ranging between 190°F. (88°C.) and 194°F. (90°C.) and pressures ranging between 287 psi and 456 psi; [621] and in the third experiment Longi polymerized propylene for five hours at temperatures ranging between 190°F. (88°C.) and 194°F. (90°C.).[622] Longi washed the product of the first experiment from the catalyst with xylene at 248°F. (120°C.), added a mixture of acetone and methanol, and filtered out the resulting crude precipitate.[623] The methods used in the second experiment are not recorded.[624] In the third experiment he washed the product from the catalyst with xylene at 266°F. (130°C.),[625] added cold methanol to the solution, and filtered out the resulting crude precipitate.

Longi isolated two solid products from the crude product of Run MB–34/35, only one of which is relevant as a reproduction experiment.[626] This product was insoluble

610. *Id.*, pp. 1491–524.

611. P–500, p. MP–00780.

612. *Id.*, p. 61.

613. Phillips claims this run was actually two separate runs. Exhibit A, Phillips' Proposed Findings of Fact. The Court has been unable to discover the source of this information, finding only enough data to show that one run, which it has labelled 60/86, was done.

614. P–500, p. MP–00789; P–506, p. 1.

615. P–500, p. MP–00780.

616. P–506 indicates that activation was carried out at a temperature of 110°F. which is equated to 590°C., an obvious mistake. Since 110°F. seems like a very low activation temperature, the Court has assumed that the 590°C. temperature is accurate. It is possible that Longi made an error in converting this temperature from the Centigrade scale with which he was familiar, to the English (Fahrenheit) system.

617. P–506, p. 1.

618. *Id.*

619. P–500, pp. MP–00781, MP–00783; P–506, p. 1.

620. P–500, p. MP–00781.

621. *Id.*, p. MP–00783.

622. P–506, p. 2. Phillips contends that the pressure ranged between 43 and 62 psi. Exhibit A, Phillips's Findings of Fact. This Court, however, was unable to discover the source of this information.

623. P–500, p. MP–00781.

624. *Id.*, p. MP–00783.

625. P–506, p. 2.

626. The other product, which was fractionated with methyl isobutyl ketone, as disclosed by Phillips's application, melted at 318.2°F. (159°C.). P–500, p. MP–00782. This temperature is outside the range disclosed by the application.

in heptane, and its intrinsic viscosity was 1.57.[627] Its melting point was 333°F. (167°C). Although this temperature is outside the range disclosed by Phillips's application, the higher melting point may have resulted from Longi's fractionation with heptane instead of the specific solvents mentioned by Phillips's application. Heptane residues generally melt at higher temperatures than pentane residues, although both are solid crystalline polypropylenes.[628] In light of this fact, plus the lack of objection by any parties to this experiment on this ground, the Court has considered this product. Longi reported that the crystallinity was 82.8%.[629] Phillips did not introduce evidence that infrared or x-ray analysis were performed on this product.

Longi also isolated two solid products from Run MB–38. The first was insoluble in methyl isobutyl ketone at 82°F. (28°C). The viscosity of this material was 0.57, and its melting point was 325°F. (163°C). The other product was insoluble in methyl isobutyl ketone at 200°F. (94°C). Longi reported no other data for this material except that it was a "normal isotactic polypropylene".[630]

Longi isolated three solid products from Run 60/86, only one of which is relevant as reproduction experiment.[631] This solid

product was insoluble in heptane. Its intrinsic viscosity was 1.73,[632] its melting point was 332.6°F. (167°C.),[633] and Longi reported that it was 71.5% crystalline.[634] That this product was crystalline polypropylene was confirmed by Wiles, who analyzed an infrared scan of the product, P–742,[635] and by Gregg, who analyzed an x-ray scan of the product, P–412.[636]

In sum, Phillips showed that at least six experimenters attempted to duplicate its 1953 disclosures and that each of them produced a product which, insofar as its properties were measured and reported, complied with the requirements of Phillips's application. That product always and invariably satisfied the limitations of the Count. This evidence, especially when combined with the testimony of Fox and Bailey regarding the direct disclosures of the Phillips applications, convinces the Court that Phillips's 1953 application disclosed crystalline polypropylene. This finding is particularly justified by the failure of the other parties to cite a single instance of the production of a material that complied with Phillips's description that was not crystalline polypropylene.

Montedison attacks Phillips 1953 application, contending that it failed to disclose the entire class of compounds covered by the Count.[637] The application specified that the molecular weight of its product was "ap-

627. See text accompanying note 512, *supra*.

628. P–946, p. 221.

629. P–500, p. MP–00781.

630. *Id.*, p. MP–00785.

631. Longi fractionated the first product with pentane at 75°F. (24°C). Its melting point, however, was 321.8°F. (164°C), P–506, Tabella 1, and thus was outside the range disclosed by Phillips's application. Longi fractionated the second product with methyl isobutyl ketone at 200°F. (94°C). Its melting point was 327.2°F. (164°C.), which was also outside the range disclosed by Phillips's application. *Id. See* text accompanying note 459, *supra*.

632. *See* text accompanying note 512, *supra*.

633. *See* text accompanying note 628, *supra*.

634. P–506, Tabella 1.

635. Tr., pp. 2743–44.

636. *Id.*, p. 2952; M–1268, pp. 78–80.

637. Montedison's Brief, *supra* note 65, at pp. 16–17. It is unclear that Phillips must disclose an entire class of products in order to establish priority over a single member. *See Mikus v. Wachtel*, 504 F.2d 1150 (Cust. & Pat.App.1974); *Petisi v. Rennhard*, 363 F.2d 903, 53 CCPA 1452 (1966). The Court could decide this priority issue on the law. As discussed below, however, this case involves patentability issues as well, *infra*, at text accompanying note 818, one of which concerns the breadth of Phillips's 1953 specification and claims. 35 U.S.C. § 112. In particular, Phillips may not be entitled to patent the full range of crystalline polypropylenes unless its 1953 application specified all of them. The Court therefore must eventually address the issue of the breadth of Phillips's specification. Since the evidence is equally relevant to Montedison's present argument, the Court has decided to address both issues here.

proximately 5000 to 20,000",[638] which Montedison contends is inadequate to include products falling within the Count having molecular weights of up to 50,000.[639] As Fox testified, however, in 1953 scientists gave far less credence to molecular weight estimates than to the intrinsic viscosity measurements from which they were calculated. This was so because the calculation used, known as the Staudinger rule or relationship, was notoriously unreliable. As early as 1948 one reliable textbook thus reported:

> [E]ven extrapolation to infinite dilution is not sufficient to eliminate shortcomings and limitations arising from the Staudinger rule. . . . It is unfortunate, therefore, that the literature contains so many molecular-weight values based on the Staudinger Rule and Staudinger "constants". Many of these values are seriously in error. Owing to this uncertainty, high polymers are now frequently characterized by their intrinsic viscosities, the results not being converted into molecular weights.[640]

In reading Phillips's application, then, it is clear that a polymer scientist would have disregarded the molecular weight value in favor of the viscosity measurements made in the laboratory.[641]

Montedison next argues that Phillips's use of the term "melting point" was vague and ambiguous and did not adequately disclose crystallinity because Phillips used the term interchangeably with "softening point" which had a wide variety of meanings and was applied to amorphous polymers as well as crystalline polymers.[642] Montedison also argues that Phillips cannot rely upon its 1953 disclosure that the density of its propylene polymer was in the range of 0.90 g./cm.$^3$ to 0.95 g./cm.$^3$ in order to prove crystallinity.[643] According to Montedison, in 1953 scientists knew of a large number of amorphous materials having densities in this range, and since no one had reported by that time that the density of amorphous polypropylene was outside this range, it would have been impossible to say whether Phillips's rather dense propylene polymer was amorphous or crystalline. Assuming *arguendo* that these narrow objections are valid, they do not prove that Phillips's disclosure was legally insufficient. In addition to Bailey's testimony regarding the meaning of "melting point" and the density data, Phillips submitted a great deal of other evidence concerning the significance of solubility, viscosity, and melting point determinations. Phillips also submitted the great variety of repetition experiments. All this evidence taken together clearly establishes the legal sufficiency of Phillips's 1953 description.

Montedison next attacks Phillips's application for its failure to establish a specific degree of crystallinity for the product.[644] In particular, Montedison argues that the mere existence of a plateau in the cooling curve measurements is not evidence of substantial crystallinity because even inconsequential crystallinity can cause a small "blip" of a plateau in the graph.[645] These objections are not well taken. Fox testified that a technician would not report the existence of a freezing point unless he found a plateau indicating a substantial amount of crystallinity.[646] Moreover, the fact that the crystalline latticework was sufficiently

**638.** P–1, p. 31.

**639.** Phillips's 1956 application, through which Phillips entered the Interference, does disclose products with molecular weight "in the range 900 to 50,000 and higher". D–648, p. 12.

**640.** P–1369, p. 249. *See also* P–3170, pp. 52–53.

**641.** *See* Tr., p. 880.

**642.** Montedison Brief, *supra* note 65, at p. 22.

**643.** *Id.,* p. 26.

**644.** Montedison's Brief, *supra* note 65, at p. 25.

**645.** Tr., pp. 938–39.

**646.** *Id.*

strong to prevent Phillips's polymer from dissolving in a number of organic solvents including pentane indicates that the crystallinity was substantial. Also, the quantity of repetition experiments resulting in the production of propylene polymers containing very substantial amounts of crystallinity is strong evidence that Phillips's 1953 application described a substantially crystalline polypropylene.

Montedison finally claims that Phillips's application not only failed to disclose that its polymer was composed essentially of recurring propylene units, but in fact taught away from this disclosure.[647] Phillips's application did state that its propylene samples were unsaturated, i. e., that they contained double bonds.[648] In context, however, Phillips's description is not inconsistent with a polymer containing essentially recurring propylene units because its application also discloses that none of the molecules examined contained more than approximately 2.4 such double bonds per molecule. Fox testified that since the total number of recurring units in these molecules was greater than 400, it is justifiable to conclude that a skilled polymer chemist would have known that Phillips's scientists were discussing a "minor feature" of the structure in their polymers.[649]

### 2. Enablement.

Bailey reviewed these reproduction runs and testified that Phillips's application disclosed sufficient information to enable production of the product of the Count:

> [W]hen I read the application I was convinced that there was a process here, and after going through all this reproduction work there are eight different groups of research chemists working for four different companies on two different conti-

nents that had access to different equipment, different purities of materials, different backgrounds, and they were all able to eventually produce a solid crystalline polypropylene as indicated [by Phillips's application], and the study of these reproductions then reinforces very strongly my conclusion that there is definitely a process disclosed in the application for producing the solid material [by Phillips's application].[650]

Montedison argues that Phillips's 1953 application failed to disclose sufficient information to enable a person skilled in the relevant art to make the product as required by 35 U.S.C. § 112.[651] Specifically, Montedison claims that the application failed to disclose three allegedly important processing requirements. The first requirement is that water vapor must be excluded from the presence of the catalyst during activation and in subsequent handling. Phillips's 1953 application did teach that the catalyst should be activated at elevated temperatures in flowing air,[652] and that the catalyst should be regenerated in flowing "dry air".[653] Based on these teachings, Bailey concluded that "one skilled in the art would have certainly taken precautions to remove as much of the water from the flowing dry air as possible."[654] He also testified that it should have been obvious to someone skilled in the art that the catalyst was "very hydroscopic".[655] Precautions against exposing it to moisture would therefore have been superfluous.

Montedison attempted to rebut Bailey's testimony by introducing a patent for a process for "cracking" or breaking up heavy crude oil molecules and forming lighter molecules of gasoline that suggested the use of steam for cleaning soot from silica-alumina catalysts.[656] Montedison failed,

---

**647.** Montedison's Brief, supra note 65, at p. 27.

**648.** P–1, pp. 31–32.

**649.** Tr., p. 3939.

**650.** Tr., pp. 2219–20.

**651.** Montedison's Brief, supra note 65, at pp. 17–19.

**652.** Tr., p. 1727.

**653.** P–1, p. 8.

**654.** Tr., p. 1727.

**655.** Id., pp. 1734–35.

**656.** P–1196; Tr., pp. 2435–44.

however, to present a single witness, expert or otherwise, to testify that the art of cracking crude oils was at all relevant to the art of building large molecules by polymerizing light propylene molecules. Indeed, the two processes appear to vary a great deal: propylene is polymerized at moderate temperatures below 300°F., while petroleum is cracked at much higher temperatures.[657] Since in the notably unpredictable fields of catalysis and organic chemistry small changes can yield quite significant results,[658] Montedison's unsupported request to apply the crude oil cracking art to propylene polymerization is of no moment.

Montedison also insists that Example X of Phillips's 1953 application favored exposing the catalyst to moist air. In relevant part, Example X [659] states:

### EFFECT OF AGING OF CATALYST WITH DRY AIR AND WITH WET AIR

To study the effects of prolonged treatment of the catalyst with dry air and with wet air at elevated temperatures, such as would be encountered in repeated regenerations, the catalysts were aged 88 hours at 1100°F. and 1300°F. with dry air and at 1100°F. with air saturated with water vapor at 100°F. At the end of the aging period with the wet air, which contained about 6.5 per cent water vapor, the catalyst was swept with dry air for five hours at 1100°F. Results of the polymerization tests on these catalyst and similar data on unaged catalyst are shown in Table XII . . .

**TABLE XII**

| CATALYST TREATMENT | | POLYMERIZA-TION TEST | POLYMER ANALYSIS. |
|---|---|---|---|
| Temp. °F | Gas | Time Hrs. | Average C₃H₆ Conv., % | MIBK Insoluble at 200°F. Wt.% |
| 1100 | Dry Air | 5 | 98 | 4.4 |
| 1100 | Dry Air | 88 | 99 | 2.2 |
| 1100 | Wet Air** | 88 | 55 | 5.1 |
| 1300 | Dry Air | 5 | 98 | 2.4 |
| 1300 | Dry Air | 88 | 98 | 2.5 |

** Wet air contained about 6.5 per cent water vapor. catalyst was flushed with dry air for five hours at 100°F. after the wet air treatment.

Montedison maintains that although the water-exposed catalyst converted propylene less efficiently, this deficiency was compensated for by its higher selectivity in the production of a solid product. On balance, exposure of the catalyst to water does serve to increase slightly the yield of solid product. Montedison assumed that such an increase is desirable and argues that the 1953 application implicitly taught the use of water-exposed catalysts.[660] This argument fails for a variety of reasons. Example X states that its purpose is to study the implicitly undesirable "effect of aging of [the] catalysts". The purpose of prolonged exposure of the catalyst to water vapor was to age it artificially; Phillips never suggested such exposure as a technique for increasing product yields. Moreover, Montedison's assumption that increased solid production is in all cases desirable is inaccurate. Chemical plant design hinges upon a variety of economic considerations. When feed materials are expensive, for instance, a highly selective catalyst that uses less feed is desirable, while when reactors are expensive, use of reactor space is put at a premium, and more efficient catalysts able to convert increased quantities of feed are preferred. Until all the considerations have been explored, it is impossible to say whether a more selective but less efficient catalyst is better than one with the opposite qualities.[661] The underlying premise of Montedison's argument is, therefore, unjustified and its argument unacceptable.

Montedison next argues that Phillips's 1953 application failed to include the allegedly necessary teaching that strontium should be added to the catalyst.[662] In fact, this addition is quite unnecessary to the production of crystalline polypropylene, although it apparently extends the useful life of the catalyst. As Bailey testified:

**657.** Tr., p. 1973.

**658.** Levenspiel, Chemical Reaction Engineering 33 (2d Ed. 1972).

**659.** P–1, p. 19.

**660.** Montedison's Findings of Fact, *supra* note 216, at No. 805.

**661.** Peters & Timmerhaus, Plant Design and Economics for Chemical Engineers 1–156, 281–340 (2d Ed. 1968).

**662.** Montedison's Findings of Fact, *supra* note 216, at Nos. 813–14.

The function of the strontium in this connection is to stabilize the catalyst so as to prolong its life but not to change either the character or the type of polymer that is obtained.[663]

Similarly, Phillips's witness Professor Herman Pines, testified:

The purpose of using strontium, as I understand it, was to extend the active life of the catalyst. . . .

. . . . .

[P]robably the strontium does not enter actively into polymerization reactions.[664]

Montedison also argues that Phillips's 1953 application failed to include an allegedly necessary precaution against poisoning the activated catalyst by exposing it to air or oxygen.[665] Once again Montedison has failed to produce any evidence showing that this teaching is necessary, and in fact, Phillips produced a great deal of evidence indicating that such a precaution was quite unnecessary. For example, DeLap testified that "dry air would have been [a] satisfactory medium in which to store the activated catalyst."[666] Similarly, Bailey testified:

I saw no evidence in any of the reproduction work that if you cooled under air, dry air, that it would not work. So I think one skilled in the art would have assumed . . . that you could cool under—in the presence of oxygen providing you removed the oxygen later on during the polymerization.[667]

Even Bawn, Montedison's own witness, testified:

I don't understand why if you activate a catalyst in oxygen, when you're dealing with an oxide in a highly oxidative state, why you cannot cool that catalyst in the same air or same oxygen as you used for activation. After all, you are in an oxi-dizing atmosphere in preparing the catalyst. Why can't you cool in oxygen? I don't understand why you would have to change the medium.[668]

Montedison further argues that Phillips's 1953 application failed to teach that only relatively pure propylene should be used for polymerization.[669] Bailey testified, however, that one skilled in the art in 1952 would naturally have used as pure a propylene as was available:

I think no publication of any type, cautions that you must use pure materials. That's taken for granted in any scientific thing. If you want to get a pure product, you start with pure materials. And that's so elementary that I don't think anyone would put that precaution in there.[670]

Finally, Montedison challenges Phillips's 1953 application for failing to disclose the best mode for practicing the invention, arguing that:

(a) the 1953 application did not disclose any of four runs relied upon by Phillips as a reduction to practice of the invention of the count.

(b) the 1953 application did not teach what Hogan and Banks then believed to be the proper practice, i. e., preventing poisoning due to water and oxygen, by activating in substantially anhydrous air, and storing out of contact with moisture, using prepurified nitrogen. Although Phillips' licensees were advised in confidence of the poisoning effect of moisture, the 1953 application actually taught that moisture was beneficial for the production of solid polymer.

(c) the 1953 application did not teach what substances served as catalyst poisons, despite Hogan's knowledge that dif-

---

663. Tr., pp. 1310–11.

664. Id., pp. 2369, 2373. *See also* Tr., pp. 2005–06; P–756, pp. 831–32.

665. Montedison's Findings of Fact, *supra* note 216, at Nos. 807, 811.

666. Hogan Record, *supra* note 16, at pp. 3029–30.

667. Tr., pp. 4042–43.

668. Tr., pp. 3126–27.

669. Montedison's Findings of Fact, *supra* note 216, at Nos. 240–42.

670. Tr., p. 1736.

ferent catalysts are poisoned by different materials.[671]

Each of these arguments is rejected. The problem with Montedison's first argument is that evidence was not adduced that Phillips's inventors knew that any of their four actual runs produced materially better results than the procedures specified by the application. Nor did Montedison introduce any evidence that Phillips's inventors intentionally concealed this knowledge. Montedison's other two arguments fail because Phillips's inventors are not required to describe information that was already well known to polymer scientists.

### 3. Utility:

In order to establish that the 1953 application disclosed a specific utility for its product, Phillips cited in its disclosure that:

> The solid polymers and copolymers of the invention have utility in applications where any of the solid plastics are used.[672]

Fox testified that in 1952 this sentence would have indicated to a person skilled in the art of polymer science:

> [T]hat this polymer could be used where polymer plastics are used, and the polymer plastics of commerce are materials of [Young's] modulus in [the] range . . [of] 10 to 11th, 10 to the 9th, in that range.[673]

In addition, the patent application disclosed that Phillips's product was thermally stable, a property essential to utility as a molded plastic. In column twenty-five the application disclosed that the decomposition temperature of polypropylene was 700° F. (360° C.). According to Fox, this information:

> [T]ells me that it is stable to a much higher temperature than the melting point, which is 240 to 300 Fahrenheit, and this says it is stable at 700 Fahrenheit.

Therefore it tells me that it will be stable at temperatures that you would normally use for molding [which] Professor Bawn characterized as perhaps 50 degrees above the melting point.[674]

Fox further testified that the solidity, density, and viscosity measurements disclosed in the application showed that it was so similar to other commercial plastics as to be highly useful.[675] In sum, Fox concluded:

> [T]here is no question that from this material you could mold a button, a poker chip, a rod, a sheet—there is no question that you could extrude filaments . . and such filaments could be used, for example, as insulation for noise and for heat.[676]

Based upon the foregoing analysis the Court finds that Phillips's Application No. 333,576 supports a constructive reduction to practice priority date of January 27, 1953.

■ While the Court has stated that Phillips need only prove its case by a preponderance of the evidence because fraud by Montedison affected the Board's determination of its historical date of priority, Phillips's entire case is so clear and convincing that it also meets the higher standard enunciated in *Morgan v. Daniels* as necessary to overrule the Board's Opinion in the absence of fraud.

### FRAUD INTRODUCTION

All three plaintiffs allege that Montedison perpetrated fraud on the Board by misrepresenting or suppressing information concerning the products produced by the parties. Phillips further alleges fraud in connection with Montedison's failure to produce certain documents during discovery. Allegations of inequitable conduct are raised against Phillips by Du Pont and Montedison.

---

671. Montedison's Brief, *supra* note 65, at p. 18.

672. P–1, p. 4.

673. Tr., pp. 891–93.

674. *Id.*, p. 3894.

675. *Id.*, pp. 894–95.

676. *Id.*, p. 3898.

None of the fraud claims against Montedison were raised during the course of the Interference. There is some question therefore of the extent to which they may be raised for the first time in this Court. The question of admissibility of new fraud claims in a § 146 action has already been addressed in the context of this case, both by this Court[677] and by the Court of Appeals for this Circuit.[678] At an earlier stage of this litigation, plaintiffs petitioned this Court for leave to amend their complaints to include allegations of fraud and inequitable conduct on the part of Montedison. This Court held that the only litigable issues in a § 146 proceeding were those that had previously been presented to the Board. Since plaintiffs' motions sought to add issues that had not been raised before the Board, the motions were denied. Appeals were taken by plaintiffs from that interlocutory order to the Third Circuit Court of Appeals upon certification by this Court pursuant to the provisions of 28 U.S.C. § 1292(b).

The Court of Appeals, in a decision by Judge Maris, held that the District Court may exercise its discretion to permit issues of fraud and inequitable conduct to be raised for the first time in a § 146 proceeding only if they are related to the factual issues of historical priority, i. e. to the "question as to which of the parties involved in the interference actually first used the device or process of the invention".[679] Fraud claims relating to other questions of patentability are inadmissible.

Following this decision, this Court delineated the fraud allegations to which the parties might address themselves,[680] and clearly excluded claims related solely to questions of patentability.[681]

■ The general rule on the sufficiency of pleading fraud claims in a § 146 action is that specific allegation in the complaint is not necessary if the claim was raised below because the parties are on notice that any issues properly presented to the Board may be presented in the District Court.[682] If the claim is raised for the first time on appeal, however, it must be pleaded with specificity since "a defendant in a § 146 action is entitled to notice in the complaint, or by amendment to it, of an issue of fraud, which, in the exercise of the court's discretion, has been permitted for the first time to be litigated in that action."[683] Plaintiffs in the instant case properly amended their § 146 complaints to include the fraud allegations against Montedison,[684] and insofar as these claims are relevant to priority, they will be admitted. Du Pont and Montedison, however, did not amend to include allegations against Phillips, so only such of these claims as were raised below will be examined.

■ Determination of patent law fraud traditionally consists of the examination of two elements, each of which must be proven by clear and convincing evidence.[685] The first element is misrepresentation, which may consist of either an intentional lie[686] or deceitful suppression of relevant informa-

---

**677.** *Standard Oil Company of Indiana v. Montedison, S.p.A.*, 398 F.Supp. 420 (D.Del.1975).

**678.** *Standard Oil Company of Indiana v. Montedison, S.p.A.*, 540 F.2d 611 (3d Cir. 1976).

**679.** 540 F.2d at 617.

**680.** *Standard Oil Company of Indiana v. Montedison, S.p.A.*, 431 F.Supp. 1064, 1072 (D.Del. 1977).

**681.** "[A]llegations of fraudulent misrepresentations or omissions with respect to the results of comparative tests performed by Montedison are not permissible if the only relevance of those allegations is to establish the unpatentability of the Natta invention over prior art." 431 F.Supp. at 1071.

**682.** 398 F.Supp. at 422.

**683.** 540 F.2d at 618.

**684.** Civil Action No. 4319, Pleading Papers No. 176 (Du Pont), No. 182 (Phillips), and No. 197 (Standard).

**685.** *In re Multidistrict Litigation Involving Frost Patent*, 398 F.Supp. 1353 (D.Del.1975), *aff'd. in relevant part*, 540 F.2d 601 (3d Cir. 1976).

**686.** *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461 (D.Del.1966); *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859 (D.Del.1972).

tion.[687] A party who withholds information does so at its own risk since it is ultimately the duty of the Board, and not of the applicants and their attorneys, to determine what information is relevant.[688] The second element is materiality, which is found where a misrepresentation "makes it impossible for the Patent Office fairly to assess [the patent] application against the prevailing statutory criteria." [689] Resort to this relatively low standard rather than one of actual cause and effect is necessitated by the uncertainty inherent in attempting to ascertain precisely the weight and impact carried by each fact placed before an examiner. Where a party is guilty of misrepresentation, it seems only fair that it and not the innocent party should assume the risk of this uncertainty.[690]

Many of the fraud claims against Montedison are based on events that took place during Montedison's prosecution of its application for a separate patent. Some back-

ground is therefore necessary to an understanding of the Court's decisions. Montedison filed an application for a patent for "prevailingly isotactic polypropylene" (the "'300 patent"),[691] on December 9, 1957.[692] Prosecution of this application was pursued until suspended by the Examiners on March 25, 1959 pending resolution of this crystalline polypropylene interference proceeding because of the similarities between the two products.[693] Montedison subsequently attempted to convince the Examiners to reopen the prosecution by submitting documents and samples concerning the crystalline polypropylene products of the parties to the Interference in an attempt to distinguish the products under dispute in the two actions. After prosecution was reopened on November 30, 1961 [694] and the '300 patent was eventually awarded to Montedison in 1962,[695] Montedison brought infringement actions based on this patent against various defendants.[696] These actions were ultimately transferred to and consolidated in

687. *In re Multidistrict Litigation Involving Frost Patent, aff'd. in relevant part*, 540 F.2d 601 (3d Cir. 1976); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555 (5th Cir. 1970); *SCM Corp. v. Radio Corporation of America*, 318 F.Supp. 433 (S.D.N.Y.1970); *Monsanto Co. v. Rohm & Haas Co.*, 312 F.Supp. 778 (E.D.Pa.1970), *aff'd.*, 456 F.2d 592 (3d Cir. 1972).

688. *See Super Products Corp. v. D. P. Way Corp.*, 400 F.Supp. 998 (E.D.Wis.1975).

689. *In re Multidistrict Litigation Involving Frost Patent, supra* note 685, at 604.

690. *SCM Corp. v. Radio Corp. of America*, 318 F.Supp. 433 (S.D.N.Y.1970).

691. "Prevailingly isotactic polypropylene" is a form of the crystalline polypropylene at issue here, notable for its much higher degree of crystallinity.

692. This application, No. 701,332, was a divisional application based on Montedison's June 8, 1955 application No. 514,099 for crystalline polypropylene.

693. The Examiners' communication stated:
In view of the similarity of the claims in this application and the count of Interference No. 80,634 which parent application Serial No. 514,099 is a party, prosecution is suspended pending the outcome of that interfer-

ence. Both the instant claims and the interference count include crystalline polypropylene made in the same manner and it is not seen how the question of patentability of the instant claims can be determined without deciding the propriety of the count, or potential counts, all inter partes matters which cannot be decided *ex parte.*
Applicants should call this case up for action after the Interference count or counts have finally be determined.
'300 File History, p. 189.

694. *Id.*, p. 293.

695. The Examiners initially found Montedison's claims for isotactic polypropylene unpatentable over crystalline polypropylene, and denied the application. *Id.* The Board of Patent Appeals reversed and awarded Montedison Patent No. 3,112,300 for prevailingly isotactic polypropylene on May 31, 1963. *Id.*, p. 394.

696. Montedison sued California Rexall Drug and Chemical Company, Chevron Chemical Company, and Enjay Chemical Co. in the Central District of California, and Humble Oil & Refining Co. in the District of Maryland. Montedison then joined the Avisun Corporation as a defendant in October, 1967. Separate actions were subsequently brought in this Court against Eastman Kodak Company, Phillips, and Diamond Shamrock. Montedison also sued Dart Industries, Inc. and El Paso Products Co. in the Western District of Texas.

this Court by August 31, 1971.[697] Evidence of Montedison's prior document and sample submissions to the Examiners came to light during discovery in the infringement litigation, and it is this evidence which supports certain fraud claims presently at issue.

### PHILLIPS'S FRAUD CLAIMS AGAINST MONTEDISON

Phillips alleges that Montedison perpetrated four fraudulent acts; designated by Phillips as Events I–IV.

*Event I: DeVarda's Interview.*

Phillips's first allegation of fraud centers upon an April 1, 1958 interview between Dr. Giuseppe DeVarda, Montedison's house counsel in charge of patent matters, and several patent examiners.[698] According to Patricia Peake, one of Montedison's patent counsel:

> During the conference on April 1, 1958 in the Patent Office, Mr. Mark Liebman asked Dr. DeVarda about the prior art on crystalline polypropylene. He wanted to know from Dr. DeVarda whether anyone had ever produced a crystalline polypropylene prior to Natta even if they did not know they had produced it.
>
> I [Peake] was not sure that Dr. DeVarda understood the question because of English not being his native language and I began to explain it to him. Mr. Liebman interrupted me. He said, "I asked him (Dr. DeVarda) the question, Mrs. Peake, and not you, or are you afraid he will say something you don't want him to say?"
>
> He then repeated the question to Dr. DeVarda.[699]

DeVarda described his response:

> If I remember it rightly, I managed not to give a straight yes or no answer to said question. I think I proposed another question: "What does it mean 'prior to Natta'"? There was not anything published at the time of Natta's invention. As far as pending applications are concerned it depends how far back people may go.[700]

Phillips alleges that DeVarda suppressed his knowledge that Phillips had produced crystalline polypropylene prior to Natta. Phillips further alleges that this suppression was material since the provision of accurate information might have resulted in a termination of the Interference in favor of Phillips. The Court finds that Phillips's charges are true. Moreover, the Court finds that Toulmin and Peake, who were both present at the interview, also committed fraud by suppressing their knowledge that DeVarda's statement was a misrepresentation.

The initial determination that must be made is whether this fraud claim is admissible under the standards promulgated by Judge Maris. Since Montedison's alleged failure to supply accurate information to the Examiners concerning the results of subsequent reproductions of the process disclosed in a constructive reduction to practice is relevant to the determination of whether the application disclosed the product, the required nexus between the fraud claim and Phillips's historical date of priority is established.

The second question for determination is whether Montedison had knowledge which if suppressed would have constituted a misrepresentation. It is clear to the Court that Montedison knew at the time of the Examiner's question that a process for the production of crystalline polypropylene had been disclosed prior to Natta, and that this information was suppressed. This knowledge was based on experiments performed by Montedison's Dr. Carlo Capucci[701] during 1955 following information that had been disclosed by Phillips's 1953 American

---

697. The consolidated suit was denoted Civil Action No. 3343. All claims were eventually settled and dismissed without prejudice by 1975.

698. This meeting was attended by Guillio Natta, Montedison's inventor, and Patricia Q. Peake, one of Montedison's patent counsel. *See* P–639.

699. P–638.

700. P–637.

701. *See* text accompanying notes 463–521, *supra.*

application. Montedison first learned of the possible priority of Phillips in 1955, after Phillips Belgian patent and an Australian patent application for the same inventions had become open for public inspection.[702] Shortly after Montedison obtained these documents, Capucci began attempting to reproduce Phillips's work in order to determine whether Natta's priority date was threatened.[703]

Montedison contends that Capucci did not produce a solid crystalline polypropylene but rather a copolymer containing ethylene and propylene. This argument is based on Mazzanti's 1974 deposition testimony that Capucci's product was soluble in hydrocarbon liquids at room temperature. Since solid crystalline polypropylene is usually insoluble under those conditions while copolymers are generally dissolved quite readily, Mazzanti concluded that Capucci's product was a copolymer.[704] Although Mazzanti thought this hypothesis had been formulated at Montedison in 1955 or 1956,[705] he did not cite a single contemporaneous document as support.

In sharp contrast to Montedison, Phillips introduced extensive evidence that Capucci did produce the product of the Count. The evidence concerning the product itself is set forth *supra*, at text following note 463. In addition, Phillips has submitted contemporaneous documentation to support the argu-

ment that Montedison knew that Capucci's spring products were crystalline polypropylene homopolymers. Perhaps the most telling document is a report written by Natta, Montedison's senior polymer chemist, on September 14, 1956, prior to Capucci's autumn 1955 experiments.[706] In this document Natta states that the fact that Capucci had separated "a crystalline part which however contains a mixture of polythene [polyethylene] and of propylene, . . . makes us consider as highly improbable the copolymerization of the propylene with ethylene which is claimed in the Phillips patent." [707] This observation is particularly significant because "mixture" is a precise chemical term meaning "a substance whose ingredients can be separated by physical means",[708] or "two or more substances which are mixed; but not chemically combined. Mixtures . . . may be separated by mechanical means".[709] The use of the term "mixture" therefore excluded the possibility that Capucci's products were copolymers, since the components of a copolymer may be separated only by chemical means.

Another report lending further support to Phillips's position was prepared by Dr. Arthur Glasebrook, describing a June 1955 interview with Natta.[710] On June 5, 1955 Glasebrook prepared P–488, stating that Montedison had tried out the Phillips proc-

---

**702.** P–533; The interrelationships between Phillips's various applications and patents is summarized in the following table:

U.S. Application No 33,576, January 27, 1953 (P-1)

**703.** M–236, p. 3171.

**704.** M–1266F, p. 960. Mazzanti conceded the possibility that "there could be some homopolymers having a very, very low crystallinity, but I think that also in that case they should be

insoluble by hydrocarbons at room temperature. So I am more inclined to believe that those were copolymers, as we know that copolymers are much more soluble." *Id.*, p. 961.

**705.** *Id.*, pp. 961–62.

**706.** P–553.

**707.** *Id.*, pp. 10–11.

**708.** Concise Chemical and Technical Dictionary (2d Ed. 1962), p. 628.

**709.** Hackh's, *supra* note 30 at p. 542.

**710.** P–488. Glasebrook was employed by the Hercules Powder Company, a large American chemical company originally involved in this Interference, to gather and report information concerning the research of foreign scientists. Pleading Paper No. 720, pp. 499–506.

ess to determine whether it could be used to produce crystalline polypropylene and found that "[t]he answer", according to Natta, "is 'Yes'."

The argument that Montedison knew that Capucci's spring products met the Count is also supported by several documents indicating that at a July 1955 scientific meeting in Zurich, Natta announced his discovery that the Phillips product contained crystalline polypropylene. One of these documents is an October 26, 1954 letter to Montedison in which Peake wrote:

> [W]e referred in our preliminary statement for Natta et al., to Professor Natta's public announcements on July 22 and 23, 1955, at Zurich, and during which he referred to having obtained (using his techniques) a "petite" amount of isotactic polypropylene (as defined by us) from a crude prepared by him using Hogan et al. [i. e., Phillips] catalysts.[711]

Another is a letter written on March 14, 1958, and sent to Montedison by Toulmin and Toulmin. The letter states:

> At the Zurich meeting of July, 1955, Professor Natta announced that his group had isolated a small amount (some percent units) of crystalline polymers *from the crude polymerizate of the Phillips' process.* (emphasis in original).[712]

In light of this evidence, the Court finds that Montedison was aware that Capucci's initial work had produced crystalline polypropylene by following the Phillips Belgium patent and its first Australian patent application. In mid-September, 1955 Montedison learned of additional Phillips filings corresponding to the second Australian application that had been opened for public inspection on July 21, 1955. On September 20, 1955, Capucci began his autumn 1955 experiments in order to determine further whether the products claimed by Phillips posed a

threat to Montedison's priority position.[713] Montedison claimed that Capucci followed Phillips second Australian application.[714] The importance of Montedison's claim is that a part of this application carried a priority date of December 20, 1954 which, rather than being "prior to Natta", is nearly six months after Natta's date of June 8, 1954. Montedison argues that Liebman's question did not concern art that had developed after Natta's priority date and that therefore DeVarda committed no fraud by failing to mention Capucci's autumn experiments.

Montedison buttresses its argument by pointing to what it considers to be essential differences between the second Australian application and its predecessor documents. Phillips contends that the differences were minor and that the Capucci autumn runs were essentially based on information that had been disclosed earlier. The first difference identified by Montedison concerns the need for excluding water vapor from the presence of the catalyst during activation and in subsequent handling. Montedison correctly asserts [715] that the second Australian application cautions that "water [and] oxygen . . . act as poisons for the catalysts of this invention".[716] This caution, however, was not new, but was at least implicitly included in Phillips 1953 application.[717]

Montedison refers next to varying teachings regarding the addition of strontium to the catalyst support in an effort to buttress its claim that Capucci's autumn experiments followed the teachings of Phillips second Australian application, rather than its 1953 American application. While Phillips January 27, 1953 disclosure failed to mention strontium, Montedison correctly states that Phillips second Australian application taught that strontium should be added.[718] Montedison failed to prove, however,

---

711. P–530, p. 11607.

712. P–629, p. 3.

713. P–756; M–1274, p. 3227.

714. *See* note 702, *supra.*

715. Montedison's Findings of Fact, *supra* note 216, at No. 804.

716. P–417, p. 69.

717. *See* text following note 651, *supra.*

718. Montedison's Findings of Fact, *supra* note 216, at No. 856.

that the addition of strontium materially affected propylene production.[719] If Montedison could prove that the addition of strontium was material to propylene production DeVarda's failure to mention Capucci's autumn experiments would still not be justified. Although Montedison first learned of the addition of strontium from Phillips second Australian application, the technique was actually first disclosed in an American patent application filed by Phillips on June 1, 1954,[720] which was clearly "prior to Natta". The resulting products were therefore within the scope of Liebman's question.

In a final effort to support its claim that Capucci's autumn work followed methods disclosed only after Natta, Montedison refers to precautions against exposing the catalyst to oxygen. Montedison claims that Capucci's autumn experiments followed alleged disclosures in the second Australian application that the activated or regenerated catalyst should be cooled and stored in an atmosphere of nitrogen rather than in the oxygen atmosphere used for activation or regeneration.[721] Similar teachings were not included in Phillips 1953 application. Montedison's argument, however, misinterprets the second Australian application. Although the application states the oxygen can poison the catalyst, this threat is neither constant nor is it described as such. Phillips second Australian application explicitly mentions only one period—during polymerization—when oxygen must be removed from the presence of the catalyst.[722] The Court therefore finds that Capucci's autumn experiments followed Phillips 1953 disclosure and that Capucci merely added an undisclosed unnecessary step.

Indeed Capucci at least partially attributes his autumn work to Phillips Belgian patent.[723] which was based on Phillips's 1953 American disclosures. In his summary report on the fall experiments, Capucci wrote:

> [We have] heard that Phillips Co. had filed a patent [2] claiming the production of
>
> [2] Belgium Pat. 530,617 and Australian Pat. Application 6365/54.[724]
>
> alpha-olefin high polymers by the use of catalyst consisting of chromium oxides supported on porous oxides of silica, alumina, dioxide, etc. . . . . [W]e have thought it convenient to reproduce the runs shown in the examples of Phillips' patent, in order to establish whether, from the obtained crude polymers, fractions could be isolated having properties and structures analogous or equal to the ones shown by isotactic polymers. . . We have therefore reproduced the runs described in Phillips' patents. . . .

Several additional documents not expressly identified with either Capucci's spring or fall experiments also indicate that Montedison believed prior to the date of DeVarda's interview that Phillips's 1953 application disclosed the production of crystalline polypropylene. One such document is a letter from Toulmin to Montedison dated March 14, 1958 which states that by January 1, 1955:

> Phillips already had pending their U.S. applications Ser. No. 333,576 filed January 27, 1953, and Ser. No. 476,306 filed December 20, 1954. Those applications showed the pentane extraction and the extraction of the pentane residue with MIBK, *but said nothing at all about crystallinity, isotactic structure, or any struc-*

719. *See* text accompanying notes 663, 664, *supra.*

720. U. S. Patent Application No. 433,804. *See* note 702, *supra.* It may be argued that DeVarda was unaware of this application. Phillips second Australian application, however, of which DeVarda was aware, clearly listed June 1, 1954 as the priority date for a variety of claims based upon strontium addition. *See* P–417.

721. Montedison's Findings of Fact, *supra* note 216, at No. 807.

722. P–417, pp. 69–70.

723. *See supra* note 702.

724. P–756. Montedison claims that Capucci erroneously footnoted the Belgium patent, while properly citing the second Australian application. Montedison's Findings of Fact, *supra* note 216, at No. 857. Once again, however, Montedison provides only weak support, relying upon Mazzanti's very recent reconstruction. M–1266F, pp. 875, 936. On the other hand, Capucci testified that his notation was accurate. M–1274, p. 3303.

ture. Phillips did not *know* what they had. (emphasis in original).[725]

Discussing the possible attacks upon Phillips, Toulmin failed to suggest that Phillips's product was anything other than a crystalline polymer or that Montedison produced it following disclosures that came after Natta.

Another document is Pirani's response dated March 27, 1958, still four days before the DeVarda interview. This letter also attributed the production of a solid crystalline polypropylene homopolymer to Phillips's earliest application:

> [W]e have come to the conclusion that Phillips may be in a position to assert that the *solid polypropylene* which they have disclosed in their early application . . . is a polymer corresponding to what, according to the Natta nomenclature, is called of "predominantly isotactic structure".
>
> The analysis of this residue, as was done in Prof. Natta's laboratory, and illustrated to you in Milan last year, leads in fact to the conclusion that it corresponds approximately to a mixture [containing] . . . 20% of an highly isotactic polymer non-extractable with boiling n-heptane. (emphasis in original).[726]

A third document is a September 10, 1957 letter to Toulmin from DeVarda and Pirani which admitted that Phillips's January 27, 1953 application disclosed "solid polypropylene" containing "small amounts (20%) of isotactic macromolecules" and which faulted Phillips for failing to recognize what it had.[727] In discussing other possible attacks, the letter failed to suggest that Phillips's product was only a copolymer or that it was obtained by following disclosures that were not prior to Natta's.

In October, 1955, DeVarda and Pirani expanded their thought in a fourth docu-

ment, a letter to Toulmin.[728] When Phillips filed its 1953 application, DeVarda and Pirani argued that its inventors did not notice that the solid product was a mixture of polymers, that it was characterized by a considerable percentage of isotactic structure, and that it contained substantial crystallinity. Although DeVarda and Pirani were concerned with possible attacks upon Phillips's product, the letter never suggested that these polymers were ethylene-propylene copolymers.

In October, 1955 Mazzanti prepared a fifth document, a chart summarizing the properties of the various polymers involved in this Interference, in which the Phillips 1953 application was again credited with disclosing crystalline polypropylene products.[729] Two memoranda recording Montedison's strategy discussions also strongly evidence Montedison's belief that Phillips 1953 application disclosed the production of crystalline polypropylene. One memo records a May 16, 1956 conference between Toulmin and DeVarda, where the discussion included the properties of the polypropylene obtained with the first Australian Phillips method and Natta reported that a portion of this product was composed of "mixtures of isotactic and block polymers".[730] No one suggested the possibility that this isotactic product might contain ethylene, although other possible attacks upon Phillips were extensively discussed. Nor did anyone suggest that this product was obtained by following the second Australian application which was also discussed at length.

A May 3, 1957 strategy conference attended by Toulmin, Peake, Natta, DeVarda, and Pino was also reported.[731] During this session the earliest Phillips product was again reported to contain "block polymers" and was discussed in terms of head-to-tail enchainment. Although the conferees spent a great deal of effort trying to distin-

---

725. P–629, p. 3.

726. P–631.

727. P–907.

728. P–644.

729. M–1266F, p. 929.

730. P–599, p. M9383.

731. P 602.

guish Phillips's product from those of Natta, no one suggested that Phillips's products might be contrasted on the basis of an ethylene content. In fact, DeVarda specifically referred to the "Phillips' polypropylene".

Montedison's personnel thus prepared a large number of documents attributing the production of crystalline polypropylene to Phillips's earliest application. Montedison has attempted to dismiss these documents as mistaken. It charges that Toulmin was in error concerning the priority date of the second Australian application and that he therefore incorrectly assumed that all of Phillips's applications had been filed prior to Natta. This explanation is rejected. Any confusion Toulmin might have had concerning the priority date assigned to the second Australian application was at best shortlived. As early as October 28, 1955 Montedison accurately informed Toulmin:

> [W]e are informing you that the Phillips Australian Patent Application No. 6365/55 are [sic] open to public inspection on July 21, 1955; the convention dates are June 1 and December 20, 1954.
>
> As you know Phillips have [sic] an earlier application in Australia, 864/54 of June 6, 1954, which corresponds to Belgian Patent 530,617 of July 7, 1954 . . . .[732]

The Court therefore finds that as of the April 1, 1958 interview between DeVarda and the Examiners, DeVarda believed that Phillips had produced crystalline polypropylene prior to Natta.[733]

Montedison argues that the Court should not find that DeVarda's failure to answer the question in these circumstances constituted an intentional misrepresentation for three reasons, all of which must be rejected. Montedison first contends that DeVarda did not understand the question because he asked for supplementary information and

that he subsequently lacked the opportunity for further comment.[734] The weaknesses of this argument , is that the information sought by Examiner Liebman remained relevant and material for more than four years after the April 1, 1958 interview.[735] It stretches credulity to believe that Montedison could find no opportunity to supply the requested answer to the Examiner's question during this period when it prepared and submitted more than one hundred documents comprising several thousand pages of other information to the Examiner.

Montedison next argues that DeVarda's silence was proper. This argument construes the Examiner's question as an inquiry only as to what Phillips's own data revealed. Montedison contends that since DeVarda had no knowledge of Hogan and Banks's data except as discussed by their application, it was proper for him to say nothing.[736] The weakness of this argument is that it too narrowly construes the Examiner's question which asked "whether anyone had ever produced a crystalline polypropylene prior to Natta even if they did not know they had produced it." The question as stated did not limit DeVarda's attention solely to each experimenter's data but rather asked him to consider all relevant information. Among such information were Capucci's repetition experiment results, which should have been mentioned to the Examiners.

Finally, Montedison argues that DeVarda was excused from answering the Examiner's question since to do so would have been "misleading".[737] Indeed, DeVarda has twice attempted to explain and justify his fraud in this manner. In recounting his October interview to Toulmin, DeVarda wrote:

> Perhaps things would have not changed by admitting a possible priority of Phillips . . . in discovering normally

---

**732.** P–859, P–727. *See* text accompanying note 702, *supra.*

**733.** P–602, P–631, P–644, P–921.

**734.** Montedison's Findings of Fact, *supra* note 216, at No. 891.

**735.** *See* text accompanying note 9, *infra.*

**736.** Montedison's Findings of Fact, *supra*, note 216, at Nos. 892, 893.

**737.** Montedison's Findings of Fact, *supra* note 216, at No. 891.

solid crude polypropylene mixtures, which after our discovery of isotactic polypropylene turned out to be partially crystalline. At least in the Phillips case this seems most likely to have really happened.

However in April 1958 the situation did not seem sufficiently ripe, for making this admission to four prejudiced Examiners who did not seem to be particularly anxious, at least then, to have available and at their disposal all the relevant and complex information on the issue. . . [I]t was hardly the right time to enter into too many details on said particularly "hot" topics, in the presence of four not very sympathetic Examiners who were *listening probably for the first time to our story* of the Natta's discoveries as resulted from the first complete analysis which we were able to perform during the first months of 1958. . . .

I recall that the examiners were showing unwillingness to enter, not only into any detail, but also into discussion whatsoever on the relevant and complex information I had just broadly outlined to them, since, according to the Examiners, there would have been ample time to do this properly, once the interference had been declared.

Since you are asking my views on the matter, I will frankly reply that what seems most urgent and important to us is the direct education, preferably by direct action (interviews, amendments, letters), of all those who in the Patent Office may in whatever capacity have to do with our cases. (emphasis in original).[738]

DeVarda again reiterated his feelings in a 1973 deposition:

[C]rystallinity was a peculiar parameter to rely upon and . . . what I really desired was to give the Examiner a full and complete disclosure and picture of the situation without withholding anything at all. But I had . . . al-

ready tried several times to do so; but I recall that the Examiner says the letter was showing unwillingness to enter not only into any detail, but also into discussion whatsoever on the relevant and complex information I had just broadly outlined to them. . . . [T]he Examiners were not willing to listen to my explanation in order to get the full grasp of the situation.[739]

DeVarda apparently thought that, considered alone, the results of Capucci's experiment would present an unfair and incomplete picture. Such considerations, however, do not excuse the failure to supply material information. It is the province of a patent examiner, and not a party, to determine what data is relevant and to elicit it from the parties. When requested to do so, the parties must supply available information. Although a party may subsequently attack such information as unfair or irrelevant, it cannot attempt to perform the examiner's function by determining the validity of its own case.[740] To the extent DeVarda sought to do so, his actions cannot be excused.

Further, if DeVarda's actions were somehow excusable, those of Peake and Toulmin were not. Peake and Toulmin both recognized that the Patent Office might award priority to Phillips should it be discovered that its polypropylene was the least bit crystalline.[741] Having participated in Montedison's strategy discussions,[742] Peake and Toulmin were well aware that Phillips's product was crystalline polypropylene. They were also aware, from reading DeVarda's account of his interview,[743] that he had withheld information from the Examiners. Peake and Toulmin nevertheless remained silent, despite numerous opportunities to correct the impression which DeVarda left with the Examiners.

The Court therefore finds that by failing to inform the Patent Office that Phillips

---

**738.** P–637, p. 2.

**739.** M–1265B, p. 324.

**740.** *See* text accompanying note 688, *supra.*

**741.** *See* text accompanying notes 747–53, *infra.*

**742.** See text accompany notes 730, 731, *supra.*

**743.** P–637.

had disclosed a homopolymer of crystalline polypropylene prior to Natta, Montedison engaged in an intentional suppression of relevant information that constitutes a misrepresentation.

It remains to be established that Montedison's misrepresentation was material to the Examiners' decision. The Court finds that the misrepresentation was material because it might have affected the Examiners' ability to decide properly two motions made by Phillips which could have affected its date of priority.[744] The first motion was to dissolve the Interference and grant Phillips priority, and the second was to make Phillips the senior party.[745] Both motions were based on Phillips's claimed 1953 constructive reduction to practice. The rationale advanced by the Examiner Liebman for denying these motions was that there was insufficient proof that the product disclosed by Phillips's 1953 application was in fact the product of the Count:

> [Phillips 1953 application] does not give a method for preparing the solid polymer fraction in question which corresponds to a disclosed method for preparing a polypropylene disclosed to fall within the scope of the count.· . ·. . [T]here is no actual duplication [of this application] wherein a crystalline polypropylene component is identified. . . . [T]here is a reasonable doubt that [Phillips's] solid polymer . . . was in fact a solid polypropylene containing a substantial crystalline polypropylene content.[746]

Had Montedison supplied the information that it had in fact produced solid crystalline polypropylene by duplicating the process disclosed in Phillips's 1953 application, the Examiners might well have decided the motions differently and either dissolved the Interference or directly awarded Phillips the senior party status it requested. The possible effects of Montedison's suppression upon the outcome of Phillips's two motions is not mere speculation. Strategy discussions among Toulmin, Peake, and Montedison officials demonstrate the importance attached by the Examiners to information relevant to whether Phillips's 1953 products were crystalline. On several occasions between 1957 and 1962, the Examiners indicated to Toulmin, Peake, and DeVarda that they would strongly favor the first party who had produced any amount of crystalline polypropylene.

Toulmin first learned in 1957 about the Examiners possible preference for the first party who produced crystalline polypropylene. About November 8 of that year the Patent Office proposed as the Interference Count "normally solid polypropylene having a crystalline polypropylene component." This wording worried Toulmin who was afraid that the Patent Office "might take the attitude that the *extent of crystallinity* is a *matter of degree.* It would then follow that they would be prepared to hold that whoever had *any* amount of crystalline polypropylene first, would be the *first inventor.*" (Emphasis in original).[747] The need thus arose to distinguish the Phillips product which, though crystalline, was less so than Natta's. Toulmin confirmed this fear during a November 26, 1957 interview in which he learned that "the [Patent] Office is disposed to take just the position" outlined above.[748] "The *fundamentally new thing* to them," Toulmin later reported, "is a polypropylene having a *crystalline content,* any amount." (Emphasis in original).[749]

The Examiners reiterated their opinion at DeVarda's April 1, 1958 interview. Peake reported that Examiner Liebman[750] stated:

---

744. Interference Record Paper No. 32, pp. 68, 73, 74.

745. The senior position in an Interference is advantageous because the burden of proof is on the challenging parties to prove that the senior party is not entitled to the patent. Rosenberg, *supra* note 463, at pp. 143–44.

746. Interference Record Paper No. 132 at p. 1050.

747. P–865, p. 9308.

748. *Id.*

749. P–921, p. 9449.

750. P–638.

[I]f a reference (having 1% crystallinity) were found, no interference would be set up on the present count. . . . The Examiners whom we interviewed will not make the decision according priority in the interference but the Examiner's insistence that he would use a reference showing a polypropylene of even 1% crystallinity (whether the crystallinity had been recognized or was only discovered later) against the proposed count may be some indication of present Patent Office thinking.[751]

The materiality of DeVarda's suppression is further attested to by Peake's report of a July 1962 interview with Examiner Schofer, who had assisted Liebman in deciding Phillips's motions:

[Schofer] has objective criteria for finding invention. He is convinced that the broad invention in polypropylene is the

discovery of cystallinity in it. No one has ever shown him that there was even a trace of crystallinity in any polypropylene that would be prior art to the parties to [this interference], and he knows that when the Examiners asked Dr. deVarda and Prof. Natta for such a prior art reference, in February 1958,[752] they did not direct the Examiners to any such reference.[753]

Montedison still claims, in the face of all this evidence, that its fraud was not material. Montedison argues that the Examiners learned from seven of Natta's publications that crystalline polypropylene could be produced by following Phillips earliest application.[754] The Court has examined these articles and does not find that they would have supplied the Examiners with sufficient information to render Montedison's suppression immaterial.[755] Assuming that the Ex-

---

751. P–639.

752. Peake probably meant April, 1958.

753. P–692, p. M12705.

754. Montedison's Findings of Fact, *supra* note 216, at Nos. 894–896.

755. On June 7, 1955, for example, Natta reported in the Proceedings of the Fourth World Petroleum Congress:

Our research on the production of propylene polymers with the aid of catalysts described in [Phillips first Australian patent], have up to now only resulted in low yields of almost completely amorphous polymers, having irregular structures. Only when employing technical propylene, which contains some percent units of ethylene, the mixture of polymers obtained has small amounts of a solid crystalline product that, as revealed by x-ray examination, consists of polyethylene. P–535(a).

Of similar import is the August 1955 issue of Angewandte Chemie, which reported that Natta had disclosed:

If one wants to polymerize higher olefins [than ethylene] to regularly built, crystalline macromolecules, one cannot in practice employ the catalysts mentioned in [the Phillips] patent. P–535(b).

In the October-November, 1955 issue of Die Makromolekulare Chemie, Natta wrote:

We have even isolated small quantities of isotactic polymers of low molecular weight, by fractionating polymers of propylene prepared by using catalysts made up of metal oxides. P–535(c).

This article failed to disclose, however, that these catalysts had been the subject of Phillips

earliest application. A similar failing characterizes the October 1955, disclosure in La Chimica E L'Industria, where Natta wrote:

Subsequently, we have prepared the isotactical polymers of alpha-olefins with a type of catalysts other than that used by Ziegler. We have isolated small quantities of high-molecular-weight isotactical polymers by the fractionation of propylene polymers, which had been prepared with certain catalysts made of the oxides of polyvalent metals, and not with metallo-organic reagents. P–535(d).

In the November, 1955 issue of La Chimica E L'Industria, Natta wrote:

Finally, as we have previously communicated, we have noticed the presence of small amounts of crystalline polypropylene with a molecular weight below 20,000 and mixed with considerable quantities of amorphous polypropylene in the propylene polymers prepared with the aid of catalysts containing supported hexavalent chromium. Such catalysts have been previously suggested for the polymerization of poly-alpha-olefins. P–535(e).

For this last proposition, Natta cited the Australian patent application No. 6367/55, P–535(e). Even assuming that the Examiners understood that Natta intended to cite Phillips second Australian application No. 6365/55, P–417, the article failed to direct the reader's attention to Phillips earliest patent application. Similarly, Natta's February, 1956 La Chimica E L'Industria article (P–535(f)), failed to mention Phillips first Australian application, although it did claim that 1–2% isotactic polymer had been made by following Australian patent application No. 6367/55.

aminers might have gleaned some useful information from these articles, Montedison has failed to prove that the Examiners ever saw them. The only evidence of Board review offered was that in early 1960 Montedison placed copies of these articles in the Patent Office Library.[756] Based on the proximity of the articles, Montedison attempts to infer that the Examiners carefully studied them and absorbed their contents.[757] The Court doubts, however, that the Patent Examiners took the time to study these articles, six of which were written in either French or German,[758] with sufficient detail to understand that Phillips produced crystalline polypropylene prior to Natta. These doubts are confirmed by Peake's observations, quoted above, that Examiner Schofer did not know that Phillips earliest patent application disclosed crystalline polypropylene.

 In sum, the Court finds that Montedison committed fraud against Phillips by virtue of DeVarda's, Toulmin's and Peake's failure to inform the Examiners of Phillips's pre-Natta reference to crystalline polylene.

*Events II and III: Toulmin's Affidavit and Peake's Sample Submission.*

Phillips also asks this Court to find that two of Montedison's other actions, designated by Phillips as Events II and III, were fraudulent. In Event II Toulmin submitted an affidavit [759] to the Patent Office which was allegedly misleading and fraudulent in that it described only the unfavorable characteristics of Phillips earliest product without revealing the favorable information that the product was crystalline polypropylene.[760] Similarly, in Event III Peake displayed samples of the Phillips 1953 product to the Examiners,[761] which Phillips alleges was misleading and fraudulent in that Peake thoroughly discussed the bad characteristics of Phillips 1953 product without revealing that it was crystalline polypropylene.[762] Although these claims are admissi-

---

In the September, 1956 issue of La Chimica E L'Industria, Natta wrote:

> We too have demonstrated that very small amounts of solid polymers present in those obtained with the aid of Phillips catalysts [34]
>
> [34] Australian patent 864/54 and Belgium patent 530,617. P–535(g).
>
> exhibit a certain crystallinity . . .

Although the article does mention that crystalline polypropylene can be produced by following two patents of Phillips, it fails to indicate that the priority date of these patents is prior to Natta.

**756.** M–921; M–922; M–923.

**757.** Montedison claims that in working on the Zletz Interference application, Examiner Schofer examined these "very Natta publications". Montedison's Findings of Fact, *supra* note 216, at No. 895. In fact, Examiner Schofer cited only two articles, neither one of which is presently relied upon by Montedison. Moreover, Schofer understood the cited articles as teaching something entirely different from what Montedison now contends. Where Montedison claims that Natta's publications revealed that Montedison's polymers could be made using the Phillips catalysts, Schofer cited these articles for the proposition that "polymers prepared by different processes are in fact different." M–1137, pp. 44–46.

**758.** *Cf.,* M–924, p. 3 and P–535.

**759.** P–547.

**760.** Phillips also claims that Montedison misrepresented other relevant data to the Examiners claiming (1) that it had followed precisely Phillips 1953 application when in fact strontium had been added to the catalyst, and (2) that it had measured certain data including density of the product when it had not done so. Phillips's Brief, *supra* note 131, at 274. Since Phillips has failed to show any injury from these allegedly fraudulent acts, and in fact was apparently benefited by them, this Court finds that the claims are without merit.

**761.** P–587. *See also* P–675; M–1263J, pp. 624–38.

**762.** Phillips's Brief, *supra* note 131, at pp. 304, 315. Phillips also appears to invent a theory best described as fraud *per se* under which the Court is asked to find that Peake committed fraud during her interview because she violated a Patent Office rule in failing to report what was said at that interview. *Id.,* p. 304. In support of its theory, Phillips cites two cases: *La Maur, Inc. v. DeMert & Doughtery, Inc.,* 265 F.Supp. 961 (N.D.Ill.1965); and *Corning Glass Works v. Anchor Hocking Glass Corp.,* 253 F.Supp. 461 (D.Del.1966). Neither case, however, indicates more than that the failure to record properly Patent Office interviews *may* indicate fraudulent activities. This Court has factored this consideration into its findings.

ble because they are relevant to the determination of the date of Phillips's constructive reduction to practice, the Court rejects Phillips's contentions because it has proven neither that the actions of Toulmin and Peake were deceitful in this respect nor that they were material to this Interference action. Since Toulmin's and Peake's actions were made in prosecution of an entirely separate patent application, the '300 application for isotactic polypropylene,[763] the Court is skeptical about finding that Montedison committed fraud in the present action.

In seeking to overcome this skepticism and thereby to prove fraud by clear and convincing evidence, Phillips argues that Montedison expressly applied for a patent upon isotactic polypropylene in order to use that prosecution to make *ex parte* attacks upon Phillips's product in this Interference.[764] In support of this proposition, Phillips relies upon four arguably relevant documents.[765] The first is an October 23, 1959 letter from Pirani to Montedison's Piero Giustiniani stating that it was beneficial for Montedison to submit a petition in the isotactic polypropylene prosecution because:

> [I]t allowed us (since, according to the rules, it was no longer possible to do so directly in the . . . Interference) to present to the Patent Office in a detailed and documented attachment, what were in our view the limits of the 'invention' of our opponents in the 'interference' providing thereby a considerable contribu-

tion to the clarification of the problems relative to the 'interference' itself and this was our main objective in presenting it.[766]

This document does not in itself imply, however, that Montedison was not honestly and diligently prosecuting its patent application for isotactic polypropylene. Montedison was entitled to prosecute a patent for isotactic polypropylene for its own sake since it was itself a very valuable, if not the most valuable, form of crystalline polypropylene.[767] As part of this strategy, it was necessary to distinguish between isotactic polypropylene and the product at issue in the Interference.[768] Since definition of the isotactic product remained in dispute until June 4, 1962,[769] Toulmin therefore properly focused on the product of each of the parties in order to define "the limits of the 'invention' of our opponents in the 'interference' " and so to distinguish isotactic polypropylene.

In seeking to prove that statements made in the course of the isotactic polypropylene prosecution were misleading and materially affected the crystalline polypropylene interference, Phillips also relies upon a November 29, 1959 letter from Toulmin to Montedison stating:

> We think a second petition should be filed as promptly as possible . . . this being your chance to put the analysis of the early opposing disclosures before the Office in . . . this case which is presently ex parte.[770]

763. *See* text accompanying note 691, *supra.*

764. Phillips's Proposed Findings of Fact and Conclusions of Law, Part II, Fraud Issues, No. 98.

765. Phillips also attempts to rely on P–673. *Id.* After careful review, however, this Court fails to see how this document is relevant to this issue.

766. P–891.

767. *See* P–556, pp. 107–10.

768. Montedison accompanied its patent application with three of Natta's articles identifying and distinguishing isotactic polypropylene. P–556, pp. 1–89. On January 8, 1958 these were followed up with an affidavit in which Natta

distinguished between isotactic polypropylene and the product of the Count. *Id.,* pp. 91–92. Subsequently, Montedison submitted five amendments further refining and distinguishing its claims for isotactic polypropylene. *Id.,* pp. 93–147. When the Patent Examiner suspended further prosecution of the isotactic polypropylene patent on March 25, 1959 pending resolution of this Interference because of the similarity between isotactic polypropylene and the product of this Interference Count, Montedison redoubled its efforts to distinguish between the two substances. Toulmin accordingly submitted nearly ninety pages of materials, including the affidavit at issue. *Id.,* pp. 190–270.

769. Interference Record Paper No. 132, p. 1050.

770. P–666, p. 35790.

Phillips also points to a letter from Toulmin to Montedison, dated January 26, 1960, which states:

> [The isotactic polypropylene prosecution] has served the purpose of letting us go in *ex parte* with those samples prior to any hearing on motions, something which could never be done if we did not have the *ex parte* [prosecution] pending.[771]

Neither of these documents indicates, however, that Toulmin's affidavit or Peake's sample submission in the isotactic polypropylene prosecution constituted a misrepresentation in the crystalline polypropylene Interference. Neither do they establish the materiality of these events to the Examiners' decision.

Finally, Phillips relies upon a letter from Peake to Montedison written on April 29, 1960:

> The samples, so far, have been presented and considered, for record purposes, only in connection with [the isotactic polypropylene prosecution]. The Examiners said while the samples are revealing, they cannot accept them as finally determinative in the *inter partes* proceeding [the Interference] without letting the other parties comment on them also. They were entertained in [the isotactic polypropylene prosecution] and had the effect of getting acknowledgment of the patentability of

the [isotactic polypropylene] claims over the present count of the product interference.

> We do not doubt the samples are having their effect on consideration of the *inter partes* [interference] issues in the Patent Office, but for the record they are presented and considered at this point only in relation to the [isotactic polypropylene prosecution], and because [this patent] is not in interference but is rejected on interference matters.[772]

This document does indicate that Peake viewed this Interference and the '300 prosecution as so closely intertwined that statements made in one could influence the other. In fact, however, the Examiners recognized the difference in procedures between the two actions and refused to discuss samples submitted in the '300 action until they were officially submitted in the Interference.[773] Since Phillips has failed to cite any specific instances in which the Examiners failed to keep submissions separated, this Court is reluctant to believe that the Examiners did not do so.

*Event IV; Montedison's Document Production.*

Finally, Phillips asks the Court to find fraud in Montedison's delayed production of documents first requested by Phillips in 1966 [774] relevant to reporting Capucci's ex-

---

**771.** P–579.

**772.** P–675, p. 11221.

**773.** As early as 1953 the Manual of Patent Examining Procedure (MPEP) began with the warning:

"§ 1111.01 *INTERVIEWS*—Where an interference is declared all questions involved therein are to be determined *inter partes*. This includes not only the question of priority of invention but all questions relative to the right of each of the parties to make the claims in issue or any claim suggested to be added to the issue and the question of the patentability of the claims.

The Examiners are admonished that *inter partes* questions should not be discussed *ex parte* with any of interested parties and that they should so inform applicants or their attorneys if any attempt is made to discuss *ex parte* these *inter partes* questions. (Notice of March 2, 1935)." M–839.

Later MPEP editions included similar warnings. Toulmin also stated in P–675:

"What we get out of it all is a resolve by the Patent Office to hold everybody up on any product claim for a polypropylene until all parties are heard by motion to avoid the final action by the Office being criticized as having been taken without giving each party its 'day in court'."

**774.** P–542. Among Phillips's requests were:

"All documents relating to the duplications or attempted duplication of any run on propylene polymerization described in Hogan and Banks' application Serial No. 333,576, filed January 27, 1953, in any United States patent issued thereon or foreign patent corresponding thereto, including without limitation . . . Australian Patent, 864/54, and United States Patent 2,852,721." *Id.*, p. 4.

periments and Montedison's efforts to suppress his results.[775] Phillips argues that it could have used these documents for rebutting claims that its 1953 application failed to disclose the product of the Interference Count.[776] The Court finds that this argument is admissible because documents concerning Capucci's experiments could have affected Phillips historical date of priority by virtue of their relevance to the Board's determination of Phillips's constructive reduction to practice date.

Phillips's argument regarding Event IV is rejected because Phillips has not shown that Montedison's failure to produce the requested documents was misleading. The facts that emerge are that Montedison initially assigned Dr. Georgio Moretti to search some of its files for the requested documents.[777] Moretti failed to discover some of the requested documents but did discover many other possibly relevant documents which he submitted to Montedison's American counsel.[778] Counsel then transmitted to Phillips many of the documents that Moretti had submitted but removed several documents[779] which Phillips now claims should have been produced.

Phillips has not adduced evidence that Montedison's failure to produce these documents was fraudulent. The Court will not infer facts which Phillips has failed to prove, since there are too many innocent explanations for Montedison's actions, especially in view of the size of this document production: it took Moretti 118 pages just to list succinctly the documents he supplied to Montedison's American patent counsel.[780]

Phillips also failed to carry its burden of proving that Montedison's omissions were material to the Board's Opinion, because an examination of the facts indicates that the Board, which was apparently anxious to bring to a close this long-standing Interference case, refused to spend its time considering data similar to that obtained by Capucci.[781] First, it refused to consider any information gathered in what were improperly labelled "*nunc pro tunc* experiments". In particular, the Board refused to consider very similar evidence concerning reproduction work performed by Du Pont's Eleuterio. Since evidence of Capucci's experiments would not have been considered, the Court finds that the failure to produce them was immaterial.

## STANDARD'S FRAUD CLAIMS AGAINST MONTEDISON

Standard first claims that Montedison performed experiments following the Field-Feller patent[782] and produced a product with a crystalline polypropylene content but in subsequent communications with the Examiners misrepresented or omitted informa-

---

775. Phillips claims that its request included documents P–578, P–579, P–644, P–645, P–653, P–662, P–675, P–677, P–930, P–592, P–599, P–620, P–631, P–929, P–655 and P–576, none of which were produced by Montedison. It is difficult, however, to see how Phillips's request can be interpreted to cover documents P–578, P–579, P–592, P–653, P–663, P–675 and P–677, since these documents generally discuss interference strategy without describing any reproduction efforts or including any data therefrom.

776. Phillips's Proposed Findings of Fact and Conclusions of Law, Part II, Fraud Issues, Nos. 169–189.

777. Moretti, p. 1728. Montedison's American patent counsel also searched through some of the files. *Id.*, p. 1765.

778. P–541.

779. *Cf.*, P–541, P–545 and P–546.

780. *See* P–541.

781. Montedison contends that its failure to comply with Phillips's document request was immaterial because it produced at least some of the requested documents to Du Pont, which permitted Phillips's attorney to review them, along with many others, for a "couple hours" during one afternoon. Montedison's Brief, *supra* note 65, at p. 116; Milan, pp. 1667–68. Montedison's argument is meritless, however. If Montedison deceitfully failed to supply the Patent Office Examiners with relevant information by violating a duty to so supply Phillips Montedison's action can be excused only if the Examiners, or at least Phillips, obtained the same information in another way. The fact that Phillips's patent attorney might have spent two hours in the vicinity of such information obviously fails to satisfy this requirement.

782. The Field-Feller, Patent No. 2,691,647 (S–578), issued October 12, 1954 on an application filed December 6, 1952 and is assigned to Standard Oil Company of Indiana. The patent discloses processes for the polymerization of ethylene and propylene, and is not relied upon by Standard for priority in the instant proceeding. Tr., pp. 10752–53.

tion concerning these results.[783] Specifically, Standard claims that Montedison, in attempting to distinguish Natta's product from those it had prepared following the Field-Feller patent, failed to disclose evidence of crystallinity in the product of its reproduction run designated 40–S, undertaken on July 25, 1956, and omitted to report that the products of its runs designated 58–S and 59–S, alleged reproductions of the Field-Feller process made on October 5 and 6, 1956, were crystalline polypropylene.

Standard does not contend that this alleged fraud affected the Board's determination of its historical date of priority.[784] It only contends that:

> [I]f such withheld information had been disclosed to the Board at Final Hearing, the Board might have made an appropriate recommendation to the Commissioner pursuant to Rule 259 of the Patent Office Rules of Practice and the Commissioner might have directed further proceedings to determine: the patentability of the count to Montedison; Montedison's right to remain in the interference; or the necessity of formulating the count differently.[785]

This Court has previously ruled that the parties' allegations of fraud concerning the results of tests performed by Montedison are not admissible "if the only relevance of those allegations is to establish the unpatentability of the Natta invention over prior art".[786] Since Standard's claims are raised

for the first time in this proceeding for the purpose of establishing the unpatentability of the Natta invention over prior art, and not the date upon which a party first reduced that invention to practice, they are inadmissible.[787]

Standard next alleges that between 1959 and 1965 Montedison performed reproduction experiments following the Zletz application, some of which yielded the product of the Count, and yet failed to fully inform the Examiners of these results.[788] Specifically, Standard claims that Montedison produced crystalline polypropylene in reproduction runs conducted during November 1961 and that Mazzanti excluded this information from an affidavit [789] filed with the Patent Office on January 8, 1962. In January and February, 1962 Montedison allegedly again produced crystalline polypropylene in runs designated Gamma–76 and –78 but failed to disclose these results to the Patent Office. Standard further claims that these suppressions enabled Montedison to denigrate the Zletz products and application by comparing them to the Field-Feller patent which Montedison had disparaged by suppressing the information discussed above.[790]

■ Since Montedison's allegedly bad acts related to the historical date of Zletz's actual reduction to practice, they are admissible. This Court finds, however, that even if true, Montedison's acts do not constitute fraud. Standard's claim for an actual reduction to practice was rejected because

---

**783.** Plaintiff Standard's Post Trial Brief On The Issues Relating To Montedison's Fraud, pp. 26–79 [hereinafter cited as "Standard's Fraud Brief"].

**784.** *See* text accompanying note 782, *supra.*

**785.** Standard's Fraud Brief, *supra* note 783, at p. 79.

**786.** 431 F.Supp. at 1071.

**787.** Standard also charges that Montedison's alleged fraud affected the determination of Montedison's priority date. Standard's Fraud Brief, *supra* note 783, at p. 76. Standard argues that if complete disclosure of the Field results had been made, the Examiner might have found that the Count was unpatentable to Montedison and prevented it from participating

in the Interference. This effect, however, would only be relevant to the question of patentability to Montedison and not to determination of an historical date of priority which is the sole question allowable there. This claim is therefore also not admissible in the instant proceeding.

**788.** Standard's Fraud Brief, *supra* note 783, at pp. 103–48.

**789.** S–660.

**790.** Standard's Fraud Brief, *supra* note 783, at pp. 76, 103.

Standard failed to prove production, recognition, and utility for its product.[791] Evidence of subsequent testing of a party's product is admissible to prove that the party obtained a product by a certain date. Standard has not produced, nor has the Court found, however, support for the much broader rule that evidence concerning a product produced by a third party in a reproduction run subsequent to a claimed priority date is admissible to establish recognition on the part of the claiming party of the product or of its utility. The information withheld by Montedison could therefore not have affected the Board's ultimate opinion concerning Standard's actual reduction to practice claim, especially since Standard's case regarding the utility of its products was extremely weak.

Standard also alleges that Montedison's actions might have harmed Standard's constructive reduction to practice claim.[792] Assuming arguendo that Montedison misrepresented the facts by failing to inform the Board of positive results of experiments performed following Zletz's disclosures, this Court does not see how this suppression might have affected the Board's Opinion, since the Board ultimately decided this issue in favor of Standard and against Montedison. This allegation is therefore denied.

Finally, Standard alleges that Montedison improperly engaged in a series of actions, involving especially DeVarda's interview,[793] Toulmin's affidavit,[794] and Peake's sample presentation,[795] that were designed to improperly influence the Examiner's decisions on the issues raised in the course of the Interference.[796] Standard claims that such contacts constituted instances of unclean hands which "should cause this Court to disaffirm the award to Montedison . .[,] to withhold relief from the acting party and to remedy the wrong done other parties, the public institutions, and the public itself".[797]

This Court finds these fraud in the air claims inadmissible because they are not relevant to the question of the historical date of priority of a party but relate instead to the question of Montedison's right to enforce a patent. Even if these claims are admissible, Standard has not established that Montedison's acts were fraudulent as to Standard. Standard has not established that the various contacts were at all material to the Board's determination of its actual reduction to practice claim. Standard produced no evidence that DeVarda or any of Montedison's other employees knew or suspected that Zletz, whose application was not filed until five months after Natta's date of priority, produced crystalline polypropylene prior to Natta. Finally, Standard did not adduce evidence that the contacts that occurred in the context of Montedison's prosecution of its '300 patent might have exerted any influence on the Examiners involved in this Interference.

## DU PONT'S FRAUD CLAIMS AGAINST MONTEDISON

Du Pont claims that Montedison misrepresented information concerning Du Pont's products to the Patent Office and that these misrepresentations so influenced the Board that it was unable to assess accurately the utility of Du Pont's products.[798] Du Pont's objections stem from Toulmin's affi-

791. See text accompanying notes 229, 230, supra.

792. Standard's Fraud Brief, supra note 783, at pp. 127–48.

793. See text following note 698, supra.

794. See text following note 759, supra.

795. See text following note 761, supra.

796. Standard's Fraud Brief, supra note 783, at pp. 148–86.

797. Id., p. 152.

798. Du Pont argues: "Montedison attempted to affect and probably succeeded in affecting the outcome of Interference 89,634 by actions taken in its copending divisional application. . . Montedison [thus] set up a scheme to disparage before the Patent Office officials who Montedison knew would decide the motions, the utility of the Baxter et al. product and at the same time make the products of its own early application appear more attractive than they actually were." Du Pont's Brief, supra note 70, at p. 108.

davit submission and Peake's sample presentation, both of which occurred in the prosecution of the separate '300 patent application.

The Court finds that this claim is admissible because it is sufficiently related to the question of Du Pont's historical priority date. Since Du Pont failed to adduce any evidence showing that these actions should be viewed as misrepresentations in this Interference or that these actions might have influenced the Board, however, this Court finds no fraud.

Du Pont did not establish that Montedison's actions in the '300 prosecution constituted misrepresentations in this Interference, nor did it offer evidence that these actions might have affected the Examiners working on this Interference since the Board found that Du Pont failed to establish *any* of the three elements necessary to an actual reduction to practice: production of the product of the Count, recognition that the product corresponding to the Count, and recognition of a utility for the product.[799] Even if Du Pont's claim that there is a connection between the Examiners' determination and Montedison's alleged misrepresentations regarding utility is true, the application would still have been denied on the basis of the two other deficiencies. There is no possibility, therefore, that Montedison's possible fraud could have affected the Examiners' ultimate decision.

## MONTEDISON'S AND DU PONT'S FRAUD CLAIMS AGAINST PHILLIPS

Montedison's first fraud claim concerns the 1956 American application [800] which formed the basis for Phillips's invitation to join this Interference. This application was based on information contained in Phillips's first Australian patent application.[801] Montedison claims that Phillips should have informed the Patent Office that the first Australian application had been laid open for public inspection more than one year prior to the filing date of its 1956 application.[802] Montedison claims that had Phillips so informed the Patent Office, Phillips's 1956 application would have been found unpatentable over its first Australian application under 35 U.S.C. § 102(b), which provides:

> A person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Phillips would thus have been denied admission to this Interference.

This issue was neither raised before the Board nor pleaded in this proceeding. Rather, it arose for the first time, apparently as an afterthought, in Montedison's Brief.[803] Since Montedison failed to plead this claim in time for Phillips to prepare to meet it, it is inadmissible as a fraud claim in this action. Assuming *arguendo* that Montedison's claim is admissible, it is meritless. Montedison asserts that the opening of the Australian patent to public inspection on December 9, 1954 constituted "printed publication" for the purpose of § 102(b). Case law shows, however, that opening an application for public inspection does not itself constitute "printing" for § 102(b).[804] Rather, the application must literally be printed. The mere fact that Phillips's first Australian application was

**799.** *See* text accompanying note 136, *supra.*

**800.** No. 558,530, filed January 11, 1956; D–648. *See* note 702, *supra.*

**801.** *See* note 702, *supra.*

**802.** Montedison's Brief, *supra* note 65, at p. 64.

**803.** *Id.*

**804.** *Phillips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronic Industries, Inc.,* 311 F.Supp. 17, 185 U.S.P.Q. 185 (D.N.J. 1970), aff'd, 450 F.2d 1164 (3d Cir. 1971); *In re Tenney, Frank and Knox,* 117 U.S.P.Q. 348 (C.C.P.A.1958); *Ex Parte Ha-ler,* 103 U.S.P.Q. 332 (Bd.App.1953).

laid open to public inspection does therefore not establish a violation of the statute.

Montedison, joined by Du Pont, also allege that Phillips copied into its 1956 application data published by Natta.[805] Specifically, Montedison faults Phillips's application for using both the term "crystalline" and the idea of relying upon x-ray analysis as proof of crystallinity. Du Pont faults Phillips only for appropriating the term "crystalline". Both parties allege that as a result of these acts, Phillips fraudulently gained entry to this Interference.

If Phillips had read Natta's disclosure, followed it, produced a conforming product for the first time, and then applied for a patent, the Court might well find fraud. Phillips did not however engage in this devious chain of activity, but merely executed Natta's tests on products that it had independently conceived and produced, in order to sharpen the issues before the Examiners.[806] The Court does not find that this activity rises to the level of misrepresentation and therefore does not find fraud.

Montedison [807] and Du Pont [808] also allege that Phillips supported its 1956 application by submitting misleading affidavits by Thornton [809] and Hogan and Banks [810] that were inconsistent with P–56, a 1952 inhouse report written contemporaneously with Phillips's experiments.[811] Specifically, Montedison and Du Pont allege that these affidavits should have revealed that P–56 failed to characterize Phillips's products as crystalline and that it affirmatively stated that the recurring propylene unit structure had been eliminated as a possible structure for Phillips's product.[812]

The Court is unconvinced that these affidavits were fraudulent. They were submitted on June 7, 1957 in order to overcome a Patent Office rejection [813] of some of the claims in Phillips's 1956 application based on a reference published by Natta in the Journal of the American Chemical Society.[814] The affidavits honestly stated that Phillips had produced the product of the Count in 1952, and that at some intervening time the product had been conclusively determined to contain a crystalline structure. The report contained infrared spectra that conclusively evidenced the presence of recurring propylene units and propylene type crystallinity. Phillips later submitted P–56 to the Board and forcefully drew the Board's attention to it.[815] There is no reason to assume that the Patent Office might have been misled by Phillips's submission. The Court thus finds that these fraud claims are without merit.

Finally, Du Pont points out that Phillips's 1953 application disclosed production of a crude product containing 10.2% solids, while in subsequently attempting to overcome a Patent Office rejection of that application, Phillips offered an affidavit stating that 90% of the crude was solid.[816] Phillips states that Du Pont builds a fraud case on this alleged inconsistency.[817] This Court does not find that this claim was either raised before the Board or pleaded in the instant action. It is therefore not admissible in the present proceeding. If this claim were admissible, this Court would nevertheless hold that the latter statement was clearly mistaken, and that it was neither misleading nor material.

## PATENTABILITY

Although the parties do not raise the general issue of whether the invention at

805. Montedison's Reply Brief, *supra* note 65, at p. 31; Du Pont's Brief, *supra* note 70, at p. 177.

806. *Cf., Goodrich v. Harmsen*, 442 F.2d 377, 58 C.C.P.A. 1144 (1971).

807. Montedison's Reply Brief, *supra* note 65, at p. 31.

808. Du Pont's Brief, *supra* note 70, at p. 176.

809. D–648, p. 74.

810. *Id.*, p. 45.

811. *See* text accompanying notes 433, 435, *supra*.

812. P–56, p. 8.

813. D–648, p. 34.

814. D–387.

815. Interference Paper No. 720, pp. 108–20.

816. Du Pont's Proposed Findings of Fact and Conclusions of Law, I.G. 26–28.

817. Phillips's Brief, *supra* note 131, at pp. 410–11.

issue here is actually patentable to Phillips, this Court believes that the issue must be decided. In *Hill v. Wooster*,[818] Wooster and Hill sought a patent for a "cabinet creamery". The Patent Office awarded priority to Hill, but the Circuit Court for the District of Vermont reversed this finding and awarded priority to Wooster. The lower court failed to address the patentability question which the parties to the suit apparently were willing to ignore. The Supreme Court held, however, that "neither the Circuit Court nor this Court can overlook the question of patentability".[819] Consideration of this issue was mandated by Section 4915 of the Revised Statutes which provided that if a Circuit Court adjudges an applicant entitled to receive a patent for his invention, the Court shall authorize the Commissioner to issue the patent:

> It necessarily follows that no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention. The litigation between the parties on this bill cannot be concluded by solely determining an issue as to which of them in fact first made a cabinet creamery. A determination of that issue alone, in favor of the applicant, carrying with it, as it does, authority to the Commissioner to issue a patent to him for the claims in interference, would necessarily give the sanction of the court to the patentability of the invention involved.[820]

*Hill v. Wooster's* viability was retained in 1952 when Section 4915 was codified and re-enacted as 35 U.S.C. § 146. Section 146 still provides that a reviewing Court shall authorize the issuance of a patent, and Congress has not intimated that this phrase should be interpreted any differently than it was in *Hill v. Wooster*. Case law has,

however, limited the situations in which it must be applied. In *Sanford v. Kepner*,[821] the Supreme Court held that as long as the reviewing Court agreed with the Board's Opinion it need not consider patentability. Thus if this Court had decided priority in favor of Montedison, it would be unnecessary to decide whether solid crystalline polypropylene is a patentable invention. Since this Court does not agree with the Board's finding, however, this case presents a situation identical to that in *Hill v. Wooster* and the patentability issues must now be considered.

Patentability generally includes at least three questions:[822] usefulness,[823] novelty[824] and non-obviousness.[825] In light of the previous discussion regarding the utility of Phillips's product, this Court finds that the product is useful either as a wax modifier or as a solid plastic. The Court also finds that Phillips's product was novel and non-obvious. As early as 1949 the Primary Examiners were required to determine that an invention is patentable prior to the declaration of an interference. Patent Office Rule 201 thus provides:

> (a) An interference is a proceeding instituted for the purpose of determining the question of priority of invention between two or more parties claiming substantially the same patentable invention and may be instituted as soon as it is determined that common patentable subject matter is claimed in a plurality of applications or in an application and a patent.[826]

In the instant case, the Primary Examiner extensively considered the novelty and non-obviousness issues in determining the Count's proper wording. Shortly after the Interference was declared, the parties began attempting on August 3, 1957 to amend

**818.** 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1889).

**819.** *Id.*, p. 698, 10 S.Ct. p. 230.

**820.** 132 U.S. at 698, 10 S.Ct. at 230.

**821.** 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952).

**822.** Rosenberg, Patent Law Fundamentals, pp. 116–17 (1975).

**823.** 35 U.S.C. § 101.

**824.** 35 U.S.C. §§ 101, 102.

**825.** 35 U.S.C. § 103.

**826.** 37 C.F.R. § 1.201.

the initial wording of the Count, claiming that the Count's description failed to distinguish the invention as novel over prior art. For example, Phillips attacked the original Count for failing to require that the crystalline component be substantial rather than insignificant, and sought to substitute counts reading:

A. A solid polypropylene having a density in the range of about 0.90 to about 0.96.

B. A solid polypropylene having a density in the range of about 0.885 to about 0.96.[827]

Montedison attacked the original Count as vague, apparently because it failed to require that the product contain substantial crystallinity[828] and because the original Count might have been interpreted to cover ethylene-propylene copolymers as well as propylene homopolymers.[829] Although Du Pont did not attack the wording of the original Count, it asked that the Count be interpreted so as to cover only homopolymers of polypropylene.[830]

During the next three years, the parties battled over these and other motions submitting nearly one hundred papers containing about one thousand pages of legal and scientific discussion seeking to clarify the language of the Count so as to leave no doubt that the defined invention was novel and non-obvious. The Primary Examiner denied the parties' motions on June 4, 1962 but on his own motion rephrased the Count to its present formulation, concluding: "the substituted count defines a novel and patentable solid polypropylene".[831] At the parties' request, the Primary Examiner subsequently reconsidered his decision but did not change it.[832] Following unsuccessful appeals to the Commissioner of Patents,[833] the parties ceased to question the Examin-

ers' decision. After the Board awarded priority to Montedison in 1971, the Patent Office immediately resumed consideration of the patentability issues concerning Montedison's patent application. The record concerning patentability was so thorough and dispositive that a full-time patent examiner felt that further work was unnecessary and that claims based upon the Interference Count were "allowable".[834]

This Court has carefully studied the records and finds that the product of the Count was novel and non-obvious. The Court accordingly finds that Phillips invention, being the product of the Count, is patentable to Phillips and that the Commissioner should be authorized to issue to Phillips the patent for solid crystalline polypropylene.

Any issues not specifically addressed in this Opinion have nevertheless been considered by this Court and found to be without merit. The foregoing Opinion constitutes this Court's Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52.

## SUPPLEMENTAL OPINION

Shortly after releasing its Opinion of January 11, 1980, this Court requested that Phillips prepare and circulate among the parties a draft order conforming to the Opinion. Montedison and Standard objected to the inclusion of the proposed fifth paragraph, which provided:

5. That the invention of the count in issue is novel, useful and unobvious, and is patentable to John Paul Hogan and Robert L. Banks, and they and their assignee, the Phillips Petroleum Company, are entitled according to law to receive and have duly issued United States Letters Patent for the invention of said count.

827. Interference Paper No. 32.

828. Interference Paper No. 35.

829. Interference Paper No. 41.

830. Interference Paper No. 28.

831. Interference Paper No. 179.

832. Interference Paper No. 171.

833. Interference Paper No. 132.

834. P–945, Paper No. 1.

Montedison and Standard claim that this Court was not required to decide whether solid crystalline polypropylene was patentable to Phillips and that this question should have been left for the Patent Office's determination.

The question of whether the general issue of patentability to Phillips should be determined was not raised by the parties during the course of the Interference proceeding, but occurred to the Court only as it neared completion of its Opinion, long after the submission of the parties' briefs. At that time, the Court considered requesting additional briefing on the necessity for determining patentability issues in a 35 U.S.C. § 146 proceeding. Such a course, however, might have signalled that the question of priority had been resolved against Montedison, since *Sanford v. Kepner*, 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952), clearly holds that a District Court need not discuss the patentability issue as long as it agrees with the Board of Interferences's decision. A request for additional briefing prior to release of the Opinion would have placed the attorneys for Du Pont, Standard, and Phillips in a difficult position since they would not have known which position to articulate on the necessity for considering the issue of patentability in order to best serve their clients' interests. For these reasons, the Court decided to address the question of patentability to Phillips in its Opinion and thereafter to permit the parties to address this decision prior to the filing of the final order.

Following this procedure, this Court considered the objections of Montedison and Standard and thoroughly reviewed its Opinion regarding the necessity for determining the issue of patentability to Phillips. The Court invited the parties, in its letter dated February 6, 1980, to consider about a dozen cases, *General Motors Corp. v. R. E. Deitz Co.*, 137 U.S.App.D.C. 100, 420 F.2d 1303 (D.C.Cir.1969); *Pure Oil v. Socony-Vacuum Oil Co.*, 94 U.S.App.D.C. 86, 212 F.2d 454 (D.C.Cir.1954); *Knutson v. Gallsworthy*, 82 U.S.App.D.C. 304, 164 F.2d 497 (D.C.Cir.

1947); *Cleveland Trust Co. v. Berry*, 99 F.2d 517 (6th Cir. 1938); *Potter Instrument Co. v. Mohawk Data Sciences Corporation*, 309 F.Supp. 866 (S.D.N.Y.1969); *E. I. du Pont de Nemours & Co. v. Celanese Corp.*, 291 F.Supp. 428 (S.D.N.Y.1968); *Sperry Rand Corp. v. Bell Telephone Laboratories, Inc.*, 208 F.Supp. 598 (S.D.N.Y.1962); *Turchan v. Bailey Meter Company*, 19 F.R.D. 201 (D.Del.1956); *Shell Development Co. v. Universal Oil Products Co.*, 61 F.Supp. 925 (D.Del.1954); *Keefe v. Gora*, 61 F.Supp. 629 (D.Conn.1944), that it had previously studied, to submit additional briefing and, insofar as they felt it might be useful, to participate in oral argument. The Court has now determined that its prior decision was legally correct.

█ The Court notes in its January 11th Opinion the equivalence between the facts presented in this case and those of *Hill v. Wooster*, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1890). The only real question concerns the continued vitality of that ninety year old precedent. Unless or until its rule is modified, a court that overrules the Board of Patent Interferences and decides in favor of an appealing plaintiff must consider all questions of patentability to that plaintiff, whether or not the parties to a 35 U.S.C. § 146 proceeding actually raise those questions.

Montedison insists that subsequent statutes modified the *Hill v. Wooster* rule. The relevant portion of R.S. 4915, considered by the court in *Hill v. Wooster*, however, initially provided:

> . . . . And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the patent-office a copy of the adjudication, and otherwise complying with the requirements of law. . . .

Congress has altered this sentence only once, in 1952, changing it to read:

> . . . Judgment of the court in favor of the right of an applicant to a patent shall authorize the Commissioner to issue such patent on the filing in the Patent

and Trademark Office of a certified copy of the judgment and on compliance with the requirements of law.

35 U.S.C. § 146.

According to the accompanying Senate Report, the 1952 alterations, which were considered and enacted in the context of a general patent law codification, were considered insignificant:

The next chapter [§§ 141–146] relates to the review of Patent Office decisions.

. . . . .

This group of sections makes no fundamental change in the various appeals and other review of Patent Office Action, but has made a few changes in the procedure in various instances to correct some of the problems which have arisen, particularly in Section 146. These details are mainly procedural.[1]

Montedison notes that the first portion of R.S. 4915 provided:

Whenever a patent on application is refused, either by the commissioners of Patents or by the Supreme Court of the District of Columbia upon the appeal from the Commissioner, the applicant may have remedy by bill in equity . . .

In contrast, § 146 now provides:

Any party to an interference dissatisfied with the decision of the board of patent interferences *on the question of priority,* may have remedy by civil action . .. (emphasis added). .

Montedison contends that the addition of the new language " 'on the question of priority' . . . can only be read as a legislative decision that limited the scope of

review in a § 146" to questions of priority and excluded all questions of patentability.

Montedison's argument misconstrues the added language. The original § 4915 failed to distinguish among the various appealable Patent Office decisions refusing a patent. All such decisions received identical treatment under § 4915. In codifying the patent law, Congress sought to vary the appeals procedures for different Patent Office decisions. Section 145 was thus enacted to control appeals from decisions by the Board of Patent Appeals and § 146 to control appeals from decisions by the Board of Patent Interferences on the question of priority. Once a plaintiff brings the latter type of appeal, as Du Pont, Standard and Phillips did here, the case is governed by § 146, which does not alter the basic nature of the appeal. *E. I. du Pont de Nemours & Co. v. Celanese Corporation,* 291 F.Supp. 428, 432 n. 3 (S.D.N.Y.1965), expressly rejects Montedison's argument relating to possible language changes, and a number of recent cases indicate the continued application of *Hill v. Wooster* to § 146 proceedings.

In *Sanford v. Kepner,* the Supreme Court noted, "The principle of the *Hill* case is that the court must decide whether claims show patentable inventions before authorizing the Commissioner to issue a patent." *Id.* 344 U.S. at 15, 73 S.Ct. at 76. Rather than overruling this principle, the court merely distinguished the fact situation presented by *Sanford,* a case in which the lower court decided against the plaintiff, from that presented in *Hill v. Wooster* where the lower court decision favored the plaintiff, and concluded that "only if the [plaintiff] wins on priority" does the statute require a court to find that the invention is patentable to

---

1. In later sections, the Report specifically identified the changes:

The first paragraph and parts of the second paragraph [of § 146] are based on title 35, U.S.C., 1946 ed., § 63 (R.S. 4915, amended (1) Mar. 2, 1927, Ch. 273, § 11, 44 Stat. 1336, (2) Mar. 2, 1929, Ch. 488, § 2(b), 45 Stat. 1476, (3) Aug. 5, 1939, Ch. 451, § 4, 53 Stat. 1212), limited to interferences and making some changes. The action is not restricted to applicants, but a patentee may also bring the action. The time for bringing the action is made the same as for appeals.

In the second paragraph the first sentence is new and eliminates difficulties arising from unrecorded interests.

The second sentence is based on 35 U.S.C., 1946 ed., § 72a (Mar. 3, 1927, Ch. 364, 44 Stat. 1394, reenacted Oct. 31, 1951, Ch. 655, § 53a, 65 Stat. 728) with changes in language.

The fourth sentence is new and prevents such suits from being filed against the Commissioner as a defendant; however, the Commissioner has the right to intervene.

Language is changed.

that plaintiff before authorizing the Commissioner to issue a patent.

*General Motors Corp. v. R. E. Dietz Co.,* 137 U.S.App.D.C. 100, 420 F.2d 1303 (D.C. Cir.1969) presented a situation similar to that of *Sanford.* In refusing to consider the patentability issue there, the Court noted: "The Supreme Court [has] held that only if the District Court finds priority in the [plaintiff] may it, as a necessary corollary of the power to authorize issuance of a patent, reach the issue of patentability." *Id.* 137 U.S.App.D.C. at 102, 420 F.2d at 1305.

In *Pure Oil Co. v. Socony-Vacuum Oil Co.,* 94 U.S.App.D.C. 86, 212 F.2d 454 (D.C. Cir.1954), the Interference Board found that Pure Oil, rather than Shell Development Company or Socony, had priority to the involved invention. The District Court reversed, finding "that, if the count be patentable, Socony is entitled to the patent." 111 F.Supp. 197, 201 (D.D.C.1953):

> . . . Even though the parties to an action under § 4915 are willing to ignore the question of patentability and to litigate merely the question of priority, the court cannot overlook the question of patentability, since no adjudication can be made in favor of any applicant unless his alleged invention is a patentable one *.
>
> * *Hill v. Wooster,* 132 U.S. 693, 698, 10 S.Ct. 228, 33 L.Ed. 502.
>
> Inasmuch as the court finds that Socony is entitled to priority rather than Pure Oil, the issue of patentability must be determined in this case.

*Id.* at 208. The District Court proceeded to determine whether the product of the Count was patentable to any of the parties. One factor that strongly influenced the Court was the fact that the Patent Office had previously ruled that the Interference Count was patentable.

> . . . Since it was the view of the Patent Office that the subject of the interference count is patentable, the Patent Office must have determined that the disclosure is not included in any prior patent issued to . . . .. [Socony's as-

**2.** Indeed, the Circuit Court held that the District Court had properly considered patentabili-

signee]. The strong presumption of the correctness of the decision of the Patent Office as to patentability must be overcome by evidence that it is clearly erroneous. There is no such evidence in the instant case.

For the foregoing reasons, the court holds that the interference count is patentable as to . . .. [Socony's assignee].

*Id.* at 210. The Circuit Court affirmed, ruling:

> . . . Under the doctrine of *Hill v. Wooster,* 1890, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502, the court could not properly hold that a plaintiff under Rev.Stat. § 4915 . . . was entitled to a patent unless it could make an affirmative finding that the claim was patentable. Likewise, if the court found the claim unpatentable, it could not grant the relief sought. . . .

212 F.2d 454, 457.[2]

In *Sperry Rand Corp. v. Bell Telephone Laboratories, Inc.,* 208 F.Supp. 598 (S.D.N. Y.1962), the Court again overturned the Interference Board and ruled in favor of a plaintiff.

> It appears that in a Section 146 proceeding where the issue of priority is resolved in favor of the plaintiff the court is required to consider whether the plaintiff is in all respects entitled to a patent. *Hill v. Wooster,* 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1890); *Sinko Tool & Mfg. Co. v. Automatic Devices Corp.,* 136 F.2d 186, 189 (2d Cir. 1943); *Wiegand v. Dover Mfg. Co.,* 292 F. 255 (N.D.Ohio 1923).
>
> In *Sanford v. Kepner,* 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952) it was held that in a Section 146 proceeding where the plaintiff had not established priority, the court was not required to pass on the patentability of the defendant's invention. . . .

. . . . .

> The situation is entirely different, however, where the *plaintiff* is able to establish priority, since it then becomes necessary for the Court to adjudicate the ques-

ty to a losing plaintiff (Shell Oil) and to a losing defendant (Pure Oil).

tion of patentability of the *plaintiff's* invention in order to be able to direct the Commissioner to issue a patent to the plaintiffs. *Hill v. Wooster*, supra. (emphasis in original).

*Id.* at 602 (footnote omitted).

The Court then considered whether the invention was patentable to the plaintiff. Once again the fact that the Patent Office had previously decided patentability significantly influenced the Court:

There seems no reason for the Court to review the question of patentability any further, inasmuch as the Patent Office by its earlier grant of a patent to the defendant has recognized that the invention here at issue was a "new and useful" machine within the meaning of 35 U.S.C. § 101 and that it was not an obvious improvement in the prior art so as to be barred under 35 U.S.C. § 103. This aspect of the invention, which was favorably passed on by the Patent Office, is not contested and need not be further considered.

*Id.* at 605.

In *Potter Instrument Co. v. Mohawk Data Sciences Corp.*, 309 F.Supp. 866 (S.D. N.Y.1969), plaintiff sought to amend his complaint to litigate whether the product of an interference count was patentable to the defendant in whose favor the Board had ruled. The Court refused plaintiff's motion, noting:

I am not presented herein, as the Court was in *Sperry Rand Corp. v. Bell Tel. Laboratories, Inc.*, 208 F.Supp. 598 (S.D. N.Y.1962), appeal dismissed, 317 F.2d 491 (2d Cir. 1963), with a situation where the plaintiff is able to establish priority and it therefore becomes necessary for the Court to adjudicate the question of the patentability of plaintiff's invention in order to direct the issuance of a patent to plaintiff. The present situation, rather, is analogous to *Sanford v. Kepner*, 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952), where it was held that if the trial court decides the factual issue of priority against plaintiff and thus affirms the Patent Office, plaintiff has obtained the full remedy the statute gives him. . .

*Id.* at 868.

*Turchan v. Bailey Meter Company*, 19 F.R.D. 201 (D.Del.1956), presented a situation where the licensee of an interference party against whom the Board of Patent Interferences had decided, sought to participate in a § 146 action. The licensee conceded that the interference parties would fully litigate the priority issue, but it wanted to litigate whether the invention was patentable to the defendant. Judge Rodney noted:

There is thus raised again the question of whether in a proceeding under 35 U.S.C. § 146 if the plaintiff does not establish priority the Court should or may proceed further and consider the question of validity. Stemming from *Hill v. Wooster*, it is well established that if priority is accorded to the plaintiff the Court should then proceed to determine validity. This is because the Court having established priority would adjudge the plaintiff to be entitled to a patent and this should not be done unless validity be also established. (footnotes omitted).

*Id.* at 208. Judge Rodney then distinguished *Hill v. Wooster* from the situation in *Sanford v. Kepner* by which his case was governed.

Since the codification of § 146, then, *Hill v. Wooster* has been widely viewed as a viable precedent requiring a District Court, in overturning a Board of Interference decision, to determine patentability to the prevailing plaintiff.

■ Standard argues that the prior decisions of this Court and the Third Circuit in this case, *Standard Oil Co. v. Montedison, S.p.A.*, 540 F.2d 611 (3d Cir. 1976); *Standard Oil Co. v. Montedison, S.p.A.*, 431 F.Supp. 1064 (D.Del.1977), negated the *Hill v. Wooster* rule. Standard misconstrues these earlier cases which determined what fraud issues might be raised for the first time in a § 146 proceeding. These decisions permitted the parties to allege and prove fraud affecting the historical date of a party's priority, an issue that is especially important in a § 146 action which is "as the Supreme Court pointed out in *Sanford v.*

*Kepner*, (citations omitted) . . . in the first instance directed solely to the review of the decision of the Board on the factual issues of priority . . . ." 540 F.2d 611. If an applicant commits fraud relating to the historical date of a party's priority and another applicant is thereby hindered from prosecuting its priority position, it is important to correct for the effect of that fraud before priority is finally determined, and a possibly well deserving party is denied priority. A reviewing court must therefore consider claims of fraud relating to the historical date of a party's priority, and, if fraud has harmfully affected the Patent Office's findings regarding a party's priority date, the Court must overturn those findings and independently reassess the submitted evidence.

Standard, however, sought to amend its complaint to charge an entirely different kind of fraud, the type that might have produced an unjustifiably favorable decision regarding the question of patentability. If a party to an interference prevails, and a patent issues, enforcement of the patent can only be effectuated in a subsequent infringement suit, where patentability, including fraud issues relating to that question, may then be examined. If the court in the infringement action ultimately determines that the invention was not patentable, it can invalidate the alleged patent rights. Since possible frauds favorably affecting the patentability of an invention may be thus corrected for in an infringement proceeding, there is no need to consider them in connection with an interference. The earlier decisions in this case thus prevented a party from amending its complaint to raise possible fraud issues in connection with patentability. They did not prevent any party from raising patentability issues.

Montedison finally claims that none of the parties addressed the patentability issue in this § 146 proceeding, and that it is therefore improper to decide the issue. Montedison's argument, however, ignores the fact that the parties, particularly Montedison, used this § 146 proceeding to address patentability issues, albeit narrow ones. Indeed, Montedison raised a patentability issue against Phillips,[3] Phillips responded,[4] Phillips raised patentability issues against the other parties,[5] and Montedison [6] and Standard [7] responded.

Moreover, Montedison's argument ignores the situation presented in *Hill v. Wooster*, where, although the Patent Office, the lower courts, and the parties all failed to address patentability issues, the Supreme Court nonetheless decided patentability. Rather than demonstrating that this Court should not consider patentability to Phillips, Montedison's point demonstrates that the product of the Count is in fact patentable to Phillips. A number of courts place more weight upon the Patent Office's determination of patentability when the parties do not challenge this determination during the § 146 trial and subsequent briefing. *See e. g. Sperry Rand Corp. v. Bell Telephone Laboratories, Inc.*, 208 F.Supp. 598 (S.D.N.Y.1962); *Pure Oil Co. v. Socony-Vacuum Oil Co.*, 94 U.S.App.D.C. 86, 212 F.2d 454 (D.C. Cir.1954).

In sum, *Hill v. Wooster* requires this Court to determine whether solid crystalline polypropylene is patentable to Phillips. A careful study of all the evidence submitted in this proceeding and before the Patent Office shows that the product of the Count is patentable to Phillips. This Court accordingly authorizes the issuance of a patent to Phillips and signs the Phillips proposed order, including the controversial fifth paragraph.

**3.** Montedison's Main Brief After Trial, pp. 16–17. Montedison's arguments are discussed in the text accompanying footnotes 637–641 and 647–649 of this Court's January 11, 1980 Opinion.

**4.** Phillips's Reply Brief, pp. 7–8.

**5.** Phillips's Brief, pp. 209–212. Since the Court decided priority for Phillips, it was unnecessary to reach this issue.

**6.** Montedison's Main Brief After Trial, pp. 60–64.

**7.** Post Trial Brief of Plaintiff Standard Oil Company (Indiana) With Respect to Priority, pp. 169–170; Reply Brief of Plaintiff Standard Oil Company (Indiana) With Respect to Priority, p. 90.